**ROPES & GRAY LLP**
John D. Donovan (*pro hac vice forthcoming*)
john.donovan@ropesgray.com
Robert A. Skinner (*pro hac vice*)
robert.skinner@ropesgray.com
Amy D. Roy (*pro hac vice*)
amy.roy@ropesgray.com
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951 7000
Fax: (617) 951 7050

**IRELL & MANELLA LLP**
David Siegel (101355)
dsiegel@irell.com
Glenn K. Vanzura (238057)
gvanzura@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277 1010
Fax: (310) 203 7199

Attorneys for Defendant
METROPOLITAN WEST ASSET
MANAGEMENT, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| THOMAS J. KENNIS,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN WEST ASSET MANAGEMENT, LLC,<br><br>Defendant. | Case No. 2:15-cv-08162-GW-FFM<br><br>**DEFENDANT METROPOLITAN WEST ASSET MANAGEMENT LLC'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: March 17, 2016<br>Time: 8:30 a.m.<br>Courtroom: 10<br>Judge: Hon. George H. Wu |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on March 17, 2016, at 8:30 a.m., or as soon thereafter as this matter may be heard in the Courtroom of the Honorable George H. Wu, United States District Judge, Central District of California, Western Division, located at 312 N. Spring Street, Courtroom 10, Los Angeles, California 90012, Defendant Metropolitan West Asset Management, LLC ("MetWest" or "Defendant"), by and through its counsel, will and hereby does move the Court for an order dismissing the Complaint filed in the above-captioned action against MetWest pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on December 10, 2015 between Robert A. Skinner of Ropes & Gray LLP, counsel for MetWest, and Ana Cabassa-Torres of Zwerling, Schachter & Zwerling, LLP, counsel for plaintiff.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities and Request for Judicial Notice filed herewith, the Supporting Declaration of Robert A. Skinner, and all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion, and any other evidence and argument the Court may consider.

| | |
|---|---|
| 1 | December 18, 2015 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |

December 18, 2015

Respectfully submitted,

**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice forthcoming*)
Robert A. Skinner (*pro hac vice*)
Amy D. Roy (*pro hac vice*)

**IRELL & MANELLA LLP**
David Siegel
Glenn K. Vanzura

By: */s/ Glenn K. Vanzura*
  Glenn K. Vanzura

*Attorneys for Defendant Metropolitan West Asset Management, LLC*

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................................ 3

    A.   Mutual Funds and the Investment Company Act of 1940 ........................ 3

    B.   MetWest and the Total Return Bond Fund ............................................. 5

    C.   Advisory Agreement and Fees ................................................................ 6

    D.   The Sub-Advised Funds .......................................................................... 8

    E.   Approval of IMA and Fees by Statutorily Independent Trustees .......... 11

    F.   The Fund's Shareholders Overwhelmingly Approved the IMA and Fees Twice in Recent Years ................................................................ 13

ARGUMENT ................................................................................................ 15

I.   THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE ADVISORY FEES UNDER SECTION 36(B) OF THE ICA ...... 15

    A.   Legal Standard for Pleading a Section 36(b) Claim .............................. 15

    B.   The Complaint Alleges No Facts Regarding the Fees Paid for Analogous Services by Comparable Mutual Funds, and It Therefore Says Nothing About the Arm's-Length "Bargaining Range" for the Challenged Fee .............................................................. 17

    C.   The Complaint is Based Entirely on Inapt Comparisons and Conclusory Allegations of the Very Type Rejected by the Ninth Circuit in Turner .................................................................................... 21

        1.   Comparison to Sub-Advised Funds .................................................. 21

        2.   Economies of Scale .......................................................................... 24

        3.   Board Independence and Conscientiousness ..................................... 26

    D.   Plaintiff's Passing Reference to Other "Gartenberg Factors" Provides No Basis for a Claim that the Fees were Outside an Arm's-length Range ................................................................................ 30

II.  SECTION 47 PROVIDES NO SEPARATE BASIS FOR A CLAIM ................ 31

CONCLUSION ................................................................................................ 32

# TABLE OF AUTHORITIES

CASES

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
    464 F.3d 338 (2d Cir. 2006)...................................................................27, 28, 30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................1, 15, 26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................ 15

*Burks v. Lasker*,
    441 U.S. 471 (1979)................................................................................. 3

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
    590 F.3d 806 (9th Cir. 2010)............................................................... 15, 30

*Curran v. Principal Mgmt. Corp., LLC*,
    No. 4:09-CV-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010)................... 19

*Davis v. Bailey*,
    No. 05-civ-0042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005)........................... 31

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ................................................................5

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982)........................................................passim

*In re Evangelist*,
    760 F.2d 27 (1st Cir. 1985) .................................................................32

*In re Gartenberg*,
    636 F. 2d 16 (2d Cir. 1980)................................................................32

*In re Goldman Sachs Mut. Funds Fee Litig.*,
    No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)...........................25

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................19

*In re Scudder Mut. Funds Fee Litig.*,
   No. 04-cv-1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ........................ 26

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010) ................................................................................... passim

*Jones v. Harris Assocs. L.P.*,
   611 Fed. App'x 359 (7th Cir. 2015) ........................................................... passim

*Kalish v. Franklin Advisers, Inc.*,
   742 F. Supp. 1222 (S.D.N.Y. 1990) ................................................................... 25

*Kamen v. Kemper Fin. Servs., Inc.*,
   908 F.2d 1338 (7th Cir. 1990) ........................................................................... 32

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
   305 F.3d 140 (3d Cir. 2002) .............................................................................. 27

*Krinsk v. Fund Asset Mgmt., Inc.*,
   875 F.2d 404 (2d Cir. 1989) ................................................................................ 4

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ................................................................ 17, 27, 28

*Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*,
   290 F.3d 1055 (9th Cir. 2002) ........................................................................... 16

*Turner v. Davis Selected Advisers, LP*,
   No. 13-15742, 2015 WL 5692324 (9th Cir. Sept. 29, 2015) ........................ passim

*Turner v. Davis Selected Advisers, LP*,
   No. 4:08-cv-00421, slip. op. (D. Ariz. June 1, 2011) ........................ 25, 27, 30, 31

*Zehrer v. Harbor Capital Advisors, Inc.*,
   No. 14 C 789, 2014 WL 6478054 (N.D. Ill. Nov. 18, 2014) ............................... 32

**STATUTES**

15 U.S.C. § 80a-10(a) .................................................................................................. 3

15 U.S.C. § 80a-10(b) ............................................................................................. 3, 11

15 U.S.C. § 80a-15(a) ............................................................................................. 3, 14

15 U.S.C. § 80a-15(b) ................................................. 3

15 U.S.C. § 80a-15(c) ............................................... 3, 4

15 U.S.C. § 80a-35(b) ........................................... 1, 4, 29

15 U.S.C. § 80a-46(b) ............................................... 31

**OTHER AUTHORITIES**

John D. Morley, *The Flawed Mechanics of Mutual Fund Fee Litigation*,
    Faculty Scholarship Series, Paper 4919, at 22 (2015), *available at*
    http://digitalcommons.law.yale.edu/fss_papers/4919 ........................................... 25

## MEMORANDUM OF POINTS AND AUTHORITIES

The plaintiff Thomas J. Kennis alleges that Metropolitan West Asset Management, LLC ("MetWest") breached its "fiduciary duty with respect to the receipt of compensation" under Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b), by charging "excessive" fees to the Metropolitan West Total Return Bond Fund (the "Fund").  Mr. Kennis seeks to recover those ostensibly "excessive" fees on behalf of the Fund, in which he allegedly holds shares.

But the Supreme Court recently set an exceedingly high bar for liability under Section 36(b).  To breach its fiduciary duty, "an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been the product of arm's length bargaining*." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added).  To state a Section 36(b) claim, the Supreme Court's *Jones* standard requires a plaintiff to plead facts supporting a plausible conclusion that the challenged fee is *outside* the arm's-length range.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Jones*, 559 U.S. at 346.   Just this fall, the Ninth Circuit affirmed the dismissal of a complaint remarkably similar to the instant pleading under the *Jones* standard.   *Turner v. Davis Selected Advisers, LP*, No. 13-15742, 2015 WL 5692324 (9th Cir. Sept. 29, 2015).

The Complaint fails to state a claim under the rigorous *Jones* standard, as applied by the Ninth Circuit in *Turner*.  The pleading is devoid of facts showing that MetWest's advisory fee is outside the range of what could have been bargained at arm's-length.  The plaintiff asserts no facts whatsoever about the advisory fees paid by comparable mutual funds, and advances nothing to define the relevant "arm's-length bargaining" range.  So in the absence of any factual basis to say what the

arm's-length range for comparable mutual fund advisory fees *is*, there is no plausible basis to claim that MetWest's fees are *beyond* that range.

The reason for that omission from the Complaint is obvious:  the public record – including the Fund's SEC filings that the Complaint invokes – makes clear that the Fund has achieved outstanding long term investment results while paying fees that are *below* the median fees of its peer funds.  Indeed, the Complaint itself identifies three mutual funds the plaintiff deems comparable to the Fund, but glaringly omits that the advisory fee paid by each of those funds is *higher* than MetWest's corresponding fee.  And ironically, although the pleading claims that the total dollar amount that MetWest collects in fees has risen substantially, on its face that is because investors have in the past year flocked to the Fund, attracted by its stellar returns and below median fees, making the informed decision to pay less for premium performance.   The Fund's below-median fee rate has remained unchanged.

Otherwise, the plaintiff attempts to make out his case through misdirection. The pleading compares the Fund's advisory fee to a *different* category of fees charged by MetWest to *other* clients – namely "sub-advisory" fees that other funds' advisers pay MetWest to perform a *subset* of the services that MetWest provides to the Fund.  But that is precisely what the Ninth Circuit in *Turner* rejected.  The *Turner* court dismissed an analogous complaint because its claim of "excessive" fees was "grounded in inapt comparisons" that relied on purely conclusory allegations of comparability.[1]  *Turner*, 2015 WL 5692324, at *1-2; *accord Jones*,

---

[1] Specifically, the Ninth Circuit rejected allegations that the mutual fund underperformed in comparison to an index fund because the funds did not pursue "similar investment strategies," and rebuffed a comparison of advisory fees charged to other mutual funds where the complaint "fail[ed] to allege that these other funds' advisers provided the same services or pursued a similar investment strategy." *Turner*, 2015 WL 5692324, at *2.   *Turner* also rejected purely conclusory

559 U.S. at 349-50.  This Complaint is no different.  It offers nothing but the plaintiff's say-so that MetWest's *advisory* services to the Fund are comparable to its *sub-advisory* services to other funds.  But *ipse dixit* allegations flunk the plausibility requirement and *a fortiori* cannot be sustained when they are contradicted by the public record.

The plaintiff's Complaint should be dismissed in its entirety.

## BACKGROUND

### A.    Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a pool of assets, consisting primarily of a portfolio of securities, which belongs to the individual investors who own shares in the fund.  *See Jones*, 559 U.S. at 338.  As a practical matter, the management and operations of a mutual fund are typically externalized and contractually delegated to a mutual fund's investment adviser.  The ICA acknowledges this standard structure, and enshrines the legal separation of a mutual fund and its adviser as the Act's principal purpose – to protect mutual fund investors by maintaining a fund's independence from its adviser.  *See Burks v. Lasker*, 441 U.S. 471, 480-85 (1979); 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

The ICA ensures this independence by entrusting noninterested directors or trustees sitting on a mutual fund's board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from conflicts of interest with the fund's adviser.  *See* 15 U.S.C. § 80a-15(c).  Accordingly, pursuant to Section 15(c) of the ICA, a majority of a fund's independent trustees must approve the advisory agreement annually, including the compensation the adviser receives for the services it provides to the fund (the "15(c) process").  *Id.*; *accord*

---

allegations that the defendant-adviser achieved economies of scale.  *Id.*

*Jones*, 559 U.S. at 340.  To fulfill this obligation, the trustees must "request and evaluate" – and the investment adviser must provide – all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds.  15 U.S.C. § 80a-15(c).

Independent trustees are not only the "cornerstone" of the ICA's regulatory structure designed to check conflicts of interest between a fund and its adviser, they are also central to Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund.  *Id.* § 80a-35(b); *Jones*, 559 U.S. at 339.  To plead a breach of this duty, a shareholder plaintiff must meet an extremely high bar to show that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining."  *Turner*, 2015 WL 5692324, at *1 (quoting *Jones*, 559 U.S. at 346) (emphasis added).  Under *Jones,* the job of a court "is to identify the *outer bounds* of arm's length bargaining."  *Jones v. Harris Assocs. L.P.*, 611 Fed. App'x 359, 360 (7th Cir. 2015) (on remand from U.S. Supreme Court).  The court's task is only to decide whether the fee exceeds those "outer bounds"; it is not charged with deciding if fees are too high, too low, or just right, and must not thereby "engage in rate regulation."  *Id.*  In making its inquiry, moreover, the statute obliges a court to consider the role of the independent trustees in negotiating the fee:  "[A]pproval by the board of directors of such investment company of such compensation or payments . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances."  15 U.S.C. § 80a-35(b)(2) (emphasis added); *see Turner,* 2015 WL 5692324, at *2.  The statute does not require the directors to negotiate the "'best deal' possible."  *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).  And it does not authorize the Court to sit as a "super-trustee" charged with

"setting" a fee, or to second-guess informed board decisions. *See Jones*, 559 U.S. at 352; *Jones*, 611 Fed. App'x at 360 (Section 36(b) "does not allow a court to assess the fairness or reasonableness of advisers' fees"). Instead, it requires a plaintiff to plausibly allege and ultimately prove that the fee that resulted from the independent trustees' negotiation *could not have* derived from arm's-length bargaining.

**B.    MetWest and the Total Return Bond Fund**

MetWest serves as investment adviser to Metropolitan West Funds, a Delaware statutory trust that is an open-end management investment company registered under the ICA, consisting of nine separate "investment series" or funds, including the Total Return Bond Fund (the "Fund"). *See* Complaint ("Compl.") ¶ 1; Ex. A[2] (Metropolitan West Funds, Statement of Additional Information, at 1, 3, 31 (July 29, 2015) ("SAI")); Ex. B (Metropolitan West Funds, Annual Report, at 183 (Mar. 31, 2015) ("2015 AR")).

Building on a remarkable long-term track record of top decile performance produced at below-median fees, the Fund has grown to more than $64 billion in assets under management ("AUM"), making it one of the largest funds in its peer group. *See* Ex. C (Metropolitan West Funds, Prospectus, at 87-90 (July 29, 2015) ("Prospectus")); Ex. D (Metropolitan West Funds, Semi-Annual Report, at 206 (Sept. 30, 2014) ("2014 SR")); Ex. R (Metropolitan West Funds, Semi-Annual Report, at 217 (Sept. 30, 2015) ("2015 SR")). For the three-year period ending

---

[2] All "Ex." references herein are to exhibits to the Declaration of Robert A. Skinner ("Skinner Decl."). The cited public filings and reports are discussed in the Request for Judicial Notice in Support of Defendant's Motion to Dismiss ("RJN"). Under the doctrine of incorporation by reference, the Court may treat public disclosures "as part of the complaint, and thus may assume that [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (internal quotation marks omitted).

March 31, 2015, the Fund's retail class (Class M)[3] shares produced 5.25% in total returns annually, significantly outpacing its benchmark of 3.11%. *See* Ex. B (2015 AR) at 3. At the same time, the Fund's advisory fee and total expenses were always below the median compared to peer funds. Ex. D (2014 SR) at 206; Ex. R (2015 SR) at 217. With its attractive combination of superior performance and competitive fees, the Fund experienced "very robust" inflows of investor assets in the fiscal year ending March 31, 2015, a period in which the Fund's largest competitor experienced significant asset outflows. Ex. B (2015 AR) at 1; *see also* Ex. R (2015 SR) at 216 (crediting "the ability of [MetWest's] organizational structure to address the recent growth in assets"). The demonstrated mobility of assets among competitor funds reflects the reality that shareholders readily "vote with their feet" in search of favorable performance and fees.

### C.   Advisory Agreement and Fees

MetWest serves as the investment adviser to the Fund pursuant to the Investment Management Agreement ("IMA") which the entire Metropolitan West Funds Board (the "Board"), and its independent trustees separately, must approve annually. Ex. A (SAI) at 49. As investment adviser, MetWest provides the Fund a full range of advisory services, including: (1) furnishing a continuing investment program; (2) making and executing investment decisions; (3) managing risks that arise from the Fund's investments and operations; (4) making continuous and significant investments in the Fund's operations, including attracting and retaining

---

[3] The Fund is offered through multiple share classes making available different expense levels and service arrangements, including Class M, Class I, Administrative Class, and Plan Class. Ex. C (Prospectus) at 19. The plaintiff has chosen not to reveal the class of shares he purportedly holds. *See* Compl. ¶ 15 (merely alleging the plaintiff "is a shareholder in the Fund"). Accordingly, for the purposes of this Motion, MetWest assumes that the plaintiff holds Class M shares.

talented personnel and investing in information technology, systems, and infrastructure supporting investment management and compliance; (4) preparing written reports on the Fund's investments for the Board; (5) monitoring market conditions; (6) regularly reporting to the Board; and (7) overseeing the administration of the Fund's business and affairs. *Id.* at 31; Ex. D (2014 SR) at 205-206; Ex. R (2015 SR) at 216-17; Ex. E (Metropolitan West Funds Investment Management Agreement, at 1-4 (Feb. 6, 2013) ("IMA")).  As the sponsor of the Fund, MetWest also incurs all of the risks associated with having created and operating the Fund.  MetWest – and MetWest alone – bears the business, legal and reputational risk of poor performance, non-compliance with regulatory matters, and associated redemptions.  Ex. D (2014 SR) at 206; Ex. R (2015 SR) at 217.  For all its services, the Fund pays MetWest an annual advisory fee equal to 0.35% of AUM.  Ex. E (IMA) at A-1.[4]

---

[4] In addition to the 35 basis points ("bps," or one-hundredth of a percent) the Fund pays to MetWest, the Fund also pays 21 bps to Foreside Funds Distributors LLC, an unaffiliated broker-dealer, under a so-called "12b-1 Plan," which supports distribution of the Fund through broker-dealers and other intermediaries.  Ex. C (Prospectus) at 19; Ex. A (SAI) at 55-56.  And the Fund pays certain expenses itself, including for administrative and accounting services provided by BNY Mellon Investment Servicing.  Ex. A (SAI) at 54-55; Ex. C (Prospectus) at 19. Together, all of those charges amount to a "total expense ratio" in 2015 of 68 bps, which is substantially below the mean total expense ratio of "peer" funds identified by industry analysts such as Morningstar, Inc.  *See* Ex. P (Morningstar, Inc. "Expense" Ratings MWTRX, *available at* http://financials.morningstar.com/ fund/expense.html?t=MWTRX (last visited Dec. 15, 2015)); *see also* Ex. T (Morningstar, Inc. "Ratings & Risk" MWTRX, *available at* http://performance.morningstar.com/fund/ratings-risk.action?t=MWTRX (last visited Dec. 15, 2015) (giving the Fund "five-star" rating for the five- and ten-year periods, which places it in the top 10% of the Morningstar peer fund group).

## D.    The Sub-Advised Funds

MetWest also provides sub-advisory services to the AZL MetWest Total Return Bond Fund (the "AZL Fund") and the Consulting Group Capital Markets Core Fixed Income Investments Fund (the "CGCM Fund").   Compl. ¶¶ 40-41. TCW Investment Management Company ("TCW"), a MetWest sister company, serves as sub-adviser to the Columbia Active Portfolios Multi-Manager Core Plus Bond Fund (the "Columbia Fund") (together with the AZL Fund and CGCM Fund, the "Sub-Advised Funds").   *Id.*; Ex. F (Columbia Fund, Prospectus, at 11 (Jan. 1, 2015)).   As sub-advisers, MetWest and TCW provide a strictly defined set of services to the Sub-Advised Funds – essentially a subset of the full range of services MetWest provides to the Fund as adviser.   As detailed in their respective SEC filings, each of the Sub-Advised Funds has also retained an investment adviser that oversees the sub-advisers' performance and provides the balance of advisory and management services in exchange for a management fee.   Ex. G (AZL Fund, Prospectus, at 52, 161-162 (Apr. 27, 2015)); Ex. F (Columbia Fund, Prospectus, at 3, 11-12 (Jan. 1, 2015)); Ex. H (CGCM Fund, Prospectus, at 20, 22-23 (Jan. 1, 2015, as supplemented Apr. 17, 2015)).

*The AZL Fund*.   MetWest serves as sub-adviser to the AZL Fund pursuant to a sub-advisory agreement with Allianz Investment Management LLC ("Allianz"), the fund's adviser.   Shareholders of the AZL Fund pay Allianz a flat advisory fee of 0.55% of the fund's AUM, which covers the services of both the adviser and sub-adviser.   Ex. G (AZL Fund, Prospectus, at 52 (Apr. 27, 2015)).   MetWest has the day-to-day responsibility to "determine which securities are bought and sold, and in what amounts" in exchange for a sub-advisory fee of 0.18% of the fund's AUM up to $500 million and 0.10% of AUM over $500 million.   *Id.* at 161-162; Compl.

¶ 57.   In return for the portion of the advisory fee it retains,[5] Allianz provides a range of services to the fund, including sub-adviser selection; comprehensive monitoring and oversight of the sub-adviser's investment performance and compliance with the fund's policies and legal and regulatory requirements; provisions of statistical data to the fund's trustees regarding portfolio investments; administration of the fund's business affairs; provisions of executive and other personnel necessary for the fund's operation; and coordination of the activities of the fund's other service providers.  Ex. I (AZL Fund, Annual Report at 16-17 (Dec. 31, 2014)); Ex. J (AZL Fund, Statement of Additional Information, at 56 (Apr. 27, 2015)).   As primary adviser, Allianz bears the principal legal and business risk associated with the creation and continued sponsorship of that fund.  *See* Ex. J (AZL Fund, SAI, at 42 (Apr. 27, 2015)).

*The Columbia Fund*.   The Columbia Fund is sponsored and managed by Columbia Management Investment Advisers, LLC ("Columbia"). Ex. F (Columbia Fund, Prospectus, at 11 (Jan. 1, 2015)).  The fund's total advisory fee is 0.41% of AUM, which includes the fee paid to sub-advisers and the portion Columbia retains for its services as the fund's adviser.  *Id.* at 3.  The Columbia Fund pursues a multi-manager strategy, meaning that its assets are divided into three portions or "sleeves," which are then allocated to different asset managers who employ complementary investment styles in pursuit of the fund's investment objective.  *Id.* at 12.  Columbia provides day-to-day portfolio management with respect to one sleeve of the Columbia Fund and oversees the performance of two sub-advisers,

---

[5] Specifically, *after* paying for MetWest's sub-advisory services, Allianz retains 0.37% of AUM up to $500 million and 0.45% of AUM over $500 million for its own advisory services to the AZL Fund.  *See* Ex. G (AZL Fund, Prospectus, at 52, 161-162 (Apr. 27, 2015)); Compl. ¶ 57.

including TCW, who manage the other two sleeves.  *Id.* at 12-14.  In addition, Columbia determines the asset allocation for the three sleeves of the fund on an ongoing basis; provides investment research and advice; regularly reports to the fund's board of trustees; administers the fund's business affairs; pays compensation to the fund's trustees and officers who are Columbia employees; and provides clerical personnel, suitable office space, necessary facilities and equipment and administrative services.  *Id.* at 12; Ex. K (Columbia Fund, Statement of Additional Information, at 82-83, 87 (Oct. 1, 2015)).   By contrast, TCW's sub-advisory services to the Columbia Fund are "limited to asset management and related recordkeeping services."   Ex. K (Columbia Fund, Statement of Additional Information, at 87 (Oct. 1, 2015)).  In return for its limited services, TCW receives 0.18% of the Columbia Fund's AUM up to $500 million and 0.05% of AUM over $500 million.  Compl. ¶ 57.  Columbia again retains the primary business, legal and reputational risk associated with the sponsorship and management of the fund.  *See* Ex. K (Columbia Fund, Statement of Additional Information, at 139 (Oct. 1, 2015)).

*The CGCM Fund.*   The CGCM Fund is only available through a Morgan Stanley advisory program that carries an annual shareholder fee of up to 2.5% of the fund's assets.   Ex. H (CGCM Fund, Prospectus, at 20 (Jan. 1, 2015, as supplemented Apr. 17, 2015)).   In addition to the shareholder fee, the fund's adviser, Consulting Group Advisory Services LLC ("Consulting Group"), charges a flat advisory fee of 0.40% of AUM for advisory and sub-advisory services.  *Id.* Like the Columbia Fund, the CGCM Fund employs a multi-manager strategy.  *Id.* at 22.  MetWest is one of four sub-advisers to the CGCM Fund, providing day-to-day investment management services to a portion of the fund's assets for a fee of 0.20% of AUM.  *Id.* at 62-63; Compl. ¶ 57.  Consulting Group, as the fund's adviser, retains a portion of the advisory fee in return for performing an array of services,

including (1) selection of sub-advisers based on a quantitative and qualitative analysis of a sub-adviser's skills and investment returns; (2) allocation and reallocation of the fund's assets among sub-advisers; (3) continuous monitoring and evaluation of sub-adviser performance; (4) performance of due-diligence functions such as assessment of changes in personnel at sub-advisers; (5) oversight of sub-adviser compliance with the fund's investment objectives; (6) monitoring of market conditions; and (7) decision-making regarding changes in the allocation of fund assets or the lineup of sub-advisers in response to market conditions.   Ex. H (CGCM Fund, Prospectus, at 22-23 (Jan. 1, 2015, as supplemented Apr. 17, 2015)). Consulting Group also bears all the risks inherent in fund sponsorship.  *See* Ex. U (CGCM Fund, SAI, at 39 (Jan. 1, 2015)).

### E.    Approval of IMA and Fees by Statutorily Independent Trustees

As required by SEC rules, the Fund's public disclosures detail the annual 15(c) process and the Board's thorough review and analysis of the Fund's service agreements, including the IMA with MetWest, throughout the course of each year. *See* Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.[6]  The Board is composed of eight trustees, six of whom (or 75%), including the Chairman of the Board, are statutorily disinterested as defined in the ICA, exceeding the requirement that 50% of the members of the governing board be disinterested.[7]  *See* 15 U.S.C. § 80a-10(b)(1); Ex. A (SAI) at 31.  The trustees are eminently qualified, as evidenced by their wealth of relevant experience.  *See* Ex. A (SAI) at 32-35.

---

[6] The Board met on September 8, 2014 and approved the IMA for another one-year term ending February 5, 2016.  Ex. D (2014 SR) at 205.

[7] In 2014, the Board consisted of nine trustees, seven of whom were independent. Ex. S (Metropolitan West Funds, Statement of Additional Information, at 30 (July 29, 2014)).  The Board's current composition is due to the passing of one of the independent trustees.

As part of the 15(c) process, the Board amasses and considers extensive information about the Fund's performance, its operations, and the services provided to it and its shareholders by MetWest.  *See* Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.  Throughout the year, MetWest furnishes to the Board written materials that include, among other things, detailed information about: the nature, extent, and quality of services MetWest provides to the Fund; the Fund's investment performance; MetWest's investment processes; and the Fund's portfolio composition and portfolio trading practices.  Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.  The independent trustees, in accordance with their duties under Section 15(c), also send an in-depth request to MetWest through their independent legal counsel for further information relevant to contract renewal.  Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.  The extensive supplementary materials they receive from MetWest in response to their inquiry include: (1) information about the Fund's investment results; (2) financial and profitability information regarding MetWest's relationship to the Fund; (3) information about the personnel providing services to the Fund; (4) information about the fees charged and services provided to other clients; (5) operational information, such as information about the Fund's and MetWest's compliance monitoring; and (6) information about MetWest's portfolio trading practices.  Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.  Notably, the independent trustees also request and receive comparative fee and performance data prepared by an independent consulting firm, Lipper, Inc. ("Lipper").  Ex. D (2014 SR) at 205-206; Ex. R (2015 SR) at 216-217.  The independent trustees discuss this wealth of information both on their own and with the rest of the Board, meeting separately with their independent counsel to review the materials they receive in the course of the 15(c) process.  Ex. D (2014 SR) at 205; Ex. R (2015 SR) at 216.

After this rigorous 15(c) process, the Board ultimately determined that

MetWest's advisory fee was "fair, both absolutely and *in comparison with those of other mutual funds in the industry*." Ex. A (SAI) at 49 (emphasis added). In reaching this determination, the Board utilized data prepared by Lipper – a consultant whose business is predicated on serving as an independent data source – to compare the Fund's performance and fees to those of its competitors. *See* Ex. D (2014 SR) at 205-206; Ex. R (2015 SR) at 216-217. To assess MetWest's advisory fee, "[t]he Board compared the advisory fees and total expenses of each Fund (each as a percentage of average net assets) with the median advisory fee and operating expense levels of the other mutual funds in the relevant Lipper peer groups." Ex. D (2014 SR) at 206; *accord* Ex. R (2015 SR) at 217. Employing this "reasonable statistical measure," the Board found that the Fund "is one of the largest in its peer group, but remains *below the median* [of the peer group] for the advisory fee and total expenses." Ex. D (2014 SR) at 206 (emphasis added); *accord* Ex. R (2015 SR) at 217.[8]

**F.      The Fund's Shareholders Overwhelmingly Approved the IMA and Fees Twice in Recent Years**

In addition to the opportunity that Fund shareholders have every single day to express their disapproval with the cost or quality of MetWest's advisory services by redeeming their shares in the Fund, the Fund's shareholders have had two additional

---

[8] The Board also considered the fees paid by MetWest's institutional clients with investment mandates similar to the Fund's, which are generally lower than the Fund's fees. The Board acknowledged the differences in fees paid by institutional clients, but attributed those differences to MetWest's "significantly greater responsibilities and expenses with respect to the Funds," such as: (1) "additional time spent by portfolio managers for reasons such as more active cash flows from purchases and redemptions by shareholders"; (2) "additional risks of managing a pool of assets for public investors"; and (3) "costs of additional infrastructure and operational resources and personnel and of complying with the more comprehensive regulatory regime applicable to mutual funds." Ex. D (2014 SR) at 206; *accord* Ex. R (2015 SR) at 217.

opportunities in the last five years to weigh in directly on MetWest's advisory services and fees. Both times, they voted in overwhelming numbers to approve the IMA – including the fees charged by MetWest – and the substantially identical predecessor agreement. Ex. L (Metropolitan West Funds, Annual Report, at 181 (March 31, 2013) ("2013 AR")); Ex. M (Metropolitan West Funds, Annual Report, at 142 (March 31, 2010) ("2010 AR")).

Under the ICA, a change in controlling ownership of a mutual fund adviser requires a shareholder vote to approve a new advisory agreement. 15 U.S.C. § 80a-15(a). Therefore, when MetWest was acquired by the TCW Group, Inc. in 2010, the Fund's shareholders were asked to approve an advisory agreement with MetWest that was substantively the same as the current IMA. Ex. N (Metropolitan West Funds, Shareholder Proxy Statement, at 4, 9 (Feb. 25, 2010)). The proxy statement disclosed the contents of the advisory agreement, including the rate of the advisory fee (which was 0.35%, as now) and the total gross amount that MetWest collected in fees in the prior fiscal year. *Id.* at 6, 9. Armed with this information, the Fund's shareholders overwhelmingly approved the proposed advisory agreement and MetWest's fee. Ex. M (2010 AR) at 142.

Two years later, the Fund's shareholders again cast votes on the MetWest IMA due to a change in ownership of the TCW Group. Ex. O (Metropolitan West Funds, Shareholder Proxy Statement, at 5-6 (Oct. 10, 2012)). Again, both the advisory fee rate of 0.35% *and* the total fees paid to MetWest in the preceding year were prominently displayed in the proxy statement. *Id.* at 8. Shareholders holding over 95% of the Fund voted in favor of the IMA, electing to have MetWest continue to act as the Fund's adviser on substantially the same terms as the then-existing agreement, including maintaining the *same fees*. *Id.* at 8, 12-13; Ex. L (2013 AR) at 181.

# ARGUMENT

## I.  THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE ADVISORY FEES UNDER SECTION 36(B) OF THE ICA

### A.  Legal Standard for Pleading a Section 36(b) Claim

The standard established by the Supreme Court to adequately plead a breach of Section 36(b) is exacting: the plaintiff must demonstrate that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added).  The pleading requirements mandate that, to withstand a motion to dismiss, a complaint must allege facts that are sufficient to state a claim for relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  To sustain a cognizable claim, then, *Jones* and *Iqbal* together require a plaintiff to plead facts that plausibly suggest the challenged fee is *outside* the arm's-length range. *Id.* ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Jones*, 559 U.S. at 346.  Although a court must "take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (internal quotation marks omitted).  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Id.* (internal quotation marks omitted).  In the context of a Section 36(b) claim, that means the allegations of fact must support a *plausible* claim that the fees are "so disproportionately large" relative to the services provided that they are *beyond* the range of what "could" have been bargained at arm's-length. *Jones*, 559 U.S. at 346; *Iqbal*, 556 U.S. at 678.

In the first Federal appellate court decision applying *Jones* at the motion to dismiss stage, the Ninth Circuit recently affirmed dismissal of the plaintiff's claims under these principles, holding that a valid claim for excessive fees could not be supported by (i) "inapt comparisons" to other funds' fees, when no basis for comparability of the funds or services was alleged; or by (ii) "conclusory statement[s]" regarding supposed economies of scale, without supporting factual allegations regarding the defendant's costs.  *Turner*, 2015 WL 5692324, at *1-*2.[9] Similarly, the Seventh Circuit in *Jones* (on remand from the Supreme Court) recently affirmed the centrality of *apt* comparisons to *peer funds' fees* in a court's Section 36(b) analysis.  "[T]he Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees; *the goal is to identify the outer bounds* of arm's length bargaining and not engage in rate regulation."  *Jones*, 611 Fed. App'x at 360 (emphasis added).  Fees "produced by bargaining at other mutual-fund complexes . . . *tell[] us the bargaining range*."  *Id.* at 361 (emphasis added).

In assessing whether the beyond-arm's-length standard is met, "all relevant circumstances [are to] be taken into account."  *Jones*, 559 U.S. at 347 (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)).  These circumstances may include economies of scale and other items in a non-exhaustive list of factors set forth by the Second Circuit in *Gartenberg* and cited favorably by the Supreme Court in *Jones*:

> (1) The nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any

---

[9] Unpublished decisions of the Ninth Circuit are "citable to courts in the Ninth Circuit if issued on or after January 1, 2007."  Ninth Circuit Local Rule 36-3(b).  Unpublished decisions of courts other than the Ninth Circuit are citable regardless of when they were issued.  *See Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1058 (9th Cir. 2002).

"fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care and conscientiousness of the board in evaluating adviser compensation.

*Id.* at 344 n.5 (quoting *Gartenberg*, 694 F.2d at 929-32).   Importantly, these so-called "*Gartenberg* factors" are not themselves the standard of liability or the elements for establishing a Section 36(b) claim.  The "factors" only provide a rubric for analyzing whether the beyond-arm's-length standard has been met. Accordingly, it is not sufficient simply to assert rote allegations about any one "factor," or even all of them.  Rather, to withstand dismissal, a pleading must plausibly connect the dots between the factual allegations about a "factor" and its *effect* on the challenged fee.  *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services").  Nonconclusory allegations about any "factor" must *push* the fee *outside* of the "bargaining range."   The specifics about any "factor" must be tied to the challenged fee so that those details permit the plausible inference that the fee is "so disproportionately large" it "could not have been" negotiated at arm's length.  *See Jones*, 559 U.S. at 346; *Turner*, 2015 WL 5692324, at \*1-\*2.

> **B.   The Complaint Alleges No Facts Regarding the Fees Paid for Analogous Services by Comparable Mutual Funds, and It Therefore Says Nothing About the Arm's-Length "Bargaining Range" for the Challenged Fee**

On remand from the Supreme Court, the Seventh Circuit recently affirmed the grant of summary judgment to the adviser in that case because the plaintiff did not establish fees were outside the range of an arm's-length bargain.  Importantly, the Seventh Circuit observed that fees charged by comparable mutual funds "tell[] us the bargaining range," 611 Fed. App'x at 361.  But here, the Complaint contains no *facts* from which to discern the arm's-length bargaining range for the Fund's

advisory fees.  The pleading simply asserts the fee is outside the range without any elaboration, let alone any plausible factual allegations.  The plaintiff does not allege what fees are paid by comparable funds for services of the type provided by MetWest or how those fees compare to MetWest's fee.  Simply put, because the pleading does not identify what the relevant "bargaining range" *is*, it supplies no basis to conclude that the challenged fees are *outside* that range.

The public record, however, including public sources the Complaint cites, does establish the relevant range.  The Fund's Semi-Annual Reports for the relevant period, for example, confirm that the independent trustees considered the peer fund comparisons that the plaintiff would have the Court ignore.  The trustees not only compared the Fund's investment performance with that of other mutual funds in peer group reports prepared by independent data consultant Lipper, but they also "compared the advisory fees and total expenses of [the] Fund . . . with the median advisory fee and operating expense levels of the other mutual funds in the relevant Lipper peer group[]."  Ex. D (2014 SR) at 205-206; *accord* Ex. R (2015 SR) at 216-217.  The comparison was revealing:  the Board observed that the Fund "is one of the largest in its peer group, but remains *below the median* for the advisory fee and total expenses."  Ex. D (2014 SR) at 206; Ex. R (2015 SR) at 217.  Given the Fund's outstanding long-term performance produced at below-median fees, the independent trustees sensibly concluded that MetWest's fee and the Fund's operating expenses are "*fair, both absolutely and in comparison with those of other mutual funds in the industry*."  Ex. A (SAI) at 49 (emphasis added).  It is no mystery, then, why facts that reveal the Fund's "bargaining range" are conspicuously absent from the Complaint.  Publicly available information shows that the Board considered independent data provided by Lipper regarding peer funds' fees and concluded that MetWest's advisory fee was easily *within* that

range.[10]

Instead of comparing the Fund's fees to competitor mutual funds, the Complaint contends that the Sub-Advised Funds are comparable to the Fund. According to the plaintiff, the Sub-Advised Funds employ a similar investment strategy, and MetWest ostensibly performs "the same or substantially the same" services for both the Fund and the Sub-Advised Funds. Compl. ¶¶ 49, 51. But that allegation – like the inapt comparisons in *Turner* – is purely conclusory. Indeed, in *Turner*, the Ninth Circuit decided plaintiff's conclusory allegations fell short of what is required to survive dismissal. 2015 WL 5692324, at *2. More importantly, the allegation is contradicted by the public record the plaintiff invokes.

The plaintiff makes an inapt comparison of MetWest's *advisory* fee to the *sub-advisory* fee it is paid by the Sub-Advised Funds for a narrower set of services. The plaintiff simply ignores the publicly available data that allows for apples-to-apples comparisons, *i.e.*, how the advisory fee paid by the Fund stacks up to the full advisory fee paid by the Sub-Advised Funds (for the services of both the adviser and sub-adviser). Public records show the Fund's advisory fee of 35 basis points is

---

[10] The Lipper comparative data commissioned and reviewed by the independent trustees is mirrored in readily available published reports comparing the Fund's fees to those of its peer funds. The Fund's total expenses are 68 basis points in 2015. Ex. P (Morningstar, Inc. "Expense" Ratings MWTRX, *available at* http://financials.morningstar.com/ fund/expense.html?t=MWTRX (last visited Dec. 15, 2015)). According to the published reports of industry analyst Morningstar, the *average* total return bond fund charged 84 basis points, which is 16 basis points more than MetWest. *Id.* As discussed in the Request for Judicial Notice, the Court may take notice of published Morningstar material. *See Curran v. Principal Mgmt. Corp., LLC*, No. 4:09-CV-00433, 2010 WL 2889752, at *1 n.1 (S.D. Iowa June 8, 2010) (taking judicial notice of Morningstar report on motion to dismiss in a Section 36(b) case), *order vacated in part on reconsideration*, No. 4:09-CV-00433 RP-CFB, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1239 (N.D. Cal. 2008) (taking judicial notice of Piper Jaffray analyst report that rated the performance and risk of company's securities).

not only within the "bargaining range," but is actually *below* the corresponding advisory fee of each competitor identified by the plaintiff:[11]

| Fund | Advisory Fee |
|------|-------------|
| AZL MetWest Total Return Bond Fund | 0.55% |
| Columbia Active Portfolios Multi-Manager Core Plus Bond Fund | 0.41% |
| CGCM Core Fixed Income Investments Fund | 0.40% + annual shareholder fee up to 2.50% |
| **MetWest Total Return Bond Fund** | **0.35%** |

Simply put, the plaintiff omits the information that reveals the "bargaining range," and that locates the fee MetWest charges easily within that range. The across-the-board higher fees paid by the Sub-Advised Funds for the full set of services that MetWest provides to the Fund highlights how modest the Fund's fee rate is. The Complaint ignores that public record. But the relevant comparison demonstrates the efficiency of the Fund's unified management structure, and it explains why the Fund's investors are not flocking to the competitor funds – the outcome one would expect if there were any merit to the plaintiff's claim that MetWest's advisory services are available for substantially lower fees via the Sub-Advised Funds. In short, when MetWest's fee is subjected to a fair comparison, there is no plausible basis for the plaintiff's conclusory allegations that MetWest's fee *could not* be within the arm's-length range.

---

[11] *See, e.g.*, Ex. G (AZL Fund, Prospectus, at 52 (Apr. 27, 2015)); Ex. F (Columbia Fund, Prospectus, at 3 (Jan. 1, 2015)); Ex. H (CGCM Fund, Prospectus, at 20 (Jan. 1, 2015, as supplemented Apr. 17, 2015)). The Fund's total expenses of 69 bps (Ex. C (Prospectus) at 19) are also below the total expenses of the Sub-Advised Funds. *See, e.g.*, Ex. G (AZL Fund, Prospectus, at 52 (Apr. 27, 2015)) (AZL Fund incurs 86 bps in total expenses); Ex. F (Columbia Fund, Prospectus, at 3 (Jan. 1, 2015)) (Columbia Fund pays 82 bps in total expenses); Ex. H (CGCM Fund, Prospectus, at 20 (Jan. 1, 2015, as supplemented Apr. 17, 2015)) (CGCM Fund carries 53 bps in operating expenses, plus an annual shareholder fee of up to 2.50%).

**C.    The Complaint is Based Entirely on Inapt Comparisons and Conclusory Allegations of the Very Type Rejected by the Ninth Circuit in *Turner***

The Ninth Circuit's recent ruling in *Turner* informs how the Supreme Court's *Jones* standard is applied on a motion to dismiss.  *See Turner*, 2015 WL 5692324, at \*2.  The Complaint fails to state a plausible claim of beyond-arm's-length fees for the same reasons the complaint was dismissed in *Turner*: inapt comparisons and conclusory allegations regarding so-called "*Gartenberg* factors" are insufficient. *See id.*

**1.    *Comparison to Sub-Advised Funds***

The plaintiff attempts to mask the Complaint's shortcomings by repeatedly trumpeting that the Fund's advisory fee is higher than the sub-advisory fees MetWest charges to the Sub-Advised Funds.   Compl. ¶¶ 5, 57 (asserting a differential of up to 497%).  But the comparison conceals more than it reveals.  As discussed above, the plaintiff does not – and cannot – allege that the advisory fee the Fund pays to MetWest for a full range of investment advisory services is higher than the corresponding advisory fees the Sub-Advised Funds pay for the full range of investment advisory services provided by a combination of the adviser and sub-adviser.  Instead, the plaintiff contends that because the *advisory* fee the Fund pays to MetWest is higher than the *sub-advisory* fees MetWest charges to the Sub-Advised Funds, the Fund's advisory fee must be "excessive."[12]  *See id.*  ¶¶ 56-59. Far from supplying a plausible inference that a shareholder can access MetWest's management elsewhere for a lower fee, the plaintiff's dramatic figure is a red

---

[12] That is akin to alleging that the fee Contractor A charges when she paints a house and fixes its roof should not be higher than the fee she charges when she's sub-contracted just to paint, and Contractor B handles the roof.  Of course Contractor A's fee is higher in the first scenario – she's providing more services – and an apt comparison must account for Contractor B's fee for fixing the roof.

herring.  It equates a *fraction* of the services MetWest furnishes to the Sub-Advised Funds with the *full* array of services it provides to the Fund – and the liabilities it bears as the Fund's primary sponsor.  The Complaint's apples-to-oranges comparison is of the same type that was rejected in *Turner* and cautioned against by the Supreme Court in *Jones*.  *See Jones*, 559 U.S. at 349; *Turner*, 2015 WL 5692324, at *2.

Like in *Turner*, the allegations in the Complaint "are grounded in inapt comparisons."  2015 WL 5692324, at *2.  The Ninth Circuit rejected a comparison to advisory fees other mutual funds paid to their investment advisers where the complaint "fail[ed] to allege that these other funds' advisers provided the same services or pursued a similar investment strategy."  *Id.*  *Turner* adhered to the Supreme Court's admonition in *Jones* that such comparisons are inapt without a factual predicate of comparable services.  *See Jones*, 559 U.S. at 349 (courts must be "wary of inapt comparisons" between services an investment adviser provides to different types of clients).

Here, the comparison of the full suite of services provided to the Fund with the limited services MetWest provides to the Sub-Advised Funds is even more inapt and lends no support to the plaintiff's claim.  The Complaint simply ignores the fact that MetWest provides only a *portion* of the services necessary to operate the Sub-Advised Funds.  And it ignores as well that each of those funds also has a primary adviser that is paid an additional fee on top of MetWest's sub-advisory fee for the additional services those advisers provide to their respective funds.  The publicly available record of the allocation of responsibilities between adviser and sub-adviser in the Sub-Advised Funds (the same record from which the plaintiff derived his fee allegations, but otherwise ignores) plainly demonstrates the additional services provided by the primary advisers – services for which MetWest bears

1  responsibility vis-à-vis the Fund.  *See supra* at 8–11 (discussing services provided
2  by investment advisers to all three Sub-Advised Funds).

3  Thus, as shown by the chart above, the MetWest Total Return Fund pays
4  MetWest an aggregate of 35 bps for *all* advisory services, including management of
5  the portfolio, as well as all other operational and management matters.  The Sub-
6  Advised Funds pay between 41 bps and (as much as) 2.9% for that same full array
7  of services, a portion of which is in turn paid over the MetWest or its affiliate TCW
8  for certain portfolio management services.  Stated another way, investors in the
9  Sub-Advised Funds pay more than investors in the Fund for the complete array of
10  services they secure.  The plaintiff's attempt to exploit the similarities in the
11  investment *strategies* of the Fund and the Sub-Advised Funds to allege that
12  MetWest's *services* as adviser and sub-adviser are the "same" and should be priced
13  identically (Compl. ¶¶ 51, 53) is specious and contradicted by the public record.

14  Further, even if MetWest provided the same set of services to the Fund and
15  the Sub-Advised Funds – which it obviously does not – this would not be enough to
16  state a Section 36(b) claim.  The *Jones* Court cautioned that Section 36(b) does not
17  require "fee parity" among all clients and funds.  559 U.S. at 350.  Standing alone,
18  allegations of a lack of "fee parity" do not state a plausible claim that the Fund's
19  advisory fee is "so disproportionately large" that it *could not* have been negotiated
20  at arm's length.  *Id.* at 346.  Indeed, the Court instructed that a trial will be
21  warranted "[o]nly where plaintiffs have shown a large disparity in fees that cannot
22  be explained by the different services *in addition to other evidence that the fee is*
23  *outside the arm's-length range*."  *Id.* at 350 n.8 (emphasis added).  Here, the
24  Complaint flunks both prongs of that conjunctive test.  It offers nothing to even hint
25  that the fee disparity it posits between advisory services and subadvisory services is
26  not explainable by service differences.  And quite apart from that failing, the

pleading does not begin to suggest that the overall fee is outside the arm's-length range.

## 2.   *Economies of Scale*

The plaintiff's conclusory allegations about the growth in the Fund's assets and presumed economies of scale also do not plausibly support an inference that the fees were outside the range of what could have been bargained at arm's length. Like in *Turner*, the Complaint's allegations that MetWest achieved but failed to pass along economies of scale to the Fund's shareholders are wholly conclusory and built on an unfounded assumption that economies of scale *must* be realized whenever AUM grow.  *See* 2015 WL 5692324 at *2.  The plaintiff alleges nothing more than that the Fund is large, that its AUM have increased substantially in recent years, and that there *must be* resulting economies of scale.  Compl. ¶¶ 61, 64.  The plaintiff alleges that the increased amount of fees that resulted from the increased AUM "was not accompanied by a proportionate increase in the work or cost required by Defendant to provide investment advisory services to the Fund," and that the fees charged "have not allowed the Fund to appropriately benefit from economies of scale."[13]  *Id.* ¶¶ 63, 70; *see also id.* ¶ 9.  But those same conclusory allegations were not credited in *Turner,* and therefore should not be credited here.

First, the plaintiff pleads no facts showing that economies of scale actually

---

[13] The allegations in *Turner* are strikingly similar.  Ex. Q (Am. Compl. ¶ 229, *Turner v. Davis Selected Advisers, LP*, No. 4:08-cv-00421 (D. Ariz. Apr. 23, 2009), ECF No. 33) ("*Turner* Compl.") ("As the Fund grows larger, economies of scale occur for many Fund activities."); *id.* ¶ 233 (alleging that time and cost of research devoted to "particular investment in a particular stock . . . remains the same regardless of whether the size of the investment would be for millions of dollars or hundreds of millions of dollars"); *id.* ¶ 241 ("As the size of the Fund grew by huge amounts, the Fund's expenses grew even more, even though the expenses of the investment adviser . . . grew at a much lower rate because of economies of scale.").

existed.  He simply asserts that "Defendant realized economies of scale as the Fund's AUM increased, which reduced the cost, as a percentage of the Fund's AUM, of providing investment advisory services to the Fund," but provides no facts in support of this conclusion.  *Id.* ¶ 64.  That was precisely the problem the Ninth Circuit identified in *Turner*.  As the *Turner* court held, "Mere allegations that the fund was 'large' and that there were economies of scale to be realized are insufficient." *Turner v. Davis Selected Advisers, LP*, No. 4:08-cv-00421, slip. op. at 16 (D. Ariz. June 1, 2011); *see Turner*, 2015 WL 5692324 at *2.  Other courts have come to the same conclusion.  *See, e.g.*, *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990) ("Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized.  The courts reject that argument.").[14]

Second, the Complaint alleges no facts showing that MetWest failed to share potential economies of scale with the Fund's shareholders.  The plaintiff simply asserts that MetWest realized economies of scale, which "increased the profitability to Defendant from providing those services," and that the fees charged "have not allowed the Fund to appropriately benefit from economies of scale." Compl. ¶¶ 64, 70.  But again, this sort of vague allegation has been rejected at the motion to dismiss stage.  *See, e.g.*, *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits

---

[14] The Complaint also simply assumes away the possibility that costs and risks to fund advisers can in fact grow with AUM – for example, by making them a more attractive target for lawsuits like this one.  *See* John D. Morley, *The Flawed Mechanics of Mutual Fund Fee Litigation*, Faculty Scholarship Series, Paper 4919, at 22 (2015), *available at* http://digitalcommons.law.yale.edu/fss_papers/ 4919 ("Advisers face substantial litigation risk and burdensome litigation costs even when they charge fees well below market norms.").

from economies of scale were not passed on to investors."); *In re Scudder Mut. Funds Fee Litig.*, No. 04-cv-1921, 2007 WL 2325862, at *13, *16 (S.D.N.Y. Aug. 14, 2007) (rejecting as "infirm" plaintiffs' allegation that defendants "failed to pass on the economies of scale they were realizing as the Funds grew").

Thus, the Complaint's conclusory allegations that economies of scale were realized but not shared with the Fund's shareholders do not supply a reason to think that the Fund's fees were beyond what could be bargained at arm's length. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to presumption of truth). Rather, in these circumstances the Court should follow the statutory command to defer to the judgment of the independent trustees.  As the public record again reveals, the Board expressly considered economies of scale – including to what extent potential economies of scale could be realized as the Funds grow and whether the advisory fees reflect those potential economies of scale – and concluded that MetWest was "*satisfactorily sharing potential economies of scale with the Funds* through low fees and reinvesting in its capabilities for serving the Funds and their shareholders."  Ex. D (2014 SR) at 206 (emphasis added); Ex. R (2015 SR) at 217-218.  In short, the plaintiff's wholly conclusory allegations about the growth in AUM and presumed economies of scale do not plausibly support an inference that the fees were outside the range of what could have been bargained at arm's length.

### 3.   *Board Independence and Conscientiousness*

Like the complaint in *Turner*, the Complaint relies on circular reasoning that the Board *must have* lacked independence, conscientiousness, and adequate information *because* – on the plaintiff's otherwise unsupported allegations –

MetWest charged excessive fees.[15]   As in *Turner*, the Complaint does not address the actual reasons that the Board approved MetWest's fee, nor does it specify facts supporting any supposed failures in the Board's diligence.   The Complaint also fails to identify a shred of relevant information that the Board lacked when determining whether to approve the IMA.   Instead, the plaintiff accuses the trustees of not being diligent simply because he is dissatisfied with the outcome.

Courts have routinely rejected similar conclusory allegations that the board rubberstamped the investment management agreement and advisory fees, based on nothing but the plaintiff's own allegations of excessiveness.   *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006); *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143-44 (3d Cir. 2002); *Migdal*, 248 F.3d at 328.   It is not enough for the plaintiff to baldly assert that the Board devoted insufficient time and attention to considering the fees prior to approving them (Compl. ¶ 73), especially when the publicly available 15(c) process disclosures show otherwise.   *See Turner*, slip. op. at 17 (finding allegations based on "the frequency with which and amount of time the directors meet throughout the

---

[15] *Compare* Compl. ¶ 73 ("The Board has approved the IMA each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by the Fund . . . ."), *id.* ¶ 76 ("In approving the IMA for the Fund, the Board relied on information and analyses that were prepared by Defendant . . . ."), *id.* ¶ 79 ("The Board has approved the IMA on the terms proposed by Defendant without negotiating more favorable terms . . . .") *with* Ex. Q (*Turner* Compl.) ¶ 383 ("The Fund's independent directors have not sought to obtain, and have not obtained, a reduction in the advisory fee paid by the Fund."), *id.* ¶ 316 ("The investment advisor controls the information which reaches the so-called independent directors of the Fund"), *id.* ¶¶ 325, 381 ("In this limited amount of time [quarterly meetings], the Board of the Fund could not possibly have examined in any meaningful way . . . the factors for continuing [the advisory agreement]").

year" are the types of "generalities" insufficient to impugn a board's 15(c) process). Nor is it sufficient for the Complaint to allege that the fee approval process *must have* been flawed because the trustees have other professional responsibilities (Compl. ¶¶ 74-75), or reviewed materials provided by the adviser (*id.* ¶ 76).[16]  *See Amron,* 464 F.3d at 345 (allegation that directors "serve on the boards of many other mutual funds, businesses, and charitable organizations" was insufficient "as a matter of law" to show directors did not exercise independence and conscientiousness); *Migdal*, 248 F.3d at 331 ("The fact that directors of the funds might be busy . . . [or] dependent on the investment advisers for information sheds no light on the question of whether the directors are disinterested.").

The public record flatly contradicts the plaintiff's circular allegation that the Board did not exercise independence or conscientiousness in approving the IMA and MetWest's fee.  The Fund's Semi-Annual Reports to shareholders for the relevant period, both publicly filed with the SEC, describe in detail the rigorous fee review process undertaken by the Board, with advice of independent counsel, and based upon extensive materials provided by MetWest and third-party consultant Lipper.  Ex. D (2014 SR) at 205-206; Ex. R (2015 SR) at 216-218.  The Board considered each of the *Gartenberg* factors, the Fund's performance record, and compared that performance and the Fund's fee to those of a universe of peer funds with data provided by independent consultant Lipper.  Ex. D (2014 SR) at 205-206;

---

[16] The plaintiff's allegation that the Board oversees eight other funds, for example (Compl. ¶¶ 26, 75), does not plausibly suggest that the Board lacked either independence or conscientiousness. *See, e.g.*, *Migdal*, 248 F.3d at 330 (holding that allegations of a fund's disinterested directors' service on 22 to 38 other boards did not support claim that directors were actually interested, where "neither the ICA nor the SEC proscribes the use of multi-board membership within mutual fund complexes" and "membership on the boards of several funds within a mutual fund complex is the prevailing practice in the industry").

Ex. R (2015 SR) at 216-218.  Based on this robust review, both the full Board and the independent trustees in a separate vote approved the advisory agreement.  Ex. D (2014 SR) at 207; Ex. R (2015 SR) at 218.  The Fund's shareholders expressly agreed with the Board's informed decision: twice in the last five years, the vast majority of the shareholders directly voted to approve the IMA – and the fees thereunder – as a result of change-of-control transactions at MetWest.  Ex. L (2013 AR) at 181; Ex. M (2010 AR) at 142.

These public disclosures illustrate the holes in the plaintiff's pleading.  The Complaint makes no factual allegation that calls into question the independence of the six independent trustees.[17]  It offers no specifics about supposed defects in the 15(c) process.  It says nothing about the trustees' conscientiousness.  The plaintiff does not identify a shred of information the trustees lacked, does not point to a single fact they failed to examine, and does not even allege what the trustees purportedly *should* have considered but did not.  As a result, the Court should observe the statutory mandate to defer to independent trustee decision-making.  *See* 15 U.S.C. § 80a-35(b)(2) ("In any such action approval by the board of directors . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances.") (emphasis added); *Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.").  On the plaintiff's allegations and the public record, the Court should not "second-guess[ ] . . . informed board decisions . . . or supplant the

---

[17] The six independent trustees, including the Chairman of the Board, are sophisticated businesspersons with a wealth of professional experience and include current and former executives of public companies, investment management firms, and a non-profit organization.  Ex. A (SAI) at 32-35.

judgment of disinterested directors apprised of all relevant information." *Jones*, 559 U.S. at 352.

### D. Plaintiff's Passing Reference to Other "*Gartenberg* Factors" Provides No Basis for a Claim that the Fees were Outside an Arm's-length Range

At most, the plaintiff makes passing reference to only one other *Gartenberg* factor, profitability, and ignores the remaining factors entirely. As previously discussed, the allegations in the Complaint that ostensibly relate to a comparison to the Sub-Advised Funds, economies of scale, and Board independence and conscientiousness fall far short of what is required to state a 36(b) claim. Having alleged no other facts to plausibly suggest that the fees were beyond the bargaining range, the Complaint should be dismissed.

On a motion to dismiss, the Court need only take the *factual* allegations in the Complaint as true, not legal conclusions, and the plaintiff has not alleged any facts to suggest that the Fund's profitability was adversely affected by the fees. *See Caviness*, 590 F.3d at 812. Instead, the Complaint contains only half-hearted references to profitability, which are wholly conclusory and therefore insufficient to state a claim: (1) "[t]he increase in fees paid by the Fund resulted in increased profits for Defendant at the expense of the Fund," and (2) "Defendant realized economies of scale as the Fund's AUM increased, which reduced the cost . . . of providing investment advisory services to the Fund, and increased the profitability to Defendant . . . ." Compl. ¶¶ 10, 64. It is well-established that a bare allegation about the size or growth of a fund, which is all the plaintiff has asserted here, is not enough to withstand dismissal. *See, e.g.*, *Amron*, 464 F.3d at 343 (dismissing Section 36(b) claim and finding plaintiffs' assertions regarding the size of the investment advisory fees "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds"); *Turner*, slip.

op. at 14, 16 (allegation that the fund was "large" was insufficient to support an inference that the fund was "excessively profitable" to adviser).

The Complaint does not even mention, let alone meaningfully address, the remaining *Gartenberg* factors, namely: (1) the nature and quality of the services provided to the fund and shareholders; (2) the adviser's cost in providing the service; and (3) any "fall-out financial benefits." *Jones*, 559 U.S. at 344 & n.5 (citing *Gartenberg*, 694 F.2d at 929-32). The plaintiff's disregard for these factors underscores the paucity of factual allegations in the Complaint. Even though a plaintiff is not required to plead facts that relate to *all* of the *Gartenberg* factors in order to state a 36(b) claim, the plaintiff's failure to plead *any* facts that plausibly show the fees are beyond what could have been bargained for at arm's length dooms his claim.

## II.    SECTION 47 PROVIDES NO SEPARATE BASIS FOR A CLAIM

The plaintiff is not entitled to rescission under Section 47(b) because he failed to state a plausible claim under Section 36(b). Section 47(b) authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter." 15 U.S.C. § 80a-46(b)(1). The plaintiff's failure to plead a violation of Section 36(b), necessarily bars his rescission claim. Additionally, the plain language of Section 47(b) makes rescission available only to a "party" to that contract – in this case, Metropolitan West Funds and MetWest. *Id.* The plaintiff is simply not a party to the IMA, so he lacks standing to seek its rescission. *See Turner*, slip. op. at 18-19 (granting motion to dismiss Section 47(b) claim because Section 36(b) plaintiff was not standing in the shoes of the fund and was not a party to the advisory agreement he was challenging); *see also Davis v. Bailey*, No. 05-civ-0042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting rescission of advisory agreement because

"[p]laintiffs were not parties" to it).[18]

## CONCLUSION

For the foregoing reasons, the plaintiff's Complaint should be dismissed with prejudice.

---

[18] The Complaint's demand for a jury trial is also a dead letter.  Courts have routinely held that Section 36(b) claims are equitable in nature and therefore do not fall within the Seventh Amendment's right to jury trial on actions at law.  *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) (holding that plaintiff was not entitled to a jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line"), *rev'd on other grounds*, 500 U.S. 90, 95 n.3 (1991); *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) ("Petitioner is not entitled to a trial by jury here, for petitioner's claim is basically 'equitable' in nature."); *In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) (holding that plaintiff "is not entitled to a jury trial" because "this case involves the equitable inquiry whether the Trust adviser violated its fiduciary obligations by charging an exorbitant fee").  Accordingly, the plaintiff's jury demand should be stricken.  *See Zehrer v. Harbor Capital Advisors, Inc.*, No. 14 C 789, 2014 WL 6478054, at *5 (N.D. Ill. Nov. 18, 2014) (striking plaintiff's jury trial demand at motion to dismiss stage).

1    December 18, 2015                    Respectfully submitted,

2

3                                         **ROPES & GRAY LLP**
                                          John D. Donovan, Jr. (*pro hac vice*
4                                         *forthcoming*)
                                          Robert A. Skinner (*pro hac vice*)
5                                         Amy D. Roy (*pro hac vice*)

6

7                                         **IRELL & MANELLA LLP**
                                          David Siegel
8                                         Glenn K. Vanzura

9

10                                        By: */s/ Glenn K. Vanzura*
11                                            Glenn K. Vanzura

12
                                          *Attorneys for Defendant Metropolitan*
13                                        *West Asset Management, LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28