# EXHIBIT A

485BPOS 1 d922577d485bpos.htm METROPOLITAN WEST FUNDS

**Table of Contents**

**As filed with the Securities and Exchange Commission on July 24, 2015**

File No. 333-18737
File No. 811-07989

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

_____

# FORM N-1A
# REGISTRATION STATEMENT
### UNDER
### *THE SECURITIES ACT OF 1933*                                    ☒
**Pre-Effective Amendment No.**                                        ☐
**Post-Effective Amendment No. 50**                                    ☒

# REGISTRATION STATEMENT
### UNDER
### *THE INVESTMENT COMPANY ACT OF 1940*                             ☒
**Amendment No. 52**                                                   ☒

_____

# METROPOLITAN WEST FUNDS
### (Exact Name of Registrant as Specified on Charter)

_____

**865 South Figueroa Street**
**Los Angeles, California 90017**
**(Address of Principal Executive Offices)**

**(213) 244-0000**
**(Registrant's Telephone Number)**

**David B. Lippman**
**865 South Figueroa Street**
**Los Angeles, California 90017**
**(Name and Address of Agent for Service)**

_____

It is proposed that this filing will become effective (check appropriate box).

☐   immediately upon filing pursuant to paragraph (b) of Rule 485

☒   on July 29, 2015 pursuant to paragraph (b) of Rule 485

☐   60 days after filing pursuant to paragraph (a)(1) of Rule 485

Exhibit A

6

[Table of Contents](#)



JULY 29
**2015**
**Statement of Additional Information**

METROPOLITAN WEST ULTRA SHORT BOND FUND ("Ultra Short Bond Fund")
(I Share: MWUIX; M Share: MWUSX)

METROPOLITAN WEST LOW DURATION BOND FUND ("Low Duration Bond Fund")
(I Share: MWLIX; M Share: MWLDX; Admin Share: MWLNX)

METROPOLITAN WEST INTERMEDIATE BOND FUND ("Intermediate Bond Fund")
(I Share: MWIIX; M Share: MWIMX)

METROPOLITAN WEST TOTAL RETURN BOND FUND ("Total Return Bond Fund")
(I Share: MWTIX; M Share: MWTRX; Admin Share: MWTNX; P Share: MWTSX)

METROPOLITAN WEST HIGH YIELD BOND FUND ("High Yield Bond Fund")
(I Share: MWHIX; M Share: MWHYX)

METROPOLITAN WEST UNCONSTRAINED BOND FUND ("Unconstrained Bond Fund")
(I Share: MWCIX; M Share: MWCRX)

METROPOLITAN WEST STRATEGIC INCOME FUND ("Strategic Income Fund")
(I Share: MWSIX; M Share: MWSTX)

METROPOLITAN WEST ALPHATRAK 500 FUND ("AlphaTrak 500 Fund")
(M Share: MWATX)

METROPOLITAN WEST FLOATING RATE INCOME FUND ("Floating Rate Income Fund")
(I Share: MWFLX; M Share: MWFRX)

This Statement of Additional Information ("SAI") is not a prospectus, and it should be read in conjunction with the Prospectus dated July 29, 2015, as supplemented from time to time, which describes each of the separate investment series (each, a "Fund" and collectively, the "Funds") of Metropolitan West Funds (the "Trust"). Copies of the Prospectus may be obtained at no charge by writing to Metropolitan West Funds, 865 South Figueroa Street, Los Angeles, California 90017. Metropolitan West Asset Management, LLC (the "Adviser") is the investment adviser to the Funds. Incorporated by reference herein are the financial statements of the Funds contained in the Funds' Annual Report to Shareholders for the fiscal year ended March 31, 2015, including the Report of Deloitte & Touche LLP, the Funds' Independent Registered Public Accounting Firm. Copies of the Funds' Annual and Semi-Annual Reports to shareholders are available, upon request, without charge, by calling (800) 241-4671, or by writing to Metropolitan West Funds, 865 South Figueroa Street, Los Angeles, California 90017 or by visiting www.mwamllc.com.

Page 1

Exhibit A
7

**Table of Contents**

INVESTMENT ADVISORY SERVICES                                          49
PORTFOLIO MANAGERS                                                    50
DISCLOSURE OF PORTFOLIO HOLDINGS                                      54
ADMINISTRATIVE AND ACCOUNTING SERVICES                               54
CUSTODIAN AND TRANSFER AGENT                                          55
UNDERWRITER                                                           55
SHARE MARKETING PLAN                                                  56
SHAREHOLDER SERVICING PLAN                                           57
OTHER SHAREHOLDER SERVICING EXPENSES PAID BY THE FUNDS                58
NET ASSET VALUE                                                       58
CONVERSION OF SHARES BETWEEN CLASSES                                  59
REDEMPTION IN KIND                                                    59
DIVIDENDS AND TAX STATUS                                              60
FURTHER INFORMATION ABOUT THE TRUST                                   62
ADDITIONAL INFORMATION                                               62
LEGAL OPINION                                                         62
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM                         62
OTHER INFORMATION                                                     62
FINANCIAL STATEMENTS                                                  62
APPENDIX — DESCRIPTION OF RATINGS                                     63

## THE TRUST

The Trust was organized on December 9, 1996 as a Delaware statutory trust and is registered with the U.S. Securities and Exchange Commission ("SEC") as an open-end, management investment company. The Trust currently consists of nine separate series, each of which has separate assets and liabilities. Each Fund is a diversified fund. Each Fund other than the AlphaTrak 500 Fund, the Low Duration Bond Fund and the Total Return Bond Fund has two classes of shares of beneficial interest, Class M and Class I, each with a par value of $0.01 per share. The Low Duration Bond Fund and the Total Return Bond Fund have an Administrative Class of shares of beneficial interest, each with a par value of $0.01 per share. The Total Return Bond Fund has a Plan Class of shares of beneficial interest, with a par value of $0.01 per share. The Trust's Board of Trustees decides matters of general policy and reviews the activities of the Adviser. The Trust's officers conduct and supervise the daily business operations of the Trust. The Board of Trustees may, at its own discretion, create additional series of shares and classes within each series.

## INVESTMENT OBJECTIVES AND POLICIES

The investment objective of each Fund is described in the Prospectus.

The portfolio and strategies with respect to the composition of each Fund are described in the Prospectus.

### *INVESTMENT RESTRICTIONS*

Each Fund has adopted the following restrictions (in addition to those indicated in the Prospectus) as fundamental policies, which may not be changed without the favorable vote of the holders of a "majority" of that Fund's outstanding voting securities, as defined in the Investment Company Act of 1940, as amended (the "1940 Act"). Under the 1940 Act, the vote of the holders of a "majority" of a Fund's outstanding voting securities means the vote of the holders of the lesser of (i) 67% of the shares of the Fund represented at a meeting at which the holders of more than 50% of its outstanding shares are represented or (ii) more than 50% of the outstanding shares.

Except as noted, no Fund may:

1.   Purchase any security, other than obligations of the U.S. Government, its agencies, or instrumentalities ("U.S. Government securities") or mutual funds, if as a result of that purchase: (i) with respect to 75% of its total assets,

more than 5% of the Fund's total assets (determined at the time of investment) would then be invested in securities of a single issuer, or (ii) more than 25% of the Fund's total assets (determined at the time of investment) would be invested in one or more issuers having their principal business activities in a single industry. For purposes of the industry concentration test, (a) finance company subsidiaries will be considered to be in the industries of their parent companies if their activities are primarily related to financing the activities of the parent companies; (b) utilities will be regarded as separate industries based on their services; for example, electric, natural gas, telephone, among others, will each be considered a separate industry; and (c) the Floating Rate Income Fund may concentrate in the banking industry to the extent that such concentration results from the Fund's purchase of loan participations from banks and the banks are considered the issuers of those participations.

2.  Purchase securities on margin (but any Fund may obtain such short-term credits as may be necessary for the clearance of transactions and may otherwise borrow as expressly permitted by the Prospectus or this SAI) provided that the deposit or payment by a Fund of initial or maintenance margin in connection with futures or options is not considered the purchase of a security on margin.

Page 3

Table of Contents

### PORTFOLIO TURNOVER

Portfolio securities are sold whenever the Adviser believes it appropriate, regardless of how long the securities have been held. Portfolio turnover generally involves some expense to the Fund, including brokerage commissions, dealer markups and other transaction costs, and may result in the recognition of capital gains that may be distributed to shareholders. Generally, portfolio turnover over 100% is considered high and increases these costs. The Adviser does not view turnover as an important consideration in managing the Funds and does not strive to limit portfolio turnover. Each Fund's investment program emphasizes active portfolio management with a sensitivity to short-term market trends and price changes in individual securities. Accordingly, each Fund may take frequent trading positions, resulting in portfolio turnover that may exceed the portfolio turnover of most investment companies of comparable size. During the last two fiscal years, there was significant variation in the portfolio turnover rates of the Intermediate Bond Fund and Total Return Bond Fund, which can be attributed to a repositioning of the portfolios in light of the increase in the volatility of interest rates and spreads.

### DEFENSIVE INVESTING

The Funds may engage in defensive investing, which is a deliberate, temporary shift in portfolio strategy that may be undertaken when markets start behaving in volatile or unusual ways. Depending on the Adviser's analysis of the various markets and other considerations, the Funds may, for temporary defensive purposes, invest a substantial part or all of their assets in bonds of U.S. or foreign governments, cash, certificates of deposit, bankers' acceptances, high-grade commercial paper, and repurchase agreements. Such investments may also be made for temporary purposes pending investment in other securities or following substantial new investment in a Fund. When the Funds have invested defensively in low risk, low return securities, they may not achieve their investment objectives. There is no assurance that the Funds will enter into a defensive strategy in the event of volatility or other unusual activity in the securities markets.

## MANAGEMENT

### BOARD LEADERSHIP STRUCTURE AND RISK OVERSIGHT

The operations of the Funds are under the direction of the Board of Trustees. The Board establishes the Funds' policies and oversees and reviews the management of the Funds. The Board meets regularly (*i.e.,* at least quarterly) to review the investment performance of the Funds and other financial and operational matters, including policies and procedures with respect to compliance with regulatory and other requirements, as well as to review the activities of the Trust's officers, who are responsible for the day-to-day operations of the Funds. The Board met four times during the fiscal year ended March 31, 2015.

The Board consists of eight Trustees, six of whom are not "interested persons" (as defined in the Investment Company Act of 1940, as amended) of the Trust (the "Independent Trustees"). An Independent Trustee serves as Chairman of the Board. In addition, there are three standing committees of the Board to which the Board has delegated certain authority and supervisory responsibilities, two of which are comprised exclusively of Independent Trustees. Those committees are the Audit Committee, Nominating Committee and Pricing Committee, whose responsibilities and activities are described below.

As part of each regular Board meeting, the Independent Trustees meet separately from the Adviser, and as needed with their independent legal counsel and with the Trust's Chief Compliance Officer. The Board reviews its leadership structure periodically as part of its annual self-assessment process and believes that its structure is appropriate to enable the Board to exercise its oversight of the Funds.

The Funds have retained the Adviser as the Funds' investment adviser. Subject to the objectives and policies as the Trustees may determine, the Adviser furnishes a continuing investment program for the Funds, makes investment decisions on their behalf, manages risks that arise from the Funds' investments and operations, and provides administrative services to each Fund, all pursuant and subject to its investment advisory agreement with the Funds. Employees of the Adviser serve as the Trust's officers, including the Trust's President, Treasurer, Secretary and Chief Compliance Officer.

The Board oversees the services provided by the Adviser, including certain risk management functions. Risk management is a broad concept that can cover many elements. The Board handles its review of different elements and types of risks in different ways. In the course of providing oversight, the Board and the Committees receive reports on the Funds' activities, including regarding each Fund's investment portfolio and the Funds' financial accounting and reporting. The Board also meets periodically with the Trust's Chief Compliance Officer who reports on the compliance of the Funds with the federal securities laws and the Trust's internal compliance policies and procedures. The Audit Committee's meetings with the Funds' independent auditors also contribute to its oversight of certain internal control risks. In addition, the Board meets periodically with the portfolio managers of the Funds to receive reports regarding the management of the Funds, including certain investment and operational risks. Because the Board has delegated

Page 31

Table of Contents

the day-to-day activities of the Funds to the Adviser and other service providers, the risk management oversight provided by the Board can mitigate but not eliminate the identified risks. Not all risks that may affect a Fund can be identified or processes and controls developed to eliminate or mitigate their occurrence or effects, and some risks are simply beyond any control of a Fund or the Adviser, its affiliates or other service providers.

### TRUSTEES AND OFFICERS

Information pertaining to the Trustees and officers of the Trust is provided in the table below. The term "officer" means president, vice president, secretary, treasurer, controller, or any other officer who performs policymaking functions. All officers serve without direct compensation from the Funds. "**Fund Complex**" used in this SAI refers to the Trust (consisting of 9 portfolios), TCW Funds, Inc. (consisting of 23 portfolios), TCW Strategic Income Fund, Inc. (consisting of 1 portfolio), and TCW Alternative Funds (consisting of 1 portfolio).

| NAME AND YEAR OF BIRTH*** | POSITION(S) HELD WITH TRUST | TERM OF OFFICE AND LENGTH OF TIME SERVED | PRINCIPAL OCCUPATIONS DURING PAST FIVE YEARS | NUMBER OF FUNDS IN FUND COMPLEX OVERSEEN BY TRUSTEE | OTHER DIRECTORSHIPS HELD BY TRUSTEE |
|---|---|---|---|---|---|
| | | | **Independent Trustees of the Trust*** | | |
| Ronald J. Consiglio (1943) | Trustee | Indefinite term, since 2003 | Since 1999, Mr. Consiglio has served as the managing director of Synergy Trading, a securities-trading partnership. From 1999 through 2001, Mr. Consiglio was Executive Vice President and Chief Financial Officer of Trading Edge, Inc., a national automated bond-trading firm. From January 1993 to 1998, Mr. Consiglio served as Chief Executive Officer and President of Angeles Mortgage Investment Trust, a publicly traded Real Estate Investment Trust. Before that position, he served as Senior Vice President and Chief Financial Officer of Cantor Fitzgerald & Co. and as a member of its board of directors. Mr. Consiglio is a certified public accountant and was an audit partner with Deloitte Haskins & Sells from 1977 through 1984. | 9 | Mannkind Corp. (pharmaceutical preparations) |
| Patrick C. Haden (1953) | Trustee | Indefinite term, since 2010 | Athletic Director, University of Southern California. Prior to August 2010, General Partner, Riordan, Lewis & Haden (private equity firm). | 34 | Tetra Tech, Inc. (Environmental Consulting); The Rose Hill Foundation (Charitable Organization); Unihealth Foundation (Charitable Organization); TCW Funds (mutual funds); TCW Strategic Income Fund, |

|  |  |  |  |  | Inc. (closed-end fund); TCW Alternative Funds (mutual funds) |
| --- | --- | --- | --- | --- | --- |
| Martin Luther King III (1957) | Trustee and Chairman of the Nominating Committee | Indefinite term, since 1997 | Since 1998, Mr. King has served as the President and Chief Executive Officer of The King Center. Since January 2006, he has served as Chief Executive Officer of Realizing the Dream, a non-profit organization that continues the humanitarian and liberating work of Dr. Martin Luther King, Jr. and Mrs. Coretta Scott King. He has been engaged as an independent motivational lecturer since 1980. | 9 | None |
| Peter McMillan (1957) | Trustee | Indefinite term, since 2008 | Since 2000, Mr. McMillan has served as the co-founder and Managing Partner of Willowbrook Capital Group LLC, an investment advisory firm. He has also served as a co-founder and Executive Vice President of KBS Capital Advisors, a manager of REITs, since 2005. He is the co-founder, Managing Partner and Chief Investment Officer for Temescal Canyon Partners, an investment advisory firm, since May 2013. | 34 | KBS Real Estate Investment Trust I, KBS Real Estate Investment Trust II, KBS Real Estate Investment Trust III, KBS Strategic Opportunity REIT II, Inc. and KBS Strategic Opportunity REIT, Inc. (real estate investments); TCW Funds, Inc. (mutual funds); TCW Strategic Income Fund, Inc. (closed-end fund); TCW Alternative Funds (mutual funds) |

Page 32

Exhibit A
13

Table of Contents

| NAME AND YEAR OF BIRTH*** | POSITION(S) HELD WITH TRUST | TERM OF OFFICE AND LENGTH OF TIME SERVED | PRINCIPAL OCCUPATIONS DURING PAST FIVE YEARS | NUMBER OF FUNDS IN FUND COMPLEX OVERSEEN BY TRUSTEE | OTHER DIRECTORSHIPS HELD BY TRUSTEE |
|---|---|---|---|---|---|
| Robert G. Rooney (1957) | Trustee and Chairman of the Audit Committee | Indefinite term, since 2009 | From 2006 until 2011, Mr. Rooney served as Executive Vice President and Chief Operating Officer of Affinion Group, Inc. ("Affinion"), a customer engagement and loyalty company. Previously, he was Executive Vice President and interim Chief Financial Officer at Affinion from October 2005 to January 2006. Between November 2004 and October 2005, Mr. Rooney was Executive Vice President at CMG (predecessor to Affinion) and between January 2004 to October 2004, Mr. Rooney was Executive Vice President and Chief Financial Officer at CMG. From July 2001 to January 2004, Mr. Rooney was Executive Vice President and Chief Financial Officer at Trilegiant, a subsidiary of Affinion. | 9 | None |
| Andrew Tarica (1959) | Trustee and Chairman of the Board | Indefinite term, since 2002 and 2008, respectively | Mr. Tarica has served as the Chief Executive Officer of Meadowbrook Capital Management, a fixed-income asset management company that manages a credit fund since February of 2001. Since 2005, responsible for managing and trading fixed-income investments at Concept Capital Markets, LLC, a New York based broker-dealer (until 2011, known as Sanders Morris Harris, a Houston-based broker-dealer). | 34 | TCW Funds, Inc. (mutual funds); TCW Strategic Income Fund, Inc. (closed-end fund); TCW Alternative Funds (mutual funds) |

**Interested Trustees\*\***

| | | | | | |
|---|---|---|---|---|---|
| Patrick Moore (1964) | Trustee | Indefinite term, since 2014 | Mr. Moore is a Managing Director for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. He has been with the Adviser since 2000. Mr. Moore is a member of the CFA Institute. | 9 | None |
| Laird Landmann (1964) | Trustee and Executive Vice President | Indefinite term, since 2008 and 2007, respectively | Mr. Landmann is Group Managing Director of TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. Since August 1996, Mr. Landmann has been a Generalist Portfolio Manager with the Adviser and currently serves as the Adviser's President. | 9 | MetWest Enhanced TALF Strategy Fund, Ltd. (investment fund) |

**Officers of the Trust who are not Trustees**

| David B. Lippman (1958) | President and Principal Executive Officer | Indefinite term, since November 2008 | Mr. Lippman is the Chief Executive Officer of the Adviser and of The TCW Group, Inc. (since February 2013), and the Chief Executive Officer and President of TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. He has served as Chief Executive Officer with the Adviser since June 2008. | N/A | TCW Strategic Income Fund, Inc. (closed-end fund) |
|---|---|---|---|---|---|
| David S. DeVito (1963) | Treasurer and Chief Financial Officer | Indefinite term, since 2010 | Mr. DeVito is Executive Vice President and Chief Operating Officer of the Adviser, TCW Investment Management Company, The TCW Group, Inc., Trust Company of the West and TCW Asset Management Company; President and Chief Executive Officer, TCW Alternative Funds, TCW Funds, Inc. and TCW Strategic Income Fund, Inc. | N/A | TCW Funds, Inc. (mutual funds); TCW Strategic Income Fund, Inc. (closed-end fund) |
| Eric Chan (1978) | Assistant Treasurer | Indefinite term, since 2010 | Mr. Chan is Senior Vice President of Fund Operations for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. He has worked for the Adviser since November 2006. Mr. Chan is a Certified Public Accountant. | N/A | N/A |
| Bibi Khan (1953) | Vice President | Indefinite term, since 2007 | Ms. Khan is Managing Director of Operations for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. She has worked for the Adviser since 2005. From 2003 through 2005, Ms. Khan served as Director, Securities Group Operations Manager for Columbia Management (formerly Banc of America Capital Management, LLC). Ms. Khan is a Certified Trust and Financial Analyst. | N/A | N/A |
| Tad Rivelle (1961) | Executive Vice President | Indefinite term, since 2007 | Mr. Rivelle is the Chief Investment Officer and Group Managing Director for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. He has been with the Adviser since August 1996. | N/A | N/A |
| Stephen M. Kane (1962) | Executive Vice President | Indefinite term, since 2007 | Mr. Kane is a Group Managing Director for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. He has been with the Adviser since August 1996. | N/A | N/A |
| Cal Rivelle (1958) | Executive Vice President | Indefinite term, since 2009 | Mr. Rivelle is a Managing Director for the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West. | N/A | N/A |

He has served as Executive Vice President of the Funds since March 2009.

| | | | | | |
|---|---|---|---|---|---|
| Jeffrey Engelsman (1967) | Chief Compliance Officer | Indefinite term, since 2014 | Mr. Engelsman is a Managing Director and Chief Compliance Officer of the Adviser, TCW Investment Management Company, TCW Asset Management Company and Trust Company of the West (since August 2014). He has served as Chief Compliance Officer of the Funds since December 2014. Prior to joining TCW, he was a Managing Director of New York Life Investments and the Chief Compliance Officer of the MainStay Funds, a group of more than 70 open-ended and closed-end funds. Mr. Engelsman holds the Series 7, 24 and 63 FINRA licenses. He is Chief Compliance Officer for the TCW Alternative Funds, TCW Funds, Inc. and TCW Strategic Income Fund, Inc. | N/A | N/A |

Page 33

Table of Contents

| NAME AND YEAR OF BIRTH*** | POSITION(S) HELD WITH TRUST | TERM OF OFFICE AND LENGTH OF TIME SERVED | PRINCIPAL OCCUPATIONS DURING PAST FIVE YEARS | NUMBER OF FUNDS IN FUND COMPLEX OVERSEEN BY TRUSTEE | OTHER DIRECTORSHIPS HELD BY TRUSTEE |
|---|---|---|---|---|---|
| Meredith Jackson (1959) | Vice President and Secretary | Indefinite term, since 2013 | Ms. Jackson is Executive Vice President and General Counsel of the Adviser, TCW Investment Management Company, Trust Company of the West and TCW Asset Management Company (since February 2013); before then she was Partner, Irell& Manella LLP (law firm). She is Senior Vice President, Secretary and General Counsel for the TCW Alternative Funds, TCW Funds, Inc. and TCW Strategic Income Fund, Inc. | N/A | N/A |
| Patrick Dennis (1981) | Vice President and Assistant Secretary | Indefinite term, since 2013 | Mr. Dennis is Senior Vice President and Associate General Counsel, the Adviser, TCW Investment Management Company, Trust Company of the West and TCW Asset Management Company (since February 2013); before then from 2010 to 2013, he was Associate, Paul Hastings LLP (law firm), and from 2006 to 2010, he was Associate, Dechert LLP (law firm). He is Vice President and Assistant Secretary for the TCW Alternative Funds, TCW Funds, Inc. and TCW Strategic Income Fund, Inc. | N/A | N/A |

\*       Denotes a Trustee who is not an "interested" person of the Funds as defined in the 1940 Act.

\*\*     Denotes a Trustee who is an "interested" person of the Trust as defined in the 1940 Act, due to the relationship indicated with the Adviser.

\*\*\*   For purposes of Trust business, the address for all Trustees and officers is c/o Metropolitan West Asset Management, LLC, 865 South Figueroa Street, Los Angeles, California 90017.

The Board of Trustees will consider nominees for Trustee recommended by shareholders provided that such recommendations are submitted by the date disclosed in a Fund's proxy statement and otherwise comply with applicable securities laws, including Rule 14a-8 under the 1934 Act. Such shareholder recommendations must be in writing and should be sent to the attention of the Board of Trustees in care of the Fund at 865 South Figueroa Street, Los Angeles, California 90017. Shareholder recommendations should include the proposed nominee's biographical information (including business experience for the past ten years) and a description of the qualifications of the proposed nominee, along with a statement from the proposed nominee that he or she is willing to serve and meets the requirements to be a disinterested Trustee, if applicable.

### INFORMATION ABOUT EACH TRUSTEE'S QUALIFICATIONS, EXPERIENCE, ATTRIBUTES OR SKILLS

The Board took into account a variety of factors in the original selection of candidates to serve as a Trustee, including the then composition of the Board. Generally, no one factor was decisive in the selection of an individual to join the Board. Among the factors the Board considered when concluding that an individual should serve on the Board were the following: (i) the individual's business and professional experience and accomplishments; (ii) the individual's ability to work effectively with the other members of the Board; and (iii) how the individual's skills, experience, and attributes would contribute to an appropriate mix of relevant skills and experience on the Board. In addition, the Trustees also possess various other intangible qualities such as intelligence, work ethic, the ability to work together, to communicate effectively, to ask incisive questions and exercise judgment, and to oversee the business of the Trust. The Board also

considered, among other factors, the particular attributes described below with respect to the various individual Trustees. The summaries set forth below as to the qualifications, attributes, and skills of the Trustees are furnished in response to disclosure requirements imposed by the SEC, do not constitute any representation or guarantee that the Board or any Trustee has any special expertise or experience, and do not impose any greater or additional responsibility or obligation on, or change any standard of care of, any such person or on the Board as a whole than otherwise would be the case.

Mr. Consiglio has many years of experience as an executive in the securities industry, including service as a board member. He also has in-depth experience with audit and accounting principles and practices, and serves as the Audit Committee Financial Expert on the Audit Committee. He also has many years of experience serving on the Trust's Board.

Mr. Haden is the Independent Chairman of TCW Funds, Inc., and the Athletic Director of the University of Southern California. Previously he was a General Partner in Riordan, Lewis & Haden, a private equity fund and serves on the boards of Tetra Tech, Inc., an environmental consulting company, and TSI, a publicly-traded closed end fund, of which he is also the Independent Chairman. Mr. Haden is a Rhodes Scholar and prior to August 2010, was a member of the Board of Trustees of the University of Southern California. All of these positions give him extensive experience serving as a board member and discharging his fiduciary responsibilities with respect to investment companies.

Mr. King is a nationally prominent community leader and organizer, and has had leadership positions with various community organizations. He also has many years of experience serving on the Trust's Board.

Page 34

Table of Contents

Mr. McMillan has many years of experience as an investment industry professional with extensive experience managing securities portfolios, and is very experienced with the analysis of investment strategy, trading, and performance results. He also has experience with board positions, including approximately four years of experience serving on the Trust's Board.

Mr. Rooney has many years of senior executive and board experience with various companies, including in-depth experience with financial matters. He also has approximately three years of experience serving on the Trust's Board.

Mr. Tarica has many years of experience in the investment management and investment advisory industry, including substantial experience managing fixed-income portfolios. He also has many years of experience serving on the Trust's Board.

Mr. Landmann is an executive and co-founder of the Adviser, and has many years of experience managing fixed-income portfolios for clients of the Adviser including the Funds. Mr. Landmann also previously served as a Trustee of the Trust.

Mr. Moore is an executive officer with the Adviser, and has many years of experience with the Adviser's portfolio management activities for its clients, including the Funds. Mr. Moore also previously served as a Trustee of the Trust from 2010 until 2011.

### COMMITTEES

The Board has an Audit Committee consisting of Messrs. King, Consiglio, Haden, Tarica, Rooney and McMillan. Mr. Rooney is the Chairman of the Audit Committee. All of the members of the Audit Committee are not "interested persons" of the Trust as defined in the 1940 Act ("Independent Trustees"). The Audit Committee reviews the scope and results of the Trust's annual audit with the Trust's independent registered public accountants, recommends the engagement of such accountants and approves all audit services and permissible non-audit services. The Audit Committee met two times during the fiscal year ended March 31, 2015.

The Board has a Nominating Committee consisting of all the Independent Trustees. The Nominating Committee evaluates the qualifications of Board member candidates and makes nominations for Independent Trustee membership on the Board. Mr. King is Chairman of the Nominating Committee. The Nominating Committee met once during the fiscal year ended March 31, 2015.

The Trust has a Pricing Committee consisting of an Independent Trustee named from time to time by the Board, David S. DeVito, the Chief Financial Officer of the Trust and the Adviser and Treasurer of the Trust, and Stephen Kane, a portfolio manager of the Adviser. The Pricing Committee is responsible for the fair value pricing of any securities held by the Funds as necessary. The Pricing Committee did not meet during the fiscal year ended March 31, 2015.

### SECURITY AND OTHER INTERESTS

The table below sets forth the dollar range of equity securities beneficially owned by each Trustee in the Funds and in all registered investment companies overseen by the Trustee within the Trust's family of investment companies, as of December 31, 2014.

| Name of Trustee | Dollar Range of Equity Securities in the Funds [1] | Aggregate Dollar Range of Equity Securities in All registered Investment Companies Overseen by Director in Family of Investment Companies [2] |
|---|---|---|
| **INDEPENDENT TRUSTEES** | | |
| Ronald J. Consiglio | Total Return Bond Fund | Over $100,000 |
| Patrick C. Haden | Total Return Bond Fund – over $100,000 Unconstrained Bond Fund – $50,001 to $100,000 | Over $100,000 |

| | | |
|---|---|---|
| Martin Luther King, III | None | None |
| Andrew Tarica | Low Duration Bond Fund – $50,001 to $100,000<br>Unconstrained Bond Fund – $50,001 to $100,000 | Over $100,000 |
| Peter McMillan | Total Return Bond Fund – $50,001 to $100,000 | $50,001 to $100,000 |
| Robert Rooney | High Yield Bond Fund – $10,001 to $50,000<br>Unconstrained Bond Fund –$50,001 to $100,000<br>AlphaTrak 500 Fund – $10,001 to $50,000<br>Floating Rate Bond Fund – $50,001 to $100,000 | Over $100,000 |

Page 35

Table of Contents

### INVESTMENT ADVISORY SERVICES

The Adviser, Metropolitan West Asset Management, LLC, with principal offices at 865 South Figueroa Street, Los Angeles, California 90017, is a registered investment adviser and was organized as a California limited liability company in 1996. The Adviser is a wholly owned subsidiary of TCW Asset Management Company.

Under the Investment Advisory Agreement relating to the Funds (the "Advisory Agreement"), the Adviser provides the Funds with investment management services. As compensation for these services, each Fund pays management fees at an annualized rate of its average daily net assets, as described in the Prospectus. For the fiscal years ended March 31, 2015, 2014 and 2013, the amounts of the advisory fees earned by the Adviser and the amounts of the reductions in fees and reimbursements of expenses by the Adviser as a result of the expense limitations and fee waivers described in the Prospectus, are provided in the chart below.

| | Fiscal Year ended March 31, 2015 | | Fiscal Year ended March 31, 2014 | | Fiscal Year ended March 31, 2013 | |
|---|---|---|---|---|---|---|
| | Contractual Advisory Fees | Advisory Fees Reduced and Expenses Reimbursed by Adviser | Contractual Advisory Fees | Advisory Fees Reduced and Expenses Reimbursed by Adviser | Contractual Advisory Fees | Advisory Fees Reduced and Expenses Reimbursed by Adviser |
| Ultra Short Bond Fund | $ 471,461 | $ 255,027 | $ 430,429 | $ 163,689 | $ 281,310 | $ 158,547 |
| Low Duration Bond Fund | $ 10,908,861 | $ 184,754 | $ 8,555,233 | $ 0 | $ 5,110,506 | $ 0 |
| Intermediate Bond Fund | $ 2,796,564 | $ 53,882 | $ 1,368,170 | $ 103,858 | $ 1,051,823 | $ 117,147 |
| Total Return Bond Fund | $140,478,557 | $ 189,006 | $88,835,942 | $ 0 | $78,277,507 | $ 24,065 |
| High Yield Bond Fund | $ 9,498,578 | $ 785,013 | $11,151,937 | $ 358,500 | $11,698,990 | $ 681,824 |
| Unconstrained Bond Fund (1) | $ 7,624,504 | $ 57,572 | $ 3,140,534 | $ 189,031 | $ 477,985 | $ 261,222 |
| Strategic Income Fund | $ 3,620,271 | $ 45,177 | $ 4,291,005 | $ 0 | $ 3,424,765 | $ 0 |
| AlphaTrak 500 Fund | $ 8,722 | $ 112,318 | $ 32,386 | $ 129,255 | $ 38,274 | $ 120,886 |
| Floating Rate Income Fund (2) | $ 744,564 | $ 83,121 | $ 415,407 | $ 123,362 | N/A | N/A |

(1) The Unconstrained Bond Fund commenced operations on October 1, 2011.
(2) The Floating Rate Income Fund commenced operations on June 28, 2013.

The Board of Trustees of the Trust, including the Independent Trustees, approved the Advisory Agreement with respect to the Funds pursuant to Section 15(c) of the 1940 Act at a meeting called for the purpose of voting on such approval. Before approving the Advisory Agreement, the Board evaluated information provided by the Adviser. The Board considered a number of factors with respect to each of the Funds. Based on this review, the full Board, and by separate vote, the Independent Trustees concluded that the advisory fees to be paid by the Funds, as well as the proposed expenses of the Funds, are fair, both absolutely and in comparison with those of other mutual funds in the industry. Shareholder reports (normally the semi-annual report) will provide a discussion of the basis for the Board's decision to approve/renew the Investment Advisory Agreement with respect to each Fund.

The Adviser has agreed in an Operating Expenses Agreement with the Trust to limit each Fund's expenses as described in the Prospectus. The Operating Expenses Agreement has a one-year term, renewable with respect to the periods for which the prospectus is effective, which normally means an annual term ending July 31 of the applicable year. Each Fund has agreed to reimburse the Adviser, for a period of up to three years, for any such expense subsidy payments or fee reductions, to the extent that the Fund's operating expenses are otherwise below its expense cap (excluding the AlphaTrak 500 Fund and the Strategic Income Fund, which shall reimburse the Adviser to the extent that the Fund's "other expenses" as described in the Prospectus, are below an agreed-upon cap). The Adviser's obligation will not be recorded as a liability on the books of the applicable Fund to the extent that the total operating expenses ("other expenses" with respect to the AlphaTrak 500 Fund and the Strategic Income Fund) of the Fund are at or above the expense cap. However, if the total operating expenses ("other expenses" with respect to the AlphaTrak 500 Fund and the Strategic Income Fund) of a Fund fall below the expense cap, the reimbursement to the Adviser (up to the cap) will be accrued by the

Page 49

Table of Contents

### DISCLOSURE OF PORTFOLIO HOLDINGS

The Board of Trustees has adopted a policy regarding disclosure of the Funds' portfolio holdings. The Funds currently disclose portfolio holdings with respect to holdings at the end of the second and fourth quarters in their semi-annual and annual reports to shareholders, and with respect to holdings at the end of the first and third quarters in their Form N-Q reports, which are available at www.sec.gov and www.mwamllc.com. The Funds or the Adviser may distribute non-specific information about the Funds and/or summary information about the Funds at any time. Such information will not identify any specific portfolio holding, but may reflect, among other things, the quality or character of a Fund's holdings.

In addition, it is the policy of the Funds to provide certain unaudited information regarding the portfolio composition of the Funds as of month-end to shareholders and others upon request to the Funds, beginning on the 15th calendar day after the end of the month (or, if not a business day, the next business day thereafter). These complete holdings lists are not contained on the Funds' website. Top ten quarter-end holdings lists and other portfolio characteristics at month-end for certain Funds may be posted on the Funds' website at www.mwamllc.com.

Shareholders and others who wish to obtain portfolio holdings for a particular month may make a request by contacting the Funds between the hours of 7:00 a.m. and 5:00 p.m. Pacific time, Monday through Friday, toll free at (877) 829-4768 beginning on the 15th day following the end of that month (or, if not a business day, the next business day thereafter). Requests for Portfolio holdings may be made on a monthly basis pursuant to this procedure, or standing requests for portfolio holdings may be accepted.

Persons making requests will be asked to provide their name and a mailing address, e-mail address or fax number. The Funds reserve the right to refuse to fulfill a request if they believe that providing portfolio holdings would be contrary to the best interests of the Funds. Such decisions are made by personnel of the Adviser of the Title of Managing Director or Executive Vice President or higher.

In addition to the policy stated above, the Funds may disclose portfolio holdings at other times to analysts or ratings agencies. Personnel of the Adviser of a title of Senior Vice President or higher are permitted to authorize the release of the Funds' portfolio holdings, as necessary, in conformity with the procedures. The disclosure of portfolio holdings in this context is conditioned on the recipient agreeing to treat such portfolio holdings as confidential (provided that analysts and rating agencies may publish portfolio positions upon the consent of personnel of the Adviser of the title of Senior Vice President or higher, under circumstances where such personnel determine that such information is publicly available through the Funds' website or by other means, or will become publicly available through such publication), and agreeing to stand-still provisions that do not allow the portfolio holdings to be used in connection with the purchase or sale of shares of the Funds. In addition, portfolio holdings are provided or otherwise available to third-party service providers of the Funds, including the Funds' custodian, pricing services, broker-dealers to facilitate trading and administrators, as necessary for the provision of services to the Funds. In the absence of a written confidentiality agreement, the recipient must be subject to professional or ethical obligations not to disclose or otherwise improperly use the information, such as would apply to independent registered public accounting firms or legal counsel. No compensation is received by the Funds or the Adviser in connection with the disclosure of portfolio holdings information.

Current or quarterly portfolio holdings may be disclosed to governmental authorities pursuant to applicable laws or regulations, or a judicial, regulatory or other similar request. Information regarding the characteristics of a Fund portfolio, such as its current credit quality or duration, may be provided upon request, subject to the discretion of the Funds' officers. Exceptions to the Funds' portfolio holdings disclosure policies may be granted only by an Officer of the Funds or the Chief Executive Officer of the Adviser upon a determination that the release of information would be appropriate for legitimate business purposes, and must be reported quarterly to the Board of Trustees. There is no guarantee that the Funds' policies on the use and dissemination of portfolio holdings information will protect the Funds from the potential misuse of holdings by individuals or firms in possession of such information.

### ADMINISTRATION AND ACCOUNTING SERVICES

The Funds have a Fund Administration and Accounting Agreement with BNY Mellon Investment Servicing (US) Inc. ("BNY Mellon"), which has offices at 760 Moore Road, King of Prussia, Pennsylvania 19406. The Agreement

provides that BNY Mellon will perform certain administrative services for the Trust including, among other things, prepare and coordinate with the Funds and Funds' counsel the filing of the Funds' annual post-effective amendment; assemble and distribute quarterly Board materials including the drafting of notices, agendas and resolutions for quarterly Board meetings; maintain the Trust's corporate records; administratively assist in arranging the fidelity bond and directors' and officers'/errors and omissions insurance policies; and maintain the Trust's regulatory calendar. BNY Mellon also performs certain administrative and accounting services for the Trust such as preparing and filing shareholder reports, preparing and filing federal and state tax returns on behalf of the Trust and providing statistical and research data. In addition, BNY Mellon prepares and files certain reports with the appropriate regulatory agencies and

Page 54

Table of Contents

prepares certain materials required by the SEC or any state securities commission having jurisdiction over the Trust. The accounting services performed by BNY Mellon include maintaining the accounting books and records of the Funds, calculating the Funds' net asset value per share, maintaining records relating to the securities transactions of the Funds and coordinating the preparation and payment of Fund-related expenses. The amount of administration and accounting services fees paid by each Fund to BNY Mellon for the last three fiscal years is as follows:

### Administration and Accounting Fees

| Fiscal Year Ended | Ultra Short Bond Fund | Low Duration Bond Fund | Intermediate Bond Fund | Total Return Bond Fund | High Yield Bond Fund | Unconstrained Bond Fund[1] | Strategic Income Fund | AlphaTrak 500 Fund | Floating Rate Income Fund [2] |
|---|---|---|---|---|---|---|---|---|---|
| March 31, 2015 | $124,333 | $519,697 | $205,113 | $3,891,814 | $293,096 | $310,990 | $161,039 | $65,336 | $101,226 |
| March 31, 2014 | $117,414 | $426,461 | $158,377 | $2,624,366 | $328,601 | $197,153 | $141,181 | $63,712 | $64,368 |
| March 31, 2013 | $104,406 | $363,355 | $150,865 | $3,194,613 | $384,398 | $101,397 | $122,328 | $50,826 | N/A |

(1) The Unconstrained Bond Fund commenced operations on October 1, 2011.

(2) The Floating Rate Income Fund commenced operations on June 28, 2013.

In addition to the services provided by BNY Mellon as described above, the Adviser provides various supplemental administrative services under an administrative services agreement. Those services may include, without limitation, administrative, compliance, legal, operational, accounting and other middle and back office activities and services, including the review and coordination of services provided by BNY Mellon. The Adviser is reimbursed a portion of its costs in providing those supplemental administrative services to the Funds under an agreement and in an amount approved by the Board of Trustees. The portion of the Adviser's costs that is expected to be reimbursed annually based on the Board's approval is approximately $650,000 for the Trust, and will be reviewed and approved annually by the Board and the Independent Trustees.

### CUSTODIAN AND TRANSFER AGENT

The Bank of New York Mellon, located at One Wall Street, New York, New York 10286, serves as the Funds' custodian under a separate Custodian Agreement. Under the Custodian Agreement, The Bank of New York (i) maintains a separate account or accounts in the name of each Fund, (ii) holds and transfers portfolio securities on account of each Fund, (iii) accepts receipts and makes disbursements of money on behalf of each Fund, (iv) collects and receives all income and other payments and distributions on account of each Fund's securities, and (v) makes periodic reports to the Board of Trustees concerning each Fund's operations. Pursuant to applicable rules, The Bank of New York Mellon also acts as the Fund's foreign custody manager.

Pursuant to applicable rules, the Funds also maintain futures accounts with Barclays Bank PLC and Citigroup Global Markets Inc., both of which are investment banks. Because of margin requirements for futures transactions, certain Funds assets occasionally may be held in the accounts instead of with the Funds' custodian.

BNY Mellon also serves as the transfer agent for the Funds under a Transfer Agency and Shareholder Services Agreement.

### UNDERWRITER

Foreside Funds Distributors LLC (the "Underwriter"), located at 400 Berwyn Park, 899 Cassatt Road, Berwyn, PA 19312, is a broker-dealer that serves as each Fund's principal underwriter in a continuous public offering of the Funds'

shares on a best-efforts basis. The Underwriter is not affiliated with the Trust, the Adviser or any other service provider for the Funds.

Under an Underwriting Agreement with the Trust (the "Underwriting Agreement"), the Underwriter acts as the agent of the Trust in connection with the continuous offering of shares of the Funds. The Underwriter continually distributes shares of the Funds on a best efforts basis. The Underwriter has no obligation to sell any specific quantity of Fund shares. The Underwriter and its officers have no role in determining the investment policies or which securities are to be purchased or sold by the Trust.

The Underwriter may enter into agreements with selected broker-dealers, banks or other financial intermediaries for distribution of shares of the Funds. With respect to certain financial intermediaries and related fund "supermarket" platform arrangements, the Funds and/or the Adviser, rather than the Underwriter, typically enter into such agreements. These financial intermediaries may charge a fee for their services and may receive shareholder service or other fees from parties other than the Underwriter. These financial intermediaries may otherwise act as processing agents and are responsible for promptly transmitting purchase, redemption and other requests to the Funds.

Page 55

Table of Contents

Investors who purchase shares through financial intermediaries will be subject to the procedures of those intermediaries through which they purchase shares, which may include charges, investment minimums, cutoff times and other restrictions in addition to, or different from, those listed herein. Information concerning any charges or services will be provided to customers by the financial intermediary through which they purchase shares. Investors purchasing shares of the Funds through financial intermediaries should acquaint themselves with their financial intermediary's procedures and should read the Prospectus in conjunction with any materials and information provided by their financial intermediary. The financial intermediary, and not its customers, will be the shareholder of record, although costumers may have the right to vote shares depending upon their arrangement with the financial intermediary. The Underwriter does not receive compensation from the Funds for its distribution services except the distribution/service fees with respect to the shares of those classes for which a 12b-1 Plan is effective. The Adviser pays the Underwriter a fee for certain distribution-related services.

After its initial term of two years, the Underwriting Agreement between the Funds and the Underwriter will continue in effect for periods not exceeding one year if approved at least annually by (i) the Board of Trustees or the vote of a majority of the outstanding shares of each Fund (as defined in the 1940 Act) and (ii) a majority of the Independent Trustees, in each case cast in person at a meeting called for the purpose of voting on such agreement. The Underwriting Agreement may be terminated without penalty by the parties thereto upon 60 days' written notice, and it is automatically terminated in the event of its assignment as defined in the 1940 Act.

***SHARE MARKETING PLAN***

The Trust has adopted a Share Marketing Plan (or Rule 12b-1 Plan) (the "12b-1 Plan") with respect to the Funds pursuant to Rule 12b-1 under the 1940 Act. The Underwriter serves as the Distribution Coordinator under the 12b-1 Plan and, as such, receives for disbursement any fees paid by the Funds pursuant to the 12b-1 Plan.

On April 1, 1997, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan or in any agreement related to the 12b-1 Plan adopted the 12b-1 Plan for Class M shares of the Ultra Short Bond Fund, Low Duration Bond Fund and Total Return Bond Fund. On May 18, 1998, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan or in any agreement related to the 12b-1 Plan, adopted the Plan for the AlphaTrak 500 Fund. On June 10, 2002, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan or in any agreement related to the 12b-1 Plan, adopted the Plan for Class M shares of the High Yield Bond Fund and Intermediate Bond Fund. On May 19, 2003, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan or in any agreement related to the 12b-1 Plan, adopted the 12b-1 Plan for Class M shares of the Strategic Income Fund. On September 19, 2011, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan, or in any agreement related to the 12b-1 Plan, adopted the 12b-1 Plan for Class M shares of the Unconstrained Bond Fund. On May 20, 2013, the Board of Trustees of the Trust, including a majority of the Independent Trustees who have no direct or indirect financial interest in the operation of the 12b-1 Plan, or in any agreement related to the 12b-1 Plan, adopted the 12b-1 Plan for Class M shares of the Floating Rate Income Fund. The Funds' Rule 12b-1 plan covers the Class M shares of each of the Funds. The 12b-1 Plan also covers the Administrative Class shares of the Low Duration Bond Fund and Total Return Bond Fund.

Under the 12b-1 Plan, each Fund pays distribution fees to the Distribution Coordinator at an annual rate of up to 0.25% of the Fund's aggregate average daily net assets to reimburse expenses incurred in connection with the promotion and distribution of each Fund's shares. The promotional and distribution activities paid by the 12b-1 Plan include, but are not limited to, compensation of intermediaries such as broker-dealers that sponsor fund marketplaces or platforms, and service shareholder accounts. The Adviser has undertaken to limit the 12b-1 Plan expenses to 0.21% for the Total Return Bond Fund, 0.19% for the Low Duration Bond Fund, 0.21% for the Intermediate Bond Fund and 0.16% for the Ultra Short Bond Fund for the fiscal year ending March 31, 2015. The AlphaTrak 500 Fund is presently waiving all Rule 12b-1 fees.

The 12b-1 Plan provides that the Distribution Coordinator may use the Rule 12b-1 distribution fees received from a Fund only to pay for the distribution and shareholder servicing expenses of the Fund. Distribution fees are accrued daily and paid monthly, and are charged as expense of the shares as accrued.

Exhibit A
27

A Fund is not obligated under the 12b-1 Plan to pay any distribution expense in excess of the distribution fee. Thus, if the 12b-1 Plan were terminated or otherwise not continued, no amounts (other than current amounts accrued but not yet paid) would be owed to the Distribution Coordinator. Using its own resources, the Adviser may pay distribution and other fees and expenses in excess of the distribution fee under agreements with certain intermediaries (such as but not limited to broker-dealers, banks, employee benefit plan alliances, record keepers or other financial institutions) under selling or servicing agreements for the Funds.

The 12b-1 Plan provides that it shall continue in effect from year to year provided that a majority of the Board of Trustees of the Trust, including a majority of the Independent Trustees, vote annually to continue the 12b-1 Plan. The 12b-1 Plan (and any distribution agreement between the Trust, the Underwriter or the Adviser and a selling agent) may be terminated without penalty upon at least 60-days' notice by the Underwriter or the Adviser, or by the Trust by vote of a majority of the Independent Trustees, or by vote of a majority of the outstanding shares (as defined in the 1940 Act).

Page 56