**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
john.donovan@ropesgray.com
Robert A. Skinner (*pro hac vice*)
robert.skinner@ropesgray.com
Amy D. Roy (*pro hac vice*)
amy.roy@ropesgray.com
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951 7000
Fax: (617) 951 7050

**IRELL & MANELLA LLP**
David Siegel (101355)
dsiegel@irell.com
Glenn K. Vanzura (238057)
gvanzura@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277 1010
Fax: (310) 203 7199

Attorneys for Defendant
METROPOLITAN WEST ASSET
MANAGEMENT, LLC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| THOMAS J. KENNIS,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN WEST ASSET MANAGEMENT, LLC,<br><br>Defendant. | Case No. 2:15-cv-08162-GW-FFM<br><br>**DEFENDANT METROPOLITAN WEST ASSET MANAGEMENT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT THEREOF**<br><br>[Statement of Uncontroverted Facts and Conclusions of Law, Supporting Declarations, and Proposed Judgment Filed Concurrently Herewith]<br><br>Date: June 5, 2017<br>Time: 8:30 a.m.<br>Courtroom : 9D<br>Judge: Hon. George H. Wu |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE** that on June 5, 2017, at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable George H. Wu in Courtroom 10, United States Courthouse, located at 350 West 1st Street, Los Angeles, California 90012, Defendant Metropolitan West Asset Management, LLC ("MetWest") will move this Court for entry of judgment following the Court-ordered Phase 1 of discovery declaring that:

1. The plaintiff's proposed comparison of MetWest's advisory fees and subadvisory fees is legally inapt and must be rejected; and
2. The plaintiff's claim under Section 36(b) of the Investment Company Act of 1940 accordingly fails as a matter of law, requiring dismissal of the Complaint in its entirety.

Defendant's Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, the accompanying declarations of Amy D. Roy, Tad Rivelle, Meredith Jackson, David S. DeVito, Jeffrey A. Engelsman, George N. Winn, Bibi Khan, Alex B. McCulloch, Patrick A. Moore, and Wayne D. Weaver, and their attached exhibits, upon all papers, pleadings, and records on file herein, and on such other matters and argument of counsel that may properly come before the Court before or at the time of the hearing.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on various occasions prior to the filing of this motion.

Dated: April 28, 2017

Respectfully submitted,

**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
Robert A. Skinner (*pro hac vice*)
Amy D. Roy (*pro hac vice*)

**IRELL & MANELLA LLP**
David Siegel
Glenn K. Vanzura

By: */s/ Glenn K. Vanzura*
Glenn K. Vanzura

*Attorneys for Defendant Metropolitan West Asset Management, LLC*

# TABLE OF CONTENTS

Page

_Toc481157060

TABLE OF AUTHORITIES ........ iii
MEMORANDUM OF LAW ........ 1
STATEMENT OF FACTS ........ 6
A. Mutual Funds and the Investment Company Act of 1940 ........ 6
B. MetWest and the Total Return Bond Fund ........ 7
C. Advisory Agreement and Fees ........ 8
D. The Subadvised Funds ........ 9
E. The Key Sponsoring Adviser Functions ........ 10
(i) Daily Pricing, Striking the Daily NAV, and Liquidity Management ........ 11
a. Daily Pricing ........ 11
b. Striking the Fund's Daily NAV ........ 13
c. Liquidity Management ........ 14
(ii) Satisfying SEC Filing Requirements and Other Statutory and Regulatory Obligations for Mutual Fund Sponsorship ........ 16
(iii) Coordination and Oversight of Third-Party Service Providers ........ 18
a. Transfer Agent, Custodian, and Administrator of the Fund ........ 18
b. The Fund's Underwriter/Distributor ........ 19
c. The Fund's Independent Auditor ........ 20
(iv) Implementation of Mandated Mutual Fund Governance Structure ........ 21
a. The 15(c) Process and Board Reporting ........ 21
b. MetWest's Compliance Program ........ 22
c. Fund Officers ........ 23
(v) Client Service of hundreds of thousands of Total Return Bond Fund Clients and Their Representatives ........ 24

PROCEDURAL BACKGROUND ....................................................................25

ARGUMENT....................................................................................28

I. LEGAL STANDARD FOR SECTION 36(b) LIABILITY AND PROPOSED FEE COMPARISONS ............................................................28

II A COMPARISON OF METWEST'S ADVISORY FEES AND SUBADVISORY FEES MUST BE REJECTED AS A MATTER OF LAW, AS THE DIFFERENCES IN FUNCTIONS OF ADVISERS AND SUBADVISERS RENDER THE COMPARISON INAPT...............30

A. The Record Shows that MetWest Does Not Provide "the Same or Substantially the Same" Services as Sponsoring Adviser to the Total Return Bond Fund as It Does as Subadviser to the Subadvised Funds ....................................................................30

1. Key Sponsoring Adviser Functions Provided by MetWest to the Total Return Bond Fund ..............................................31

2. Key Sponsoring Adviser Functions Are Provided to the Subadvised Funds by their Respective Sponsoring Advisers ....................................................................33

B. The Language in the IMA and Subadvisory Agreements Does Not Establish that MetWest Provides "the Same or Substantially the Same" Services to the Total Return Bond Fund and the Subadvised Funds ....................................................................35

C. The Additional Responsibilities and Risks Borne by MetWest as Sponsoring Adviser to the Total Return Bond Fund Are Not Delegated to Third-Party Service Providers .....................................38

CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010) .......... *passim*

*Jones v. Harris Assocs. L.P.*,
611 F. App'x 359 (7th Cir. 2015).......... 28, 29

*Kasilag, et al. v. Hartford Inv. Fin. Servs., LLC*,
No. 11-CV-01083, 2017 WL 773880 (D. N.J. Feb. 28, 2017) .......... 29

*Sivolella v. AXA Equitable Life Ins. Co.*,
No. 11-CV-4194, 2016 WL 4487857 (D. N.J. Aug. 25, 2016).......... 37

## STATUTES

15 U.S.C. § 80a-35(b) .......... 28

## MEMORANDUM OF LAW

The plaintiff launched this case under Section 36(b) of the Investment Company Act (the "ICA") with a simple theory and no evidence to support it. After many months and millions of dollars spent on discovery, the plaintiff cannot establish with competent evidence that MetWest breached its "fiduciary duty with respect to the receipt of compensation" under Section 36(b) by charging a fee that "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assoc. L.P.*, 559 U.S. 335, 352 (2010). The plaintiff seeks to satisfy that burden here by comparing the advisory fee MetWest charges to the Metropolitan West Total Return Bond Fund ("Total Return Bond Fund" or the "Fund") with the subadvisory fees MetWest charges certain external mutual funds – issued by other primary sponsors – for which it serves as subadviser (the "Subadvised Funds"). According to the plaintiff, the Fund's advisory fee is beyond the arm's-length range because MetWest provides "the same or substantially the same" investment management services to the Subadvised Funds for lower fees. Compl. ¶¶ 49, 50, 53, 54, 55.

Recognizing that the plaintiff's assertion of substantially identical services raises a "dispositive" issue under the Supreme Court's decision in *Jones*, the Court ordered "phased" discovery that focused exclusively on this core premise in order to address the legitimacy of the proffered comparison at the outset. ECF No. 76.

*Jones* itself involved a comparison of fees charged to mutual funds with fees Harris Associates charged to other clients, including separate accounts and subadvised funds. The Supreme Court recognized that the contrast could be inappropriate, specifically instructed lower courts to be "wary of inapt comparisons," and set the ground rules for proceedings where a plaintiff relied on dissimilar fees to make his case – *mandating* a threshold determination when a plaintiff failed to establish a factual predicate of comparability between

investment adviser clients. According to the Court, a *trial* will be appropriate "*[o]nly* where plaintiffs have shown a large disparity in fees that *cannot be explained* by the different services *in addition to other evidence* that the fee is outside the arm's-length range." *Jones*, 559 U.S. at 350 n.8 (emphasis added). Any fee comparison must be based on a factual predicate of comparability: "[i]f the services rendered are sufficiently different that a comparison is not probative, then courts *must reject* . . . [the] comparison." *Id.* at 350 (emphasis added). And the Supreme Court's instructions – to be "wary" of inapt contrasts, to insist on factual predicates, to grant trials "only" when fee disparities are *not* explained by different services, and to "reject" inappropriate comparisons – all arose from the Court's explicit concern that investment advisers not be "doomed" to trial just because a plaintiff juxtaposes disparate fees charged to different clients. *Id.*

Under these principles, the question before the Court now, then, is whether the plaintiff can satisfy his burden to establish the factual predicate of comparability between MetWest's respective roles for the Fund and the Subadvised Funds so that the fee comparison is probative. On that score, he advances absolutely no evidence.

In response to MetWest's interrogatories – which the Court unambiguously told the plaintiff he must answer by supplying all the evidence on which he intends to rely[1] – the plaintiff advanced nothing at all describing what MetWest actually does for the different types of clients. Instead, from all that appears,[2] he

---

[1] "[P]rior to the close of discovery, you are going to have to disclose to [MetWest] the plaintiff's theory of the case and the basis for plaintiff's – in other words, by the close of discovery or shortly thereafter, although you have to respond to discovery, you have to have, you know, what this case is about and the things that support the case." Roy Decl. Ex. 3 (Feb. 6, 2017 Hr'g Tr. on Def.'s Mot. to Compel at 10).

[2] We say "appears" because the plaintiff did not actually describe his theory in response to the defendant's interrogatories. He only identified long lists of documents produced by MetWest in discovery (spanning tens of thousands of

offers only a legal argument – that since the published "investment objectives" of the Fund and the Subadvised Funds are largely congruent, and the language of the respective investment management agreements is similar, the "services" MetWest performs for each client *must* be "substantially the same." He then attempts to bolster that legal argument with reference to other contracts in which MetWest engages vendors for certain administrative, accounting and custody services, to contend that MetWest does not do anything different for the Fund than the Subadvised Funds because it delegates away all other duties and responsibilities.

But that is not evidence, it is argument. And it elevates form over substance by focusing on the plaintiff's interpretation of contractual language and ignoring the rafts of actual evidence – from MetWest's internal documents and the depositions and declarations of a dozen witnesses – about what MetWest actually *does* for the Fund and the Subadvised Funds, and how it actually interacts with its vendors. The plaintiff makes no effort to connect any of the services described in the *evidentiary record* back to this contractual language – nor could he, as the contracts are plainly not intended to provide such an itemization. The *evidentiary* record demonstrates overwhelmingly that what MetWest actually *does* as adviser to the Total Return Bond Fund is vastly different in kind, scope, and complexity from what it *does* for the Subadvised Funds. That evidentiary record of differences extinguishes the plaintiff's legal argument for comparability and renders the proposed comparison of advisory and subadvisory fees inapt. Under *Jones*, the plaintiff's failure to establish a factual predicate of comparability means the comparison "must [be] reject[ed]."

At bottom, the record shows that as adviser to the Total Return Bond Fund,

---

pages) and various paragraphs within public filings by MetWest and the Subadvised Funds as the "basis" for his claim, without bothering to articulate how or why the documents or referenced excerpts purported to establish "substantially similar" services.

MetWest is the creator, sponsor, and operator of a fully-integrated and branded investment *product*. An estimated 1.8 million investors own Fund shares across four different share classes, and they all have the ability to redeem their shares and leave the Fund any given day. MetWest bears the business, reputational and entrepreneurial risk of having created and now operating a stand-alone fund – whose assets grew from MetWest's extraordinary stewardship but which can be erased by immediate investor redemptions in response to any slip, or by the superior performance of a competitor. MetWest owns ultimate responsibility for all operational and regulatory requirements inherent in the management of a mutual fund under the ICA, and is subject to all operational, legal, regulatory, and reputational risk for any failure to comply with these requirements. MetWest committed its capital; attracted, recruited and retained the core team of investment professionals and talent running the Fund today; and invested in the extraordinary infrastructure essential to the management, operations and customer service requirements of a nearly $80 billion dollar fund. The Total Return Bond Fund is inseparably tied to the MetWest brand name, and the brand rises and falls not just on the Fund's returns for investors earned through portfolio management, but also on the quality, reliability, and consistency of every other aspect of MetWest's operations that support the Fund.

By contrast, MetWest supplies a limited *service* to the Subadvised Funds. Those funds were created, sponsored, sold, and operated as someone *else's* product. The primary advisers to the Subadvised Funds (the "Sponsoring Advisers") branded their own creations, and they bear responsibility for all operational, regulatory, entrepreneurial, and reputational risks for the Subadvised Funds. The Sponsoring Advisers are each paid their own advisory fee for the investment vehicle they offer and maintain – a portion of which is paid to MetWest for the limited service it renders – and the balance of which compensates the Sponsoring Advisers for the management responsibilities and risks they retain.

It is that fundamental difference – between the creation and continued sponsorship of an integrated *product* and supplying a limited *service* – that is at the heart of the distinction between the enterprise of a "sponsoring adviser" and the "subadvisory" business. To illustrate that basic discrepancy, this Motion focuses on a handful of the most crucial duties that MetWest undertakes as primary sponsoring investment adviser to the Total Return Bund Fund – which it does not perform for the Subadvised Funds – and that therefore differentiate the advisory and subadvisory businesses. As set forth in the accompanying declarations of MetWest personnel and MetWest's expert reports, the critical functions that MetWest undertakes as adviser to the Total Return Bond Fund – which it does not assume for the Subadvised Funds – embody the defining characteristics of a fully-integrated mutual fund under the ICA, and distinguish that *product* from the subadvisory *service* business. Those functions (referred to herein as the "Key Sponsoring Adviser Functions") include at least the following:

(i) Daily pricing of over 1,900 individual holdings in the Total Return Bond Fund, striking of the daily net asset value ("NAV")[3] of the Fund, and other functions necessary to facilitate a mutual fund's defining characteristic of daily liquidity to investors;

(ii) Satisfying the requirements of the Securities and Exchange Commission ("SEC"), including filings, disclosures and substantive obligations for mutual fund sponsorship under federal and state law;

(iii) Coordination and oversight of third-party service providers necessary for mutual fund operation, including the fund administrator, transfer agent, custodian, and distributor;

(iv) Implementation of the statutorily mandated mutual fund governance structure, including extensive reporting to and interaction with the Metropolitan West Funds ("MetWest Funds") Board of Trustees ("the Board") and committees of the Board, implementation of required policies

---

[3] The NAV is the price at which fund shares are bought or sold by shareholders, and is required by law to be correctly calculated and published each business day.

and procedures, and provision of a Chief Compliance Officer and other Fund officers; and

(v) Client service efforts for the hundreds of thousands of Total Return Bond Fund clients and their representatives.

For the Subadvised Funds, the Sponsoring Advisers – not MetWest – are responsible for the Key Sponsoring Adviser Functions, and bear the attendant risks if not performed properly. While there are many additional differences in duties and risks reflected in MetWest's discovery responses, the Key Sponsoring Adviser Functions suffice to illustrate why the plaintiff cannot establish a factual predicate of comparability sufficient to meet the requirements of *Jones.*

## STATEMENT OF FACTS

### A. Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a pool of assets, consisting primarily of a portfolio of securities, which belong beneficially to the investors who own shares in the fund. MetWest's LR 56-1 Statement of Uncontroverted Facts and Conclusions of Law ("SUF") ¶ 1. As a matter of both law and practice, the management and operations of a mutual fund are contractually delegated to a mutual fund's investment adviser. *Id.* ¶ 2. The ICA acknowledges this standard structure, and enshrines the legal separation of a mutual fund and its adviser as the statute's principal purpose – to protect mutual fund investors by maintaining a fund's independence from its adviser. *Id.* ¶ 3. The ICA ensures this independence by entrusting noninterested directors or trustees sitting on a mutual fund's board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from conflicts of interest with the fund's adviser. *Id.* Pursuant to Section 15(c) of the ICA, a majority of a fund's independent trustees must approve the advisory agreement annually, including the compensation the adviser receives for the services it provides to the fund (the "15(c) process"). *Id.* ¶ 4.

### B. MetWest and the Total Return Bond Fund

MetWest serves as investment adviser to the MetWest Funds, a Delaware statutory trust that is an open-end investment management company registered under the ICA, consisting of nine separate "investment series" or funds, including the Total Return Bond Fund. SUF ¶ 5.

The MetWest Total Return Bond Fund was MetWest's first mutual fund, and is the flagship fund of the enterprise. The Fund was created in 1997 by the three founders of MetWest who committed their own capital to seed the Fund and build the infrastructure necessary to operate a substantial investment management firm, sell this primary investment product, and service the thousands of individual investors, institutions, pension plans, and others who ultimately invested in the Fund. *Id.* ¶ 6. Like most fledgling mutual funds,[4] progress and growth in assets was slow, as the Fund's reputation for producing consistent stellar returns developed and grew. The Fund did not gain significant scale until 2002, when it achieved $1.95 billion in assets under management ("AUM"). *Id.* ¶ 7. Even after reaching that point, the business risk associated with operating the Fund was apparent: the Fund experienced a period of poor performance that year, and aggregate assets shrunk by 23%. It then took years to recapture investors' confidence and grow assets under management. After several years of improved performance, the Fund grew from under $1.3 billion at its nadir to approximately $25 billion at year-end 2013. *Id.* ¶ 9.

Thereafter, and building on a remarkable long-term track record of top decile performance produced at below-median fees, the Fund grew very

---

[4] The development of newly created mutual funds into a sustainable business is risky. According to the Investment Company Institute ("ICI"), approximately 594 funds were created in 2015, but another 462 funds disappeared that year as they were either liquidated or merged into other more sustainable investment products. SUF ¶ 8. In the case of the MetWest Total Return Bond Fund, it grew reasonably quickly, but only consistently held over $1 billion in assets after March 2001, some four years after it was established. *Id.* ¶ 7.

significantly. *Id.* But even that growth illustrated the business risk inherent in the mutual fund industry as sophisticated and sometimes fickle investors can take advantage of daily liquidity and move assets to competing funds or other asset classes. The Fund became a principal beneficiary of the flight of investment assets from a competing fund, the PIMCO Total Return Fund, which diminished in size from nearly $222 billion in August 2014 to approximately $74 billion today, following the departure of its principal portfolio manager. *Id.* ¶ 10. MetWest's superior performance together with PIMCO's outflows contributed to the Fund's growth to more than $78 billion, making it one of the largest actively managed bond funds in the global market. The Fund current has an estimated 1.8 million shareholders. *Id.* The demonstrated mobility of assets among competitor funds reflects the reality that shareholders readily "vote with their feet" in search of favorable performance for competitive fees. For the five-year period ending March 31, 2016, the Fund's retail class (Class M) shares produced 4.64% in total returns annually, significantly outpacing its benchmark of 3.77%, while the Fund's fees were consistently below the median of its approximately 200 peer funds. *Id.* ¶ 11.

The Total Return Bond Fund has been regularly recognized by investors and market commentators as one of the industry's top bond funds. It received a Morningstar Analyst Rating of "Gold" in December 2016, a rating it has maintained since the Analyst Ratings began in 2011. *Id.* ¶ 12. Also in 2016, industry analyst Lipper, Inc. named the Total Return Bond Fund as "Best Core Plus Bond Fund" for the preceding 10-year period. *Id.* Similarly, Morningstar gave the Fund a "five-star" rating (out of five) for the ten-year period, which places it in the top 10% of the Morningstar peer fund group. *Id.*

### C. Advisory Agreement and Fees

MetWest serves as the investment adviser to the Fund pursuant to an

Investment Management Agreement ("IMA") approved in the annual 15(c) process. SUF ¶ 13. As the sponsor of the Fund, MetWest incurs all of the risks associated with the creation and operation of the Fund. MetWest alone bears the business, legal and reputational risk of poor performance, non-compliance with regulatory matters, and associated redemptions from the Fund. *Id.* ¶ 14. For its services, the Fund pays MetWest an annual advisory fee equal to 0.35% of AUM, or 35 basis points ("bps"). *Id.* ¶ 15.

In addition to MetWest's advisory fee, the Fund also pays for administrative, accounting, transfer agency, and custodial services provided by BNY Mellon Investment Servicing. *Id.* ¶ 16. Some of the smaller Fund share classes also pay 21 bps to Foreside Funds Distributors LLC, an unaffiliated broker-dealer, under a so-called "12b-1 Plan," which supports distribution of the Fund through broker-dealers and other intermediaries. *Id.* Together, all of those charges amounted to a "total expense ratio" in 2016 of 44 bps in the institutional class (Class I) and 67 bps in the smaller retail class (Class M)[5], which are both substantially below the mean and median total expense ratios of "peer" funds identified by industry analysts such as Morningstar, Inc. *Id.*

### D. The Subadvised Funds

The "Subadvised Funds" include nine funds for which MetWest provides or has provided portfolio management services reflecting an investment style generally similar to the "total return" or "core plus" style in which the Fund is invested, and two such funds for which TCW Investment Management Company, a MetWest sister company, serves as subadviser.[6] SUF ¶ 18. As subadvisers,

---

[5] Over three-quarters of the assets under management in the Total Return Bond Fund are owned by investors in the institutional share class (Class I) and the retirement plan class (Class P), which require minimum investments of $3 million and $25 million, respectively. SUF ¶ 17.

[6] By name, the eleven Subadvised Funds include the AZL MetWest Total Return Bond Fund, Consulting Group Capital Markets Core Fixed Income

MetWest and TCW provide a strictly defined set of services to the Subadvised Funds – essentially a subset of the full range of functions MetWest undertakes for the Fund as adviser – in exchange for a fee as reflected in Column 2 in the table attached hereto as Appendix 1. *Id.* ¶ 20.

Each of the Subadvised Funds has its own Sponsoring Adviser that oversees the subadvisers' performance and provides the balance of advisory services in exchange for an advisory fee – on top of the subadvisory fee paid to MetWest, as reflected in Column 3 in the table at Appendix 1. SUF ¶ 21–22. Column 4 of the table reflects the full advisory fee paid by each of the Subadvised Funds (as published in their SEC disclosures) and the Total Return Bond Fund. Notably, for most of the Subadvised Funds (eight of eleven), the published advisory fee charged to shareholders (taking into account both the Sponsoring Adviser's fee and MetWest's subadvisory fee) is *greater* than the analogous 35 bp advisory fee paid by the Total Return Bond Fund. The plaintiff would have the Court ignore this fact, directing focus instead on the inapt comparison of the Total Return Bond Fund's advisory fee to the *subadvisory* fee the Subadvised Funds pay MetWest for only a subset of services.

### E. The Key Sponsoring Adviser Functions

Among the many things that MetWest does for the Fund that it does not undertake for the Subadvised Funds, are the "Key Sponsoring Adviser Functions" that go to the very heart of sponsoring a fully-integrated mutual fund investment product under the ICA's regulatory structure, and distinguish it from the *service*

---

Investments Fund, Forum Funds Absolute Strategies Fund, Russell Strategic Bond Fund, Russell Core Bond Fund, Bridge Builder Core Plus Bond Fund, MassMutual Select Total Return Fund, MML Total Return Bond Fund, and Cornerstone Advisors Core Plus Bond Fund subadvised by MetWest; and Columbia Variable Portfolio - TCW Core Plus Bond and Columbia Active Portfolios Multi-Manager Core Plus Bond Fund subadvised by TCW. SUF ¶ 19.

MetWest performs as subadviser.

***(i) Daily Pricing, Striking the Daily NAV, and Liquidity Management***

As sponsor of the Total Return Bond Fund, MetWest is responsible for ensuring the integrity, accuracy, and timeliness of the calculation and publication of the Fund's NAV, a process called "striking the NAV." *See* SUF ¶ 23–29, 32–33. It is a complex and time-intensive process that requires MetWest to utilize its business judgment and subject matter expertise to price accurately the Fund's roughly 1,900 individual positions, according to policies that the Board and MetWest have established. *Id.* ¶ 23. The negative consequences to MetWest from any errors in striking the NAV are extreme. *Id.* ¶ 38.

**a. Daily Pricing**

Daily valuation of the Fund's securities is a responsibility that rests with MetWest as the Total Return Bond Fund's sponsoring adviser. SUF ¶ 23. MetWest must value each of the approximately 1,900 instruments – including corporate debt, high yield bonds, emerging market securities, securities priced in foreign currencies, tradeable bank loans, agency mortgage backed securities, non-agency/private label mortgage backed securities, asset backed debt, commercial mortgage bonds, derivatives, Treasury securities, and many other security types – held within the Fund each day, and must do so in accordance with the Board-established pricing policy and valuation guidelines for the Fund. *Id.* These securities trade largely over-the-counter and, unlike equity securities, do not have "ticker" prices that can simply be pulled from an online news source. To properly value the Fund's 1,900 complex fixed income positions each day, MetWest's Mutual Fund Administration ("MFA") group undertakes a time-sensitive and intensive process requiring constant scrutiny and evaluation of multiple vendor-provided prices. *Id.* ¶ 23.[7] If reliable prices are not available from the pricing

[7] For a detailed description of MetWest's daily pricing process and the various steps and internal groups involved, MetWest refers the Court to the

services, the MFA group applies the Fund's complex and rigorous fair valuation policies and procedures to determine the fair value of the securities held in the Fund with approval by MetWest's Pricing Committee. *Id.* ¶ 25.

In parallel with the MFA group's evaluation, the investment professionals on the trading desk perform their own fair value determinations requiring their judgment based on their experience and skills, and use of MetWest's proprietary valuation models and third-party software, which are relied upon if the MFA group is unable to determine a price source for a security. *Id.* ¶ 26.

As a further control, MetWest has an internal Pricing Committee that meets quarterly to review price overrides and other reports including back-testing results, price source changes, and trend analysis, to ensure that the pricing policies and procedures are followed, to understand the trends based on market conditions during the reporting period, and to ensure that there is no bias in pricing. *Id.* ¶ 27. Moreover, a separate internal Pricing Group meets monthly to review pricing on a more granular level, including the review of a series of reports including "benchmarked" securities, list of price challenges, price source changes between the approved vendors, price overrides, price source reconciliation between fund families, and stale prices. *Id.* ¶ 28.

MetWest is not responsible for establishing or implementing daily valuation policies and procedures for the Subadvised Funds, nor does it even obtain information from the Subadvised Funds' pricing vendors. *Id.* ¶ 29. As is clear from the Subadvised Funds' public disclosures, their Sponsoring Advisers remain responsible for the valuation of the Subadvised Funds' portfolio securities. *Id.* MetWest provides month-end portfolio reports for the Subadvised Funds on an "informational" basis only and extremely rare periodic input on securities

---

supporting declarations of George Winn, Bibi Khan, and Tad Rivelle, in addition to the Fund's Pricing and Fair Valuation Policies.

valuation to the Sponsoring Advisers. *Id.* ¶ 30.[8]

**b. Striking the Fund's Daily NAV**

As sponsoring adviser, MetWest is responsible for reviewing and approving the Fund's daily NAV before the Fund's third-party administrator, BNY Mellon, can publish it on the Fund's behalf from information that MetWest supplies. SUF ¶ 33. The accuracy of the daily NAV strike is dependent upon MetWest's judgment as to what constitutes a proper price for each and every one of the 1,900 underlying securities, necessitating MetWest's extraordinary investment in personnel, systems, and processes described above. *Id.* ¶ 34.

Members of MetWest's MFA, Investment Operations and Compliance groups supervise and work closely with BNY Mellon (the fund administrator) to ensure accurate daily calculation of the NAV. *Id.* ¶ 35. The Investment Operations group must perform a daily reconciliation of cash and investments between MetWest's records and BNY Mellon's records, which is critical in identifying and reconciling any discrepancies in the accounting of the Fund's holdings. *Id.* ¶ 36. This is a time-consuming and sensitive three-way reconciliation of the cash and holdings using information from at least three different sources: (i) MetWest's internal trade management order system; (ii) the

---

[8] The Subadvised Funds are also substantially smaller and less complex than the MetWest Total Return Bond Fund. While the Fund ordinarily has over 1,900 individual positions, the number of individual positions in the Subadvised Funds is typically between 200 and 300. SUF ¶ 31. The trading volume of the Total Return Bond Fund is also much higher, which requires far greater resources and research. In 2016, MetWest executed more than 10,600 trades for the Total Return Bond Fund, while averaging roughly 1,400 trades that same year for each of the Subadvised Funds. *Id.* ¶ 32. And although the Fund has extensive holdings in options, swaps, derivatives, bank loans and other complex financial instruments, the Subadvised Funds typically either do not hold such positions, or have very limited exposure to them. Indeed, some Subadvised Funds impose guidelines on MetWest's portfolio management that precludes certain positions. These differences make management of the portfolios dramatically different. *Id.*

Fund's custodian's records; and (iii) a daily cash flow report generated by the Fund's administrator. *Id.* Prior to approving the NAV before its daily release, MetWest must review 100% of the prices, including determining whether any of the price changes from the previous day fall outside of a specified threshold and researching any exceptions that fall outside of the threshold. *Id.* ¶ 37.

Striking a correct NAV is critical, as the consequences of any errors are dire to MetWest. MetWest has thus established written error correction policies and procedures on behalf of the Fund so that any errors in pricing or calculation of the NAV are timely identified and remedied. *Id.* ¶ 38. In the event any NAV error is above a specified threshold of half of 1% (or 0.50%) of the daily NAV, all shareholder transactions executed at the incorrect NAV must be fully reprocessed under the policy, with shareholders fully compensated – at MetWest's expense – for any amounts above $10 by which they overpaid for a share purchase or were underpaid for a share redemption. To the extent a shareholder benefited from the incorrect NAV, they are allowed to keep the windfall – also at MetWest's expense. Such reprocessing and reimbursement occurs for each day for which the NAV was in error – which can be for an extended period if a pricing error goes undetected. *Id.* ¶ 39. In addition to these direct expenses, the reputational impact of such an error can be significant, with shareholders apt to punish an adviser for this lapse by withdrawing assets. *Id.*

MetWest has no responsibility for, and no involvement with, striking the NAV for the Subadvised Funds. *Id.* ¶ 40. Accordingly, none of the above *daily* functions performed by the MFA, trading desk, Investment Operations, and Compliance groups is performed for the Subadvised Funds. *Id.* As MetWest does for the Fund, the Sponsoring Adviser bears all of the risk regarding the accuracy of the NAV of their funds. *Id.* ¶ 41.

### c. Liquidity Management

As the Total Return Bond Fund's adviser, MetWest is responsible under

Section 22(e) of the ICA for ensuring that the Fund can at all times honor redemption requests at the daily published NAV and bears the regulatory, business, and litigation risk from an inability to meet such requests. SUF ¶ 42. To manage the regulatory risk component and comply with existing regulatory guidance on liquidity parameters, MetWest has adopted extensive procedures to aide in its liquidity determinations. *Id.* ¶ 43. In addition, new SEC rules require MetWest to classify the Fund's securities according to relative liquidity and make regular public disclosures regarding the Fund's liquidity and redemption activity. *Id.* ¶ 44. These rules have required MetWest to develop new models, policies, procedures, and systems for making the new requisite determinations and implementing the changes for the Total Return Bond Fund. *Id.*

Moreover, MetWest utilizes a proprietary risk assessment methodology to conduct more probative liquidity testing that provides liquidity characteristic information beyond what is required to comply with regulatory requirements. *Id.* ¶ 45. This process enables MetWest to evaluate portfolio liquidity risk at a granular level, to analyze anomalous results, to predict liquidity constraints, and generally to oversee the extent of liquidity risk to the Fund. *Id.* MetWest's Fixed Income Risk team generates, for review by the investment team, daily liquidity and stress test reports for the Fund that enable MetWest to monitor the impact of market changes and other factors on the liquidity of the Fund and its ability to meet redemptions. *Id.* ¶ 46. The investment team, MFA group, Investment Operations, and Investment Control also closely monitor redemptions from the Fund and notify key personnel of all large redemptions in order to facilitate the adjustments necessary to maintain liquidity while balancing other commitments like investment positioning and risk profile. *Id.* ¶ 47.[9]

---

[9] To ensure liquidity in the normal course, MetWest also maintains credit lines for itself and the Total Return Bond Fund and has secured an exemptive order from the SEC to allow for inter-fund liquidity management. Until

As subadviser, MetWest is not responsible for liquidity management of the Subadvised Funds or their compliance with SEC guidance. *Id.* ¶ 49. Under SEC regulations, the Sponsoring Advisers are responsible for ensuring the Subadvised Funds can honor redemption requests at the daily published NAV, and they bear the regulatory, business, and litigation risk from an inability of the Subadvised Funds to meet such requests. *Id.* ¶ 50. The Sponsoring Advisers may request from time to time that MetWest generate cash to honor redemption requests, and are responsible for instructing MetWest from time to time about anticipated liquidity needs, but it is the Sponsoring Advisers that ultimately bear the risk and must generate additional cash in the event of a shortfall. *Id.*

***(ii) Satisfying SEC Filing Requirements and Other Statutory and Regulatory Obligations for Mutual Fund Sponsorship***

Shares of the Total Return Bond Fund are registered securities, making them subject to the full range of registration requirements under the Securities Act of 1933 ("1933 Act") and regular reporting requirements under the Securities Exchange Act of 1934 ("1934 Act") – all as modified by the mutual fund-specific registration and reporting requirements of the ICA. SUF ¶ 51. As sponsoring adviser to the Total Return Bond Fund, MetWest is responsible for creating and filing with the SEC the various required disclosure documents for the Fund, certain of which must also be distributed to Fund shareholders. *Id.* ¶ 52. These disclosures include: Registration Statement / Prospectus, updated at least annually; Summary Prospectus, updated at least annually; Statement of Additional Information ("SAI"), updated at least annually; Annual Shareholder Report, including all portfolio holdings and audited financial statements, filed annually as of end Q4 and mailed to shareholders; Semi-annual Shareholder Reports, including all portfolio holdings, filed annually and mailed to shareholders;

---

approximately 2010, the prior MetWest credit line was required to be personally guaranteed by certain principals of MetWest. SUF ¶ 48.

Quarterly Schedule of Portfolio Holdings, filed semiannually; Annual Notice of Securities Sold; and Annual Report of Proxy Voting Records. *Id.* ¶ 53. In addition, as Fund adviser, MetWest is responsible for creating and filing with the SEC certain periodic disclosure documents required in the event of specified events relating to the Fund, such as shareholder proxy materials in the event of a shareholder vote on election of fund trustees, new advisory agreements, increase in fees, or change in control of the adviser. *Id.* ¶ 54.

MetWest has adopted policies and procedures to ensure that all filings are timely, complete, and accurate, and assigns employees from relevant operational teams to draft and review them under the supervision of the Legal, Compliance, and MFA groups – in consultation with outside counsel. *Id.* ¶ 55. MetWest bears the regulatory, business, and litigation risk for material misrepresentations or omissions in these filings for the Total Return Bond Fund. *Id.* ¶ 56. In addition, pursuant to the Sarbanes-Oxley Act of 2002, the CEO and CFO (or their equivalents) of the MetWest Funds, who are MetWest employees, must personally certify the accuracy and completeness of the contents of the Annual and Semi-annual Shareholder Reports of the Total Return Bond Fund, subjecting themselves to potential personal liability. *Id.* ¶ 57.

The SEC also requires MetWest to file and publish annually the audited financial statements of the Fund, including audit tests and consideration of the Fund's internal control structures. *Id.* ¶ 58. MetWest hires Deloitte & Touche LLP ("Deloitte") on the Fund's behalf as independent auditor – subject to approval by the Board and its Audit Committee – and thereafter cooperates with Deloitte throughout the audit process, including collecting and providing information to Deloitte, facilitating Deloitte's communications with third-party service providers and counterparties, culminating with submission of a signed management representation letter to Deloitte attesting to all responsibilities that MetWest assumes over the preparation of the annual report. *Id.*

MetWest has no responsibility for SEC filings or the audit of the Subadvised Funds, and provides only limited information to the Sponsoring Advisers to the extent requested. *Id.* ¶ 60. It is the Sponsoring Advisers that remain responsible for creating and filing the Subadvised Fund's required disclosures, providing them to shareholders, and bearing the regulatory, business, and litigation risk for any material misrepresentations or omissions. *Id.*

***(iii) Coordination and Oversight of Third-Party Service Providers***

MetWest is responsible for the coordination with and oversight of the Total Return Bond Fund's third-party service providers, including its transfer agent, custodian, administrator, underwriter/distributor, and auditor.

**a. Transfer Agent, Custodian, and Administrator of the Fund**

As *transfer agent* for the Total Return Bond Fund, BNY Mellon is responsible for recordkeeping of the individual shareholder accounts in the Total Return Bond Fund, processing dividend and capital gain distributions to each Fund shareholder, and providing account statements to shareholders. SUF ¶ 62. As adviser to the Fund, MetWest is responsible for coordinating with and overseeing BNY Mellon in its provision of transfer agency services to the Fund, including the quality of its transaction processing, meeting deadlines, and call center service quality, each of which BNY Mellon addresses in quarterly formal reports to MetWest. *Id.* ¶ 63. The MFA group regularly reviews the results of these efforts with BNY Mellon. *Id.* ¶ 64.

MetWest's Investment Operations and MFA groups work together to supervise and provide guidance to BNY Mellon in its capacity as the *custodian* for the Fund. *Id.* ¶ 65. The custodian holds cash and securities in a dedicated account on behalf of the Fund. *Id.* ¶ 66. Accordingly, BNY Mellon is responsible for the (i) transfer of cash or securities with respect to the Fund's trades; (ii) collection of subscription proceeds and dividend and interest payments to each of the Fund's securities; and (iii) distributions out of the Fund related to expenses, redemptions,

and dividend payments to the shareholders. *Id.* ¶ 67.

In its capacity as the Fund's *administrator*, BNY Mellon provides administrative support services, such as assistance with calculating the daily NAV; financial reporting; initial preparation of drafts of filings required by the SEC; tax reporting and compliance; regulatory compliance; and other operations support. *Id.* ¶ 68. However, it is MetWest that provides the substantive inputs necessary for BNY Mellon to perform these ministerial services, such as determining securities pricing (discussed above), accounting elections, tax elections, and other executive and managerial guidance and instructions with respect to the operation of the Fund. *Id.* ¶ 69.

In order to effectively carry out its oversight of BNY Mellon in its capacities as Fund transfer agent, custodian and administrator, MetWest engages in daily dialogue with BNY Mellon in all aspect of its operations to ensure accuracy and completeness, and participates in regular calls with the respective BNY Mellon departmental managers to discuss ongoing operational items and to address any and all service issues. *Id.* ¶ 70. MetWest conducts periodic on-site due diligence visits at BNY Mellon's offices in Valley Forge, Pennsylvania, during which MetWest evaluates BNY Mellon's controls and procedures in place in providing services to the Fund. *Id.* ¶ 71.

In contrast, MetWest has no responsibility for the transfer agents, custodians, or administrators or for the services those service providers provide to the Subadvised Funds. *Id.* ¶ 72. Rather, the Sponsoring Advisers are solely responsible for these providers and their services to the Subadvised Funds. *Id.* ¶ 72.

**b. The Fund's Underwriter/Distributor**

MetWest employs a third-party underwriter/distributor, Foreside Distributors, LLC ("Foreside") on behalf of the Total Return Bond Fund, to assist with the Fund's share distribution. SUF ¶ 73. Various teams within MetWest are

responsible for coordinating with and supervising Foreside, which entails monitoring the underwriter's performance and operations; supervising the administration, due diligence and execution of selling agreements with intermediaries; reviewing and confirming that Foreside undertakes regulatory filing with respect to approved marketing materials; inquiring about Foreside's compliance with applicable rules and regulations; the administration of 12b-1 payments to payees; maintenance of National Securities Clearing Corporation ("NSCC") membership (an SEC-regulated clearing service); the provision of annual 15(c) responses to the Board; and provision of routine quarterly reporting materials to the Board. *Id.* ¶ 74. MetWest also conducts ongoing due diligence of Foreside to review key controls and procedures, including quarterly calls, in-person due diligence meetings, and receipt and review of compliance-related board materials prepared by Foreside. *Id.* ¶ 75.

As a subadviser, MetWest has no responsibility regarding the underwriter/distributor of any of the Subadvised Funds, and therefore does not oversee, supervise, or manage those providers. *Id.* ¶ 76. MetWest does not interact with those service providers' staff, does not conduct due diligence of or visits with those service providers, and is not responsible for reporting to the Subadvised Funds' boards regarding those service providers. *Id.* ¶ 77.

**c. The Fund's Independent Auditor**

In connection with the independent audit required by the SEC (discussed above), TCW's Corporate Finance group oversees the Fund's annual audit process, with the assistance of MetWest's MFA group. SUF ¶ 59. For the Subadvised Funds, the Sponsoring Advisers and the boards of the Subadvised Funds select and work with their own independent auditors. *Id.* ¶ 60. MetWest has no responsibility to select or oversee an auditor or conduct an audit in connection with the Subadvised Funds; MetWest's only duty is to cooperate with any audit as the Sponsoring Adviser may direct. *Id.*

***(iv) Implementation of Mandated Mutual Fund Governance Structure***

As sponsoring adviser of the Total Return Bond Fund, MetWest provides several statutorily-mandated functions in connection with the ongoing governance of a mutual fund for which it has no responsibility as a subadviser. SUF ¶ 78.

**a. The 15(c) Process and Board Reporting**

As part of the annual 15(c) process during which the MetWest Funds Board must review and approve the Fund's service agreement and associated fees, the ICA requires that MetWest as adviser provide the Board with extensive information about the Fund's performance, operations, and the services provided to it and its shareholders. SUF ¶ 79. Accordingly, throughout the year, MetWest prepares and furnishes to the Board written materials that include, among other things, detailed information about the nature, extent, and quality of MetWest's services to the Fund; Fund performance; MetWest's investment processes; and the Fund's portfolio composition and portfolio trading practices. *Id.* ¶ 80. Further, in response to the Board's annual in-depth 15(c) process request, MetWest prepares extensive supplementary materials including, but not limited to: information about the Fund's investment results; financial and profitability data; information about the personnel providing services to the Fund; information about the fees charged and services provided to other clients; operational information, including about the Fund's and MetWest's compliance monitoring; and information about MetWest's portfolio trading practices. *Id.* ¶ 81.

In addition to the 15(c) process, the ICA requires the Board to provide certain oversight functions for the Fund, which MetWest facilitates. *Id.* ¶ 82. This includes preparing for periodic formal meetings and providing regular reports on a wide range of issues, including Fund performance; dividend distributions; expense reimbursement recoupment; swap counterparty expenses; Fund and market presentations by portfolio managers; compliance initiatives, policies, and breaches; derivative exposure and counter-party exposure; cross-trades; liquidity;

stress testing results; cybersecurity; regulatory developments that might impact the Fund; the securities pricing process and any issues that have arisen, such as pricing errors; litigation matters; risk management issues and initiatives; and market conditions and macroeconomic risks that may affect the investment process for the Fund. *Id.*

In contrast to the detailed and voluminous information that MetWest provides to the Fund's Board, MetWest prepares no reports and provides only limited factual information to the Sponsoring Advisers of the Subadvised Funds in response to specific requests. *Id.* ¶ 83. The Sponsoring Advisers – not MetWest – determine what information, if any, to request from MetWest and what information to pass on to the respective boards. *Id.* ¶ 84.

**b. MetWest's Compliance Program**

Pursuant to Rule 38a-1 under the ICA, the Total Return Bond Fund must designate a Chief Compliance Officer ("CCO") – who is employed and paid by MetWest – and must adopt a compliance program (implemented by the CCO) reasonably designed to prevent violation of the federal securities laws. SUF ¶ 85. Accordingly, MetWest, on behalf of the Fund, creates, implements, and maintains a customized compliance program, carefully tailored to the MetWest Funds' business model with extensive consultation with outside regulatory counsel. *Id.* ¶ 86. In order to ensure that the compliance policies relating to the Total Return Bond Fund are functioning effectively, MetWest undertakes ongoing compliance monitoring of areas such as explained in more detail in the declaration of CCO Jeffrey Engelsman. *Id.* ¶ 87. MetWest must compile and report the results of these tests to the Board on a quarterly basis, in addition to providing the CCO's annual Rule 38a-1 report on MetWest's compliance program testing, policies and breaches, and annual reports on the Fund's Anti-Money Laundering Policy and Identity Theft Prevention Program. *Id.* ¶ 88.

Following its testing, review, and monitoring processes, MetWest

frequently presents compliance policy amendment proposals to the Board for approval (often on a quarterly basis) in light of regulatory changes, interpretations by regulators (statements and actions), business practice changes, evolving best practice, and technological developments. *Id.* ¶ 89.

MetWest has no responsibility for the Rule 38a-1 compliance program of the Subadvised Funds. *Id.* ¶ 90. MetWest is only responsible for providing to the Sponsoring Advisers, upon request, periodic certifications and reports showing that its existing *adviser* compliance oversight is adequate in specified areas. *Id.* ¶ 91. Similarly, MetWest has no responsibility for the functions of the CCO of the Subadvised Funds. *Id.* ¶ 92. The Sponsoring Advisers must have their own CCO and related personnel, and are responsible for monitoring both their subadvisers, such as MetWest, and other third-party service providers it selects for the Subadvised Fund. *Id.* ¶ 93. As part of that monitoring, MetWest responds to quarterly and annual compliance questionnaires and certification requests from the Sponsoring Advisers. *Id.* ¶ 94.

**c. Fund Officers**

As registered investment companies and statutory trusts, the MetWest Funds are required to have fund officers. SUF ¶ 95. Pursuant to Section 2(a) of the IMA between the MetWest Funds and MetWest, MetWest must provide qualified professionals to serve as officers of each of the MetWest Funds without additional compensation. *Id.* ¶ 96. Currently, MetWest is providing twelve of its most senior executives and professionals as officers to the Total Return Bond Fund. *Id.* ¶ 97. MetWest also provides its own qualified professionals to serve as members of the Board of Trustees without additional compensation – as referenced above, "interested trustees." *Id.* ¶ 98.

MetWest has no responsibility to provide employees to serve as officers or trustees of the Subadvised Funds. *Id.* ¶ 99.

### *(v) Client Service of Hundreds of Thousands of Total Return Bond Fund Clients and Their Representatives*

MetWest's Client Services group is responsible for communicating investment strategies, performance, and outlook to the hundreds of thousands of Total Return Bond Fund shareholders and their representatives – the vast majority of whom are sophisticated institutional investors, including investment advisers, third-party intermediaries or distributors, private banks and retirement plans. SUF ¶ 100. Indeed, because many investors hold Fund shares through intermediaries and/or with the advice of consultants, MetWest regularly deals with multiple broker-dealer intermediaries and consultants every day. *Id.* ¶ 101. MetWest conducts periodic (often annual or semi-annual) due diligence meetings with these consultants and intermediaries to allow them to evaluate MetWest and the Fund and routinely participates in requested conference calls or meetings by Fund shareholders to review the outlook and performance of the Fund, as well as quarterly updates. *Id.* ¶ 102. Each shareholder request receives a customized meeting agenda and response and/or presentation specifically tailored to the particular shareholder's needs. *Id.* ¶ 103.

In contrast to the considerable and regular client services MetWest provides for the Fund, MetWest effectively has one client and one point of contact for each of the Subadvised Funds: the Sponsoring Adviser. *Id.* ¶ 104. As subadviser, MetWest does not have any responsibility for communicating with investors in the Subadvised Funds, or their consultants or intermediaries. *Id.* ¶ 105. MetWest's client service interactions are solely with the single Sponsoring Adviser and are limited and predictable in nature, occurring only periodically. *Id.* ¶ 106.

To better illustrate this stark contrast, over the past three years (2014-2016), MetWest's Client Services group has participated in in-person meetings or calls with shareholders of the Total Return Bond Fund on 1,153 occasions. *Id.* ¶ 107. In contrast, over that same time period, the Client Services group participated in

client service meetings or calls with the Sponsoring Advisers of the Subadvised Funds on only 59 occasions, representing just 4.9% of the total meetings MetWest had with both types of clients. *Id.* ¶ 108. Similarly, between 2014 and 2016, MetWest prepared roughly ten times as many deliverables (*e.g.*, materials for 15(c) processes, questionnaires, follow-up requests, quarter-end updates, surveys) for the Total Return Bond Fund than it did for the Subadvised Fund for which MetWest provides the greatest number of deliverables. *Id.* ¶ 109.[10]

## PROCEDURAL BACKGROUND

The plaintiff's single claim under Section 36(b) is based fundamentally on the proffered comparison of the Total Return Bond Fund's advisory fee to the subadvisory fees MetWest is paid by the Subadvised Funds, for services that are allegedly "the same or substantially the same." The Complaint makes the point repeatedly:

- "The investment advisory services that Met West provides as subadviser to the Subadvised Funds are **the same or substantially the same** as the services Met West provides to the Fund pursuant to the IMA." Compl. ¶ 49.
- "The Total Return Bond Fund Team uses **the same or substantially the same** investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Funds as it uses in providing investment advisory services to MetWest Bond Fund." *Id.* ¶ 53.
- "In providing investment advisory services to the Subadvised Funds, Met West must comply with **the same or substantially the same** provisions of the 1940 Act, SEC regulations, and federal tax law as when it provides investment advisory services to the Met West Bond Fund." *Id.* ¶ 54.

---

[10] For a more detailed breakdown of the deliverables provided by MetWest to the Fund and each of the Subadvised Funds, see the declaration of Patrick Moore.

The Court found the plaintiff's assertion of virtually identical services sufficiently plausible for purposes of Rule 12(b)(6), and denied MetWest's motion to dismiss. ECF No. 58. But the Court ordered the parties to engage in focused discovery on the core premise of plaintiff's claim, in anticipation of summary judgment briefing on this dispositive issue. Roy Decl. Ex. 4 (July 16, 2016 Hr'g. Tr. at 7-8). The plaintiff later moved for an expansion of the scope of Phase 1 discovery, arguing that information relating to the costs and profitability of the services MetWest provides to the Fund and Subadvised Funds is necessary "to properly test in Phase 1 Plaintiff's core allegation." ECF No. 68. In denying the plaintiff's request to broaden the scope of phase 1, the Court stated that "the focus should be on are there differences in services provided and are they significant differences." Roy Decl. Ex. 5 (Sept. 8, 2016 Hr'g. Tr. at 7). "If they are doing two different things, the fact that one is more expensive than the other doesn't come into play because the work that is required is different." *Id.* at 15.[11]

While focused in scope, the discovery has nevertheless been extensive in terms of the quantity of information provided by MetWest and the burden of doing so. Roy Decl. ¶¶ 2–3. Given the comprehensive range of the functions undertaken by MetWest for the Total Return Bond Fund, the discovery reflecting those functions touched upon virtually every aspect of MetWest's business. *Id.* ¶ 2. MetWest served extensive interrogatory responses (which it supplemented twice) detailing the differences in the services provided to the two types of clients, the inherent differences in the markets for these services, and the diverging risks borne by MetWest in servicing the respective clients. *Id.* ¶¶ 2, 5. The interrogatory responses appended as "Exhibit A" a table that summarized more

---

[11] The Court added, "[i]ndeed, to the extent the services provided to the Sub-Advised Funds are significantly different from those provided to the Fund, the Court agrees that it would be dispositive of whether the comparison is probative, regardless of how much the services costs." ECF No. 76 at 3 n.2

than 50 types of functions carried out by MetWest for the Total Return Bond Fund and explained how those functions were either not conducted at all by MetWest for the Subadvised Funds or were conducted to a lesser and different extent. *Id.* ¶ 5. MetWest's cumulative Second Supplemental Interrogatory Responses and Exhibit A are submitted herewith as Exhibit 1 to the Roy Declaration.

The interrogatory responses and Exhibit A were then backed up with a comprehensive document production, totaling over 1.2 million pages, reflecting the broad array of functions undertaken by MetWest as sponsoring adviser of the Fund as compared to those provided as subadviser to the Subadvised Funds. Roy Decl. ¶ 2. The plaintiff took nine fact depositions of MetWest personnel, questioning them about the differences in services, markets, and risks. *Id.* ¶ 3.[12] MetWest supplemented the extensive factual record with two expert opinions – one from economist and mutual fund market researcher John Coates, Ph.D., the other from long-time mutual fund industry executive Stephen Byers – further explaining the differences in these services, markets and risks. *Id.* This Motion is also supported by a Declaration submitted on behalf of BNY Mellon.[13]

---

[12] Despite taking the depositions of nine MetWest employees, the plaintiff declined to ask any of those witnesses – beyond MetWest's General Counsel, who was responsible for coordinating the response – a single question about MetWest's Exhibit A. Similarly, as discussed further below, the plaintiff declined to provide his purported expert witness with Exhibit A for review in reaching his opinions.

[13] The plaintiff, on the other hand, responded to MetWest's discovery requests by initially pointing to just 37 documents, for which he produced only the 37 cover pages of the 5,599 pages of public filings referenced in his response to MetWest's First Set of Interrogatories. Roy Decl. ¶ 4. After the Court instructed the plaintiff to supplement his discovery responses to explain his theory of the case and the bases for his theory, the plaintiff simply listed – without accompanying explanation – 3,015 documents (totaling approximately 66,721 pages) which had been produced by MetWest in discovery. *Id.* But he never even attempted to reveal how those documents support his claim that MetWest's role for the Fund and the Subadvised Funds is "substantially the same."

## ARGUMENT

### I. LEGAL STANDARD FOR SECTION 36(b) LIABILITY AND PROPOSED FEE COMPARISONS

The plaintiff asserts his claim under Section 36(b) of the ICA, which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund. 15 U.S.C. § 80a-35(b); *Jones*, 559 U.S. at 338. To establish liability under Section 36(b), the plaintiff must prove the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's-length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). Under *Jones,* the job of a court "is to identify the *outer bounds* of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 360 (7th Cir. 2015) (on remand from U.S. Supreme Court). The court's task is only to decide whether the fee exceeds those "outer bounds"; it is not charged with deciding if fees are too high, too low, or just right, and must not thereby "engage in rate regulation." *Id.*

*Jones* came before the Supreme Court after the District Court granted summary judgment and the Seventh Circuit affirmed. 559 U.S. 335. There, as here, the plaintiffs sought to establish that the challenged advisory fees were beyond arm's-length range by comparing them to fees the adviser was paid by non-mutual fund institutional clients – including external subadvised funds. The Supreme Court gave express guidance for how such proposed fee comparisons should be judged as against summary judgment records. Rather than imposing a "categorical rule regarding the comparisons of the fees charged to different types of clients," the Court required trial courts to view the evidence in the record before them to make a threshold determination of *whether* the services are sufficiently similar to justify use of the fee comparison. *Id*. at 349-50. The Court instructed that "courts may give such comparisons the weight they merit in light of the similarities and differences between the services that the clients in question

require, *but courts must be wary of inapt comparisons*." *Id*. (emphasis added).

The Supreme Court specifically recognized that "there may be significant differences" between the services an investment adviser provides to its various client types, requiring an early determination of comparability before a fee comparison is considered: "If the services rendered are sufficiently different that a comparison is not probative, *then courts must reject such a comparison*." *Id*. (emphasis added). The Court insisted upon this threshold determination to ensure that investment advisers would not be automatically "doomed" to trial any time fee comparisons were alleged. Accordingly, the Court reiterated that "*plaintiffs bear the burden* in showing that fees are beyond the range of arm's-length bargaining" and that "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate." *Id.* at 350 n.8 (emphasis added). In focusing on the required *in limine* determination, the Court cautioned lower courts that differences in services to distinct types of clients reflect different *markets* for the adviser's services: "a showing of relevance requires courts to assess any disparity in fees *in light of the different markets* for advisory services." *Id.* (emphasis added).

On remand, the Seventh Circuit applied these principles to the summary judgment record and rejected plaintiffs' fee comparisons as inapt. *Jones*, 611 F. App'x 359, 361. *Id.*[14]

---

[14] In a recent district court trial decision rejecting a plaintiff-shareholder's Section 36(b) claim, the court expressly recognized the inherent differences between the business of an adviser and that of a subadviser. *See Kasilag, et al. v. Hartford Inv. Fin. Servs., LLC*, 11-CV-01083, 2017 WL 773880, **5, n.13 (D. N.J. Feb. 28, 2017) (observing that the comparison between a subadviser and adviser was inapt "given the businesses are different."). *Jones* confirms that an adviser should not be "doomed" to trial to make that determination.

## II A COMPARISON OF METWEST'S ADVISORY FEES AND SUBADVISORY FEES MUST BE REJECTED AS A MATTER OF LAW, AS THE DIFFERENCES IN FUNCTIONS OF ADVISERS AND SUBADVISERS RENDER THE COMPARISON INAPT

The plaintiff's claim for excessive fees under Section 36(b) fails as a matter of law, as it is founded on a legally inapt comparison between the challenged advisory fee and MetWest's subadvisory fees. There is no basis in the record to conclude that MetWest's advisory and subadvisory roles are "the same or substantially the same" (Compl. ¶ 49), and therefore no basis to treat a comparison of the fees as probative under *Jones*. The record shows that *at least* the Key Sponsoring Adviser Functions are provided by MetWest only to the Total Return Bond Fund, and not similarly provided to the Subadvised Funds. These differences by themselves render the plaintiff's proposed fee comparison legally inapt, even before consideration of the other service and risk differences discussed in MetWest's Exhibit A – including significant differences in how the respective portfolios are managed. The plaintiff cannot simply refer to the contractual language in the IMA and subadvisory agreements to establish comparability. These generic boilerplate descriptions do not reveal what MetWest actually *does* in its separate roles sponsoring adviser of the Total Return Bond Fund and service provider for the Subadvised Funds. And exclusive reliance on those contractual provisions cannot contradict the overwhelming factual record that distinguish the Key Sponsoring Adviser Functions that MetWest undertakes for the Total Return Bond Fund, but does not assume for the Subadvised Funds.

### A. The Record Shows that MetWest Does Not Provide "the Same or Substantially the Same" Services as Sponsoring Adviser to the Total Return Bond Fund as It Does as Subadviser to the Subadvised Funds

The accompanying evidentiary record is clear that MetWest provides *at least* the Key Sponsoring Adviser Functions to the Total Return Bond Fund that it does *not* similarly provide to the Subadvised Funds.

### 1. Key Sponsoring Adviser Functions Provided by MetWest to the Total Return Bond Fund

Mutual funds are subject to a complex structure of statutory and regulatory requirements, which serve to provide investors a product with a unique set of attributes: access to a diversified professionally-managed portfolio of securities; the ability to buy and sell shares every business day at the current net asset value of the portfolio; full transparency as to the portfolio's holdings, investment style and risks; regulatory protection against adviser self-dealing; and fulsome shareholder servicing (*e.g.*, account statements, tax forms, phone service centers). These attributes are defining characteristics of mutual funds, distinguishing them from other types of investment products. The Key Sponsoring Adviser Functions are central and necessary components to providing these attributes, which regulators and investors alike have come to expect with mutual funds. These services are therefore part and parcel of MetWest's sponsorship of the fully-integrated investment product that is the Total Return Bond Fund.

The singular defining characteristic of a mutual fund is "daily liquidity" – *i.e.*, the ability for investors to redeem all or a portion of their fund investment on any given business day, at a readily-ascertainable share price. Roy Decl. Ex. 6 (Byers R.) ¶ 62. Other collective investment vehicles do not offer this feature – which provides investors with the security of knowing they can limit their exposure to market forces by promptly liquidating their fund investments. Accordingly, it is absolutely imperative to MetWest's standing with its investors and reputation that the daily liquidity mechanism function correctly at all times – most notably, the daily securities valuation of the Fund's roughly 1,900 holdings and determination of the NAV. Because of the inherently subjective nature of pricing over-the-counter traded bonds and other *un*traded instruments, MetWest must bring to bear a full range of business judgment, capital market intelligence, fixed income expertise, proprietary and industry-subscribed analytical systems, IT

systems infrastructure, and more, to correctly price the Fund's holdings on a daily basis. This process is extremely resource intensive and must be completed accurately, and within strict time constraints, as demanded by government regulators, the Board, the marketplace, shareholders, and the 150-plus platforms that offer the Fund. SUF ¶ 24. Even one NAV error besmirches the reputation of MetWest, damages the trust of investors, and can result in financial liability. *Id.* ¶ 39. As demonstrated by certain recent industry events and supported by the expert opinion of long-time mutual fund industry executive Stephen Byers, "even a small error in the NAV and fair valuation process can be detrimental to a mutual fund sponsoring adviser, resulting in both substantial monetary loss and reputational damage." *Id.* ¶ 39.

Similarly, mutual fund investors expect complete transparency and consistency of information about a mutual fund's holdings, investment style, and risks. The SEC-mandated disclosure regime governing mutual funds is designed to provide investors with plain-English descriptions of how their fund is being managed. The various substantive requirements under the ICA (including limitations on potentially self-dealing transactions and the extensive compliance program requirements) are designed to provide very clear guard rails within which advisers must manage their funds. The adviser faces regulatory and litigation exposure if its SEC-mandated disclosures are inaccurate or its compliance programs faulty – and the reputational damage from the mere allegation that a fund adviser has engaged in misleading or inappropriate practices can be devastating.

Management of the portfolio is of course a crucial aspect to a successful fund. But all of the Key Sponsoring Adviser Functions reflect necessary services separate and apart from the selection of securities – and they are equally important, if not more so, for an adviser to distinguish itself from its competitors and have long-term viability and success. MetWest devotes a huge amount of

resources and attention to providing the Key Sponsoring Adviser Functions to the Total Return Bond Fund, commitments that are simply not necessary or applicable to MetWest when retained to provide portfolio management services to a Subadvised Fund. A comparison of MetWest's fees as the sponsoring adviser to the Total Return Bond Fund to its fees as subadviser to the Subadvised Funds is the quintessential apples to orange comparison – precisely of the type the Supreme Court instructed courts to be wary.

**2. Key Sponsoring Adviser Functions Are Provided to the Subadvised Funds by their Respective Sponsoring Advisers**

As the subadviser, MetWest does not similarly provide the Key Sponsoring Adviser Functions to the Subadvised Funds. Those responsibilities fall instead to the Sponsoring Advisers, along with the attendant risks from failing to perform them properly. Over and above the portfolio management duties they delegate to MetWest, the Sponsoring Advisers must ensure that the branded mutual fund products they offer to their own client base provide the defining mutual fund characteristics their clients expect – the same characteristics provided by MetWest to the Total Return Bond Fund.

Indeed, a crucial distinction is that many of the Subadvised Funds are vehicles solely or primarily supporting other types of investment products or services offered by the Sponsoring Advisers. Some of the Subadvised Funds are vehicles to support the returns of variable annuity products branded and marketed by affiliates of the Sponsoring Advisers. Other of the Subadvised Funds are sold solely or primarily to customers of financial advisory businesses operated by the Sponsoring Advisers. These customers are coming to Subadvised Funds first and foremost because of their relationship with the Sponsoring Advisers and their affiliates, and are relying on the Sponsoring Adviser to provide the appropriate mutual fund vehicle to support the Sponsoring Adviser's product.

For example, a MassMutual life insurance customer buys a variable annuity

with returns provided by the MassMutual Select Total Return Bond Fund – one of the Subadvised Funds at issue here – that customer looks to *MassMutual* to make sure that the underlying investment vehicle is operating as it should. If the published share price is inaccurate, an account statement is late or faulty, a year-end tax statement is wrong, the customer service website crashes, or a call center employee is unhelpful, that customer will consider that failing to be MassMutual's – not that of the underlying subadviser. MassMutual's reputation and standing are on the line, which is precisely why MassMutual as Sponsoring Adviser remains ultimately responsible for providing the Key Sponsoring Adviser Functions, even when it has retained MetWest to select securities for the fund's portfolio.

The Sponsoring Advisers' role in performing these key functions for the Subadvised Funds is corroborated by the fact that the Total Return Bond Fund's advisory fee of 35 bps is *lower* than the total advisory fee charged by the Sponsoring Advisers to most of the Subadvised Funds. As set forth in the table attached hereto as Appendix 1, the Sponsoring Advisers charge an advisory fee to the Subadvised Funds for the many functions they undertake, only a portion of which they in turn pay to MetWest for its limited portfolio management services. In fact, of the eleven Subadvised Funds, eight pay a total advisory fee that is greater than the 0.35% (35 basis points) advisory fee that the Total Return Bond Fund pays to MetWest. For each of those funds, the Sponsoring Advisers are charging fees of 0.22% to 0.85% on top of MetWest's subadvisory fees. (See Column 3.) That means the plaintiff's hypothesis that MetWest performs "the same or substantially the same" services for the Fund as for the Subadvised Funds must be wrong, unless the additional 22 to 85 basis points the Sponsoring Advisers of the Subadvised Funds charge is for *nothing* at all.

The Subadvised Funds' SEC disclosures underscore that the Sponsoring Advisers retain significant responsibilities that are *not* delegated to MetWest:

- The sponsoring adviser "maintains responsibility for a number of other

important obligations, including, among other things, board reporting, assistance in the annual advisory contract renewal process, and, in general, the performance of all obligations not delegated to a subadviser." MassMutual Select Total Return Bond Fund, 2016 Prospectus at Roy Decl. Ex. 8 (MassMutual Select Total Return Bond Fund, 2015 Prospectus) at 120.

- "Generally, the services that a subadviser provides to the Fund are limited to asset management and related recordkeeping services." Roy Decl. Ex. 9 (Columbia Active Portfolio Core Plus Bond Fund, 2016 SAI) at 88.
- "The Board has delegated primary responsibility for determining or causing to be determined the value of the Funds' investments (including any fair valuation) to the Manager pursuant to valuation policies and procedures approved by the Board. When market quotations are not readily available or are determined to be unreliable, investments are valued at fair value as determined in good faith by the valuation committee established by the Manager in accordance with such procedures under the oversight of the Board." Roy Decl. Ex. 10 (CGCM 2016 Semi-Annual Report, PDF 187).

The plaintiff's premise that the Sponsoring Advisers provide no services and bear no risks in connection with the Subadvised Funds – because those responsibilities all fall to MetWest as the subadviser – has no basis in the record.

### B. The Language in the IMA and Subadvisory Agreements Does Not Establish that MetWest Provides "the Same or Substantially the Same" Services to the Total Return Bond Fund and the Subadvised Funds

The ostensible basis for the plaintiff's proposed comparison of advisory and subadvisory fees is the contractual language in the IMA and the subadvisory agreements. According to the plaintiff, the use of similar language in the IMA and subadvisory agreements in the high-level descriptions of MetWest's duties as adviser to the Fund and subadviser to the Subadvised Funds, respectively, means that MetWest's roles must be "the same or substantially the same." Compl. ¶ 50. The Complaint compares boilerplate excerpts of the IMA to boilerplate excerpts of one of the subadvisory agreements, extrapolates from there to all subadvisory

agreements, and concludes that all the services are the same, as follows:

> The subadvisory agreements require Met West to provide the same or substantially the same investment advisory services as are required by the Fund's IMA. For example, like the Fund's IMA, the subadvisory agreement for the AZL Subadvised Fund requires Met West to: (a) "manage the investment operations and the composition" of the assets of the AZL Subadvised Funds; (b) "determine…what investment and securities will be purchased, retained, or sold" by the AZL Subadvised Fund; (c) place orders for the purchase and sale of securities on behalf of the AZL Subadvised Fund; and (d) "render to the Board such periodic and special reports as the Board or Manager may request."

*Id.*

But this allegedly overlapping contract language reflects nothing but generic descriptions of high-level portfolio management and board reporting responsibilities. On their face, these provisions do not purport to itemize all of the individual obligations that MetWest assumes in either role. Indeed, the plaintiff makes no effort to connect the array of services indisputably required for the operation of a mutual fund back to this contractual language – nor could he, as the contracts are plainly not intended to provide such an itemization. What the plaintiff omits in making the language comparison above is the IMA language defining MetWest's advisory duties to the Total Return Bond Fund in a sweeping, catch-all fashion that does contemplate the range of responsibilities (not itemized in the contract) that MetWest assumes in the role of sponsoring adviser:

> The Manager *shall act as investment manager to the Funds* and shall supervise investments of the Funds on behalf of the Funds *in accordance with the investment objectives, programs and restrictions of the Funds as provided in the Trust's governing documents*, including, without limitation, the Trust's Agreement and Declaration of Trust and By-Laws, or otherwise and such other limitations as the Trustees may impose from time to time in writing to the Manager. *Without limiting the generality of the foregoing*, the Manager shall ….

SUF ¶ 113. The vaguely similar descriptions in the respective agreements of

certain high-level responsibilities do not in any way stand as "evidence" that the advisory and subadvisory services are substantially similar. Nor do they contradict in any way the ample evidence presented by MetWest of the many functions it provides to the Fund that it does not provide to the Subadvised Funds. In short, this simplistic juxtaposition cannot form the factual predicate for the plaintiff's proffered fee comparison.

A similar contract-based argument was recently rejected by the court in a Section 36(b) action in the District of New Jersey. In *Sivolella v. AXA Equitable Life Insurance Co.*, the plaintiff argued that essentially all duties of the adviser to subadvised mutual funds had been delegated to the subadvisers based upon similarities in the service descriptions in the advisory and subadvisory agreements. The court rejected this argument, holding: "to the extent Plaintiffs dispute [the adviser's] services based on contractual language, the Court finds that the analysis must consider all duties, whether enumerated in a contract or undertaken in a manner to carry out the contractual duties." No. 11-CV-4194, 2016 WL 4487857, at *34 (D. N.J. Aug. 25, 2016). The court further reasoned:

> [The adviser] performed a host of duties that may not have been explicitly enumerated in the contracts. It is not uncommon for sophisticated business entities to come to a more specific understanding of their relationship, and undertake tasks throughout the course of business that many not have been explicitly outlined in a fairly boilerplate agreement.

*Id*. at 47. This reasoning applies with equal force here. Apart from the contracts' generic language, MetWest's witnesses have provided ample evidence of the Key Sponsoring Adviser Functions provided to the Total Return Bond Fund. That TCW employs over 600 employees – fewer than 80 (or 13%) of whom provide portfolio management services from TCW's fixed income investment and trading floor – while the remaining hundreds of employees work on the other eight floors or in one of TCW's other four locations, further undermines the plaintiff's premise

that MetWest is responsible only for portfolio management.

### C. The Additional Responsibilities and Risks Borne by MetWest as Sponsoring Adviser to the Total Return Bond Fund Are Not Delegated to Third-Party Service Providers

In his discovery responses, the plaintiff has asserted that various services – including Key Sponsoring Adviser Functions relating to the Total Return Bond Fund – are not performed by MetWest, but by BNY Mellon, which serves as the Fund's administrator, custodian, and transfer agent. The plaintiff thus suggests that MetWest's advisory and subadvisory roles do involve substantially identical services, because additional services required in connection with the Total Return Bond Fund are performed by BNY Mellon under separate service agreements – and not by MetWest under the IMA. For example:

- The plaintiff asserts that "BNY Mellon … performs the daily pricing of portfolio securities for the Total Return Bond Fund pursuant to the Fund Administration and Accounting Agreement." Roy Decl. Ex. 11 (Pl.'s Resp. to Def.'s First Set of RFAs) at No. 1.
- The plaintiff claims, "the daily NAV calculation is done by BNY pursuant to the BNY Administration & Accounting Agreement." *Id*. at No. 5

The plaintiff points to no evidence in support of these assertions other than BNY Mellon's service agreements. But these assertions are flatly belied by the declarations of the MetWest *and BNY Mellon* personnel involved with these pricing and NAV functions, as well as the BNY Mellon service agreement itself.

As the fund administrator, BNY Mellon's role is largely ministerial in pricing assistance and calculation of the NAV. SUF ¶ 68. BNY Mellon performs the calculation of the NAV – in effect, the arithmetic based upon the prices – but it is MetWest that must exercise discretion in assigning the appropriate daily prices of the Fund's 1,900-plus securities, which are fed to BNY by a third-party pricing vendor (if a price is readily available) or by MetWest (if a reliable vendor price is not available). *Id.* ¶ 69. This allocation of responsibilities is confirmed in the

accompanying Declaration of Wayne D. Weaver, a BNY Mellon executive who was the signatory to the administrative and transfer agency agreements. This is why it is MetWest – not BNY Mellon – that expends tremendous time and energy on a multi-tiered securities pricing and valuation infrastructure. *Id.* ¶ 23–28. And this is why it is MetWest that bears the risk of the securities valuation being performed incorrectly – which could lead to an inaccurate NAV, with disastrous consequences. *Id.* ¶ 38–39. In the event of inaccurate pricing and incorrect NAV, it is the fund's adviser who will be looked to by shareholders and regulators to make shareholders whole for share purchases at artificially high prices or share redemptions at artificially low prices.[15] *Id.* ¶ 39.

The BNY Mellon Administration and Accounting Agreement is in accord:

> BNY Mellon undertakes to "[o]btain security market quotes and currency exchange rates from pricing services approved by a Fund's investment adviser, or *if such quotes are unavailable, then obtain such prices from the Fund's investment adviser*, and in either case, calculate the market value of each Fund's investments in accordance with the Fund's valuation policies or guidelines; provided, however, *that BNY Mellon shall not under any circumstances be under a duty to independently price or value any of the Fund's investments* . . . itself or to confirm or validate any information or valuation provided by [MetWest] or any other pricing source[.]

Roy Decl., Ex. 12 at 29 (Schedule 1) (emphases added). The plaintiff has no evidentiary basis to assert that the Key Sponsoring Adviser Functions such as securities valuation and determination of an accurate NAV each day are the ultimate responsibility of anyone other than MetWest with respect to the Total Return Bond Fund. Given the plaintiff's view about the centrality of BNY Mellon's role, one would have expected the plaintiff to have directly raised these

---

[15] In enforcement settlements involving SEC allegations of NAV errors, it is the fund's *adviser* – not the fund or any third-party administrator – that is held responsible for making shareholders whole. Roy Dec. Ex. 6 (Byers R. ¶¶ 50-53).

questions with MetWest witnesses, or at the very least, BNY Mellon itself. The fact that the plaintiff did not make these inquiries speaks volumes.[16]

## CONCLUSION

The plaintiff's central fee comparison is inapt as a matter of law under *Jones*. Because the functions MetWest provides as sponsoring adviser of an integrated mutual fund product are fundamentally different from the limited portfolio management services it provides as subadviser to the Subadvised Funds, the fee comparison simply has no probative value. Accordingly, the Court must reject the comparison – and likewise the plaintiff's claim under Section 36(b).

---

[16] The plaintiff's "rebuttal" expert – offered not for affirmative evidence but only to rebut the opinions of MetWest's experts – claims that to the extent MetWest performs any administrative work, it is done pursuant to a so-called Supplemental Administration Agreement (the "SAA"), which provides that the MetWest Funds pay MetWest compensation in the amount of $650,000 each year for overseeing specified administrative services for the Funds. Roy Decl., Ex. 13 (Kopcke R.) at 6-7. Mr. Kopcke is in no position to draw conclusions from the document. Nothing about it turns on his ostensible expertise as an *economist*, and he confessed he has no experience working with mutual funds, much less administrators, custodians, or transfer agents. Roy Decl., Ex. 14 (Kopcke Tr. at 23-25). As important, his report fails to address the fact that MetWest has never requested or received any of the fees authorized by the SAA. MetWest continues to provide all of the same services to the MetWest Funds under the IMA that it provided before the SAA was authorized. SUF ¶ 112. The SAA has had no effect on the services MetWest provides to the MetWest Funds or who is paying for them. *Id*. Mr. Kopcke just assumed the contract was in force and applied; but he never read any of the nine MetWest employee deposition transcripts that might inform him on the subject; the plaintiff himself never asked a witness a single substantive question about the agreement; and both Mr. Kopcke and the plaintiff ignored the Fund's Prospectus disclosure that unambiguously said no service was provided or payment was made under the SAA. Roy Decl., Ex. 14 (Kopcke Tr. at 31-32, 110-15).

Dated: April 28, 2017

Respectfully submitted,

**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
Robert A. Skinner (*pro hac vice*)
Amy D. Roy (*pro hac vice*)

**IRELL & MANELLA LLP**
David Siegel
Glenn K. Vanzura

By: */s/ Glenn K. Vanzura*
Glenn K. Vanzura

*Attorneys for Defendant Metropolitan West Asset Management, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 28, 2017.

/s/ Morgan D. MacBride
Morgan D. MacBride

# Appendix 1

| 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|
| Fund | Subadvisory Fee to MetWest | Advisory Fee to Sponsoring Adviser | Total Mgmt. Fee | Total Expense Ratio | |
| | | | | Ratio Net of Waivers | Class |
| Forum Funds Absolute Strategies Fund* | 0.35% first $25M Breakpoint thereafter | 0.85% - 1.35% | 1.60% | 2.43% | R |
| | | | | 1.87% | Institutional |
| AZL MetWest Total Return Bond Fund | 0.18% first $500M Breakpoint thereafter | 0.42% - 0.50% | 0.60% | 0.89% | - |
| Russell Investment Core Bond Fund* | 0.16% first $500M Breakpoints thereafter | 0.37% - 0.47% | 0.53% | 0.66% | - |
| Columbia Variable Portfolio – TCW Core Plus Bond Fund | 0.18% first $500M Breakpoints thereafter | 0.31% - 0.44% | 0.49% | 0.81% | 2 |
| | | | | 0.56% | 1 |
| Russell Strategic Bond Fund* | 0.16% first $500M Breakpoints thereafter | 0.31% - 0.41% | 0.47% | 0.98% | A,E |
| | | | | 0.69% | I |
| Columbia Active Portfolios Multi-Manager Core Plus Bond Fund* | 0.18% first $500M Breakpoints thereafter | 0.29% - 0.42% | 0.47% | 0.81% | - |
| CGCM Core Fixed Income Fund* | 0.15% | 0.25% | 0.40% | 0.54% | - |
| MML Total Return Bond Fund | 0.18% first $500M Breakpoint thereafter | 0.22% - 0.30% | 0.40% | 0.85% | Service I |
| | | | | 0.60% | II |
| MetWest Total Return Bond Fund | - | - | 0.35% | 0.67% | M |
| | | | | 0.44% | I |
| MassMutual Select Total Return Bond Fund | 0.18% first $500M Breakpoint thereafter | 0.12% - 0.20% | 0.30% | 0.89% | A |
| | | | | 0.34% | I |
| Cornerstone Advisors Core Plus Bond Fund* | 0.275% first $1M Breakpoint thereafter | - | 0.27% | 0.49% | I |
| Bridge Builder Core Plus Bond Fund* | 0.18% first $500M Breakpoint thereafter | - | 0.16% | 0.24% | - |

* An asterisk after a Subadvised Fund's name indicates that it is a multi-manager fund (*i.e.*, MetWest is not the only subadviser, and therefore it manages only a portion or "sleeve" of the portfolio).