**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
john.donovan@ropesgray.com
Robert A. Skinner (*pro hac vice*)
robert.skinner@ropesgray.com
Amy D. Roy (*pro hac vice*)
amy.roy@ropesgray.com
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951 7000
Fax: (617) 951 7050

**IRELL & MANELLA LLP**
David Siegel (101355)
dsiegel@irell.com
Glenn K. Vanzura (238057)
gvanzura@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277 1010
Fax:  (310) 203 7199

Attorneys for Defendant
METROPOLITAN WEST ASSET
MANAGEMENT, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THOMAS J. KENNIS, <br><br> Plaintiff, <br><br> v. <br><br> METROPOLITAN WEST ASSET MANAGEMENT, LLC, <br><br> Defendant. | Case No. 2:15-cv-08162-GW-FFM <br><br> **DEFENDANT'S NOTICE OF MOTION AND PHASE II MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> [Statement of Uncontroverted Facts and Conclusions of Law, Supporting Declarations, and Proposed Judgment Filed Concurrently Herewith] <br><br> Date: October 25, 2018 <br> Time: 8:30 a.m. <br> Courtroom: 9D <br> Judge: Hon. George H. Wu |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE** that on October 25, 2018, at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable George H. Wu in Courtroom 10, United States Courthouse, located at 350 West 1st Street, Los Angeles, California 90012, Defendant Metropolitan West Asset Management, LLC ("MetWest") will move this Court for entry of judgment following the Court-ordered Phase II of discovery declaring that:

1.   The plaintiff has failed to demonstrate a genuine dispute of material fact that, if resolved in the plaintiff's favor, could lead to a finding that MetWest breached its duty under Section 36(b) of the Investment Company Act of 1940 ("Section 36(b)"); and

2.   The plaintiff's claim under Section 36(b) accordingly fails as a matter of law, requiring entry of judgment in favor of MetWest.

Defendant's Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, Statement of Uncontroverted Facts and Conclusions of Law, the accompanying declarations and attached exhibits, upon all papers, pleadings, and records on file herein, and on such other matters and argument of counsel that may properly come before the Court before or at the time of the hearing.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on various occasions prior to the filing of this motion, including most recently September 18, 2018.

Dated:  September 20, 2018

Respectfully submitted,

**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
Robert A. Skinner (*pro hac vice*)
Amy D. Roy (*pro hac vice*)

**IRELL & MANELLA LLP**
David Siegel
Glenn K. Vanzura

By:  */s/ Glenn K. Vanzura*
 Glenn K. Vanzura

*Attorneys for Defendant Metropolitan West Asset Management, LLC*

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..........................................1

STATEMENT OF FACTS...................................................................................3

    A.    The Fund's Median-or-Below Advisory Fee.........................................3
    B.    The Fund's Strong Long-Term Performance.........................................5
    C.    Review by the Board of Trustees...........................................................5
    D.    Comparison Between the Fund and Subadvised Funds.........................7

PROCEDURAL HISTORY ...............................................................................11

ARGUMENT......................................................................................................12

I.    IT IS THE PLAINTIFF'S BURDEN TO ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUND "COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-LENGTH BARGAINING"..........................12

    A.    MetWest Is Entitled to Summary Judgment if the Plaintiff Fails to Come Forward With Evidence Sufficient to Allow the Court to Find for the Plaintiff Under Section 36(b)..........................................12
    B.    Comparison of Mutual Fund Fees to Fees Charged to Other Types of Clients Requires the Plaintiff to Establish a Factual Predicate of Comparability............................................................................................13

II.    THE PLAINTIFF HAS FAILED TO ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUND PAID EXCESSIVE FEES IN VIOLATION OF SECTION 36(b)..........................15

    A.    The Undisputed Record of MetWest's Performance, At-or-Below Median Fees, and the Approval Process for those Fees Defeats the Plaintiff's Claims Under Section 36(b) ............................................15
    B.    The Plaintiff's Comparison of MetWest's Advisory Fees and Subadvisory Fees Does Not Create a Genuine Dispute of Material Fact Taking the Fund's Fees Outside the Arm's-Length Range .......18
    C.    The Plaintiff's Emphasis on MetWest's Profitability and Hypothetical Alterations to MetWest's Profitability Calculations Does Not Establish that the Fund's Median-Level Fees Are Beyond the Arm's-Length Range ......................................................23
    D.    The Plaintiff's Claims of Supposed "Economies of Scale" in Managing the Fund Are Unsupported by Evidence and Immaterial in Any Event ...........................................................................................25
    E.    The Plaintiff's Criticisms of the Independent Trustees' Fee Review and Approval Process Are Not Supported by the Record .................27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.   The Plaintiff's Evidence on the Remaining "*Gartenberg* Factors" Raises No Genuine Dispute of Material Fact Under Section 36(b) that the Fee Fell Within the Range of Arm's-Length Bargaining ..... 29

CONCLUSION ........................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
   No. Civ. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009),
   *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F.
   App'x 716 (9th Cir. 2011 ........................................................................ 17, 26

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................... 13

*In re BlackRock Mut. Funds Advisory Fee Litig.*,
   No. 14-cv-1165, --- F. Supp. 3d ---, 2018 WL 3075916 (D.N.J.
   June 21, 2018) ........................................................................................ 24, 29

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984) ...................................................................................... 12

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ........................................................................................ 2

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982) ......................................................................... 13

*Goodman v. J.P. Morgan Inv. Mgmt., Inc.*,
   301 F. Supp. 3d 759 (S.D. Ohio 2018), *appeal docketed*, Nos. 18-
   3238, 18-3239 (6th Cir. Mar. 14, 2018) .................................................*passim*

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d 522 (S.D.N.Y. 2008) .................................................... 25, 30

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010) .................................................................................*passim*

*Jones v. Harris Assocs. L.P.*,
   611 F. App'x 359 (7th Cir. 2015) .............................................................*passim*

*Jones v. Harris Assocs. L.P.*,
  No. 04 C 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007),
  *vacated*, 559 U.S. 335 (2010), *and aff'd on remand*, 611 F. App'x
  359 (7th Cir. 2015) ...................................................................................... 15, 28

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
  No. CV 11-1083, 2017 WL 773880 (D.N.J. Feb. 28, 2017), *aff'd*,
  No. 17-1653, --- F. App'x ---, 2018 WL 3913102 (3d Cir. Aug.
  15, 2018) ....................................................................................... 17, 18, 29, 30

*Krinsk v. Fund Asset Mgmt., Inc.*,
  875 F.2d 404 (2d Cir. 1989) ............................................................................... 25

*Pirundini v. J.P. Morgan Inv. Mgmt., Inc.*,
  309 F. Supp. 3d 156 (S.D.N.Y. 2018), *appeal docketed*, No. 18-
  733 (2d Cir. Mar. 16, 2018) ............................................................................... 26

*Sivolella v. AXA Equitable Life Ins. Co.*,
  No. 11CV4194, 2016 WL 4487857 (D.N.J. Aug. 25, 2016), *aff'd*,
  No. 16-4241, --- F. App'x ---, 2018 WL 3359108 (3d Cir. July 10,
  2018) ................................................................................................................ 17

*Turner v. Davis Selected Advisers, LP*,
  626 F. App'x 713 (9th Cir. 2015)........................................................................ 25

*Zehrer v. Harbor Capital Advisors, Inc.*,
  No. 14C 00789, 2018 WL 1293230 (N.D. Ill. Mar. 13, 2018) ......... 1, 17, 24, 29

**Statutes**

15 U.S.C. § 80a-2(a)(19) ............................................................................................ 6

15 U.S.C. § 80a-15(c) ....................................................................................... 5, 6, 15

15 U.S.C. § 80a-35(b)......................................................................................*passim*

15 U.S.C. § 80a-35(b)(2) .......................................................................................... 12

**Other Authorities**

Investment Company Act of 1940, Rule 38a-1 ....................................................... 10

## MEMORANDUM OF POINTS AND AUTHORITIES

To prevail on his claim under Section 36(b) of the Investment Company Act of 1940 ("ICA"), the plaintiff bears the burden to prove that MetWest's advisory fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been the product of arm's length bargaining*." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added). To do so, the plaintiff must prove that the fees actually exceed the "*outer bounds* of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359, 360 (7th Cir. 2015) ("*Jones II*") (emphasis added) (on remand from Supreme Court, affirming grant of summary judgment to mutual fund adviser).

MetWest respectfully submits that the plaintiff cannot do so. The core, dispositive facts surrounding the challenged advisory fee are undisputed: the Total Return Bond Fund (the "Fund") achieved consistently strong performance, for which MetWest's shareholders paid fees at or below the median for the Fund's peers, following the annual approval of those fees by the Fund's independent trustees – with the advice of actively engaged independent counsel. Indeed, the Fund's performance was strong by every measurement, including net-of-fees and adjusting for risk.

*Goodman v. J.P. Morgan Investment Management, Inc.* ("*JPM*") is an effectively identical case in which a court recently granted summary judgment to the investment adviser on a Section 36(b) claim. 301 F. Supp. 3d 759 (S.D. Ohio 2018), *appeal docketed*, Nos. 18-3238, 18-3239 (6th Cir. Mar. 14, 2018).[1] That court's reasoning applies here, where MetWest investors also enjoy a combination of strong performance and median-or-below fees. *See id.* at 777-81. Like in this

---

[1] While *JPM* is one of the latest cases granting summary judgment to an adviser defendant, the facts here also strongly resemble those held appropriate for summary judgment in *Jones II*, 611 F. App'x at 360-62, and *Zehrer v. Harbor Capital Advisors, Inc.*, No. 14C 00789, 2018 WL 1293230, at *17-18 (N.D. Ill. Mar. 13, 2018).

case, the plaintiffs in *JPM* based their excessive fee claim largely on the supposed differences in services provided by JPM to its proprietary mutual funds and certain externally-managed subadvised funds, relying on the same expert proffered by the plaintiff in this case.  In granting JPM's motion for summary judgment, the court made several findings that apply equally to the facts in this case:

- The funds' performance in *JPM* was strong, with fees "within the range of [peer group] comparators" identified by the same third-party industry analysts, Lipper/Broadridge, who showed similar results for the Fund.  *Id.* at 781.

- JPM's services for its funds and the external subadvised funds overlapped to an extent but differed in "material respects," including risks undertaken and scale of services, so the proffered comparisons "[were] not materially similar and [did not] create a genuine issue of material fact."  *Id.* at 774.

- The board's approval was entitled to considerable weight, given the board's independent and robust process and the absence of "a disconnect between what the Funds were paid, and what the services were worth."  *Id.* at 782.

Tellingly, in this case, instead of identifying concrete facts or deficiencies about *MetWest* and the *Fund* that support his position, the plaintiff resorts to reliance on purported experts who lodge generalized complaints about the mutual fund industry as a whole.[2]  And the plaintiff's proffered comparison of the Fund's advisory fee to subadvisory fees MetWest is paid by the primary advisers of external funds in no way warrants a trial under *Jones* – which requires a showing of a fee differential that *cannot* be explained by differences in services, in *addition* to other evidence of beyond-arm's-length fees.   559 U.S. at 350 n.8.   The plaintiff's evidence satisfies neither requirement.   The undisputed record is that MetWest provides greater services and bears more risk in sponsoring the Fund than when it acts as a subadviser to external funds.   The plaintiff has not established a fee differential that *cannot* be explained by differences in services and risks – especially when the all-in advisory fee paid by the subadvised funds is

---

[2] MetWest is moving to strike certain opinions of the plaintiff's putative experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

generally *higher* than the fee challenged here.  Nor can the plaintiff show *other* evidence of beyond-arm's-length fees in the face of the record of excellent long-term performance in exchange for median-level fees, as approved by an independent board.

Ultimately, the Court must focus on the "fees themselves," meaning the value proposition that the fees represent to investors when considering the services and performance obtained in exchange for those fees.  *Id.* at 352 (internal citations and quotation marks omitted).  Because the plaintiff has been unable to adduce evidence that MetWest's advisory fees were *beyond* the arm's-length range, there is no genuine dispute of material fact warranting further resolution by the Court. The Court should grant summary judgment to MetWest.

## STATEMENT OF FACTS

### A.    The Fund's Median-or-Below Advisory Fee

The Fund pays MetWest one fee – and one fee only – to compensate MetWest for all the services that it performs and all the risks that it bears. MetWest's LR 56-1 Statement of Uncontroverted Facts and Conclusions of Law ("SUF") ¶ 3.  The Fund pays a fee of 0.35% (or 35 basis points) of the Fund's assets under management ("AUM"), Compl. ¶ 38; SUF ¶ 2, all pursuant to an Investment Management Agreement ("IMA"), under which MetWest provides all of its services to the Fund, SUF ¶¶ 1, 3.  That IMA is approved annually by the Fund's Board of Trustees (the "Board") after an extensive review of relevant information.  *Id.* ¶¶ 1, 36-43.  The Fund separately pays fees to third-party service providers, including BNY Mellon Investment Servicing ("BNY Mellon"), for certain administrative, accounting, and transfer agency services.  *Id.* ¶ 5.  But because the management of mutual funds is externalized – that is, the Fund has no officers or employees of its own – the IMA requires MetWest to manage and oversee those third-party service providers.  *Id.* ¶ 4.  The Fund has four share classes, which are designed for different types of customers, receive slightly

different services, and have different minimum investment requirements. *Id.* ¶ 7. All share classes are apportioned the same 35 basis point fee paid by the Fund to MetWest. *Id.* ¶ 8. The "retail" share classes are apportioned additional fees that the Fund uses to pay BNY Mellon and Foreside Fund Distributors LLC for certain administrative and distribution costs relevant to those share classes; MetWest does not receive any of those additional fees. *Id.* Those "retail" classes account for less than 21% of the Fund's assets; over 75% of the AUM in the Fund is owned by investors in the institutional share class (Class I) and retirement class (Class P), which have minimum investment requirements of $3 million and $25 million, respectively. *Id.* ¶ 9. The total charge allocated to any given class, consisting of the advisory fee plus other applicable charges, is called the "total expense ratio." *Id.* ¶ 8.

The 35 basis point fee the Fund pays to MetWest and the total expense ratio for investors of all share classes compare favorably to the fees paid by mutual funds in the Fund's peer group, as evaluated by independent third-party consultant Broadridge Financial Solutions, Inc. ("Broadridge") (formerly called Lipper, Inc.) and reported to the Board for its review annually. Broadridge identifies peer groups consisting of bond funds employing a similar investment strategy as the Fund, categorized as "core bond" or "core plus bond." *Id.* ¶ 14. Throughout the relevant period, the Fund's fees have consistently been at the median or below it, whether comparing just the advisory fee or total expense ratio. In 2014, for example, the Fund paid a lower advisory fee than 60% of the comparable funds in its peer group, and total expense ratio for Class M (the class with the highest total expense) was lower than 58% of the funds in its peer group. *Id.* ¶¶ 18-19. In 2015, 2016, and 2017, the independent analysis similarly revealed that the Fund's advisory fee was at or below the median when compared to comparable funds, except for one measurement with respect to one share class, which was above the median by just .003% (three tenths of a basis point). *Id.* ¶¶ 20-27.

**B.     The Fund's Strong Long-Term Performance**

For average-or-below fees, investors in the Fund realized exceptional returns that far exceeded peer group averages.  For the relevant period, based on Broadridge data that the Board receives, the Fund was generally either in the top quintile or top decile of its peer group (called a "performance universe" by Broadridge) for long-term *net-of-fee* returns.  *Id.* ¶¶ 29-32.  For example, in 2014, the Fund was in the top decile of its performance universe for the preceding five and ten years, and the top quintile for the preceding three years.  *Id.* ¶ 29.  For 2015, the Fund ranked in the top decile for all three metrics, *i.e.*, net-of-fee returns for the preceding three, five, and ten years.  *Id.* ¶ 30.  Analysis of net-of-fee returns by MetWest's expert, Professor John Coates, confirms Broadrige's results:

| Period Preceding Complaint | Class I | Class M |
|---|---|---|
| Three years | 93rd percentile | 94th percentile |
| Five years | 94th percentile | 95th percentile |
| Ten years | 99th percentile | 99th percentile (top fund) |

*Id.* ¶ 33.  The Fund's performance is very favorable using other metrics commonly used to evaluate returns in the investment management industry, as Professor Coates confirmed.  Using "Sharpe ratios," a broadly-accepted metric measuring *risk-adjusted* performance, the Fund's three-, five-, and ten-year performance has always been in the top quintile of core bond funds since February 2010.  *Id.* ¶ 34.  Since June 2012, the Fund's ten-year Sharpe ratios have nearly always been the highest of any other core bond funds.  *Id.*

**C.     Review by the Board of Trustees**

As required by the ICA, the Board annually determines whether to approve the IMA, as well as the fees charged thereunder, for an additional one-year term.  The Board's approval process is known as the "15(c) process" because it is governed by Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c).  Section 15(c) requires approval "by the vote of a majority of directors, who are not parties to

such contract or agreement or interested persons of any such party" – *i.e.*, by a majority of independent members of the Board (the "Independent Trustees").  *Id.*; *see also id.* § 80a-2(a)(19) (defining "interested person").  Consistent with Section 15(c), the Board's 15(c) process culminates with an in-person meeting in August or September for the Independent Trustees to consider whether to grant their approval.  SUF ¶ 36.  In advance of each annual renewal meeting, the Board, through its independent counsel, Dechert LLP, sends a comprehensive questionnaire to MetWest seeking information relevant to the contract renewals. *Id.* ¶ 37.  MetWest provides the requested information to the Independent Trustees, in the form of a detailed memorandum with multiple exhibits – totaling hundreds of pages (the "15(c) materials").  *Id.* ¶ 38.  The Board meets before the formal contract approval meeting to discuss the 15(c) materials and raise any follow-up questions for MetWest about the materials.  *Id.*  The Board also separately engages Broadridge to provide the reports described above comparing the Fund's fees and performance to those of its peer group.  *Id.* ¶ 11.  The Board has regular quarterly meetings and engages in ongoing dialogue with MetWest throughout the year, with MetWest periodically providing the Board pertinent materials, presenting updates, and responding to questions.  *Id.* ¶¶ 44-45.

It is undisputed that MetWest's 15(c) process has, at all times, met all requirements under the ICA and its implementing regulations.  More than a majority of the Board was comprised of independent trustees meeting the ICA's definition of "disinterestedness," and the Board annually approved the Fund's fees, including the 35 basis point advisory fee challenged here, with the requisite majority vote of the Independent Trustees, following a review of the 15(c) materials and Broadridge reports – the contents of which are not in dispute. *Id.* ¶¶ 38-43, 46-47.  It is further undisputed that the Independent Trustees, through their independent counsel, requested an extensive amount of detailed information from MetWest in connection with the annual contract renewal

process, and had opportunities to review and discuss the materials, including during supplemental board calls in advance of the 15(c) meetings. *Id.* ¶¶ 37-38. It is also undisputed that MetWest in return provided the Independent Trustees with all the information they requested and that the Independent Trustees did not believe they needed any additional information in order to exercise their business judgment in fulfilling their fiduciary duties. *Id.* ¶¶ 48-49.

### D.   Comparison Between the Fund and Subadvised Funds

The plaintiff's claim centers on a purported comparison between the advisory fee that MetWest charges the Fund and the subadvisory fee charged for investment advisory services to externally sponsored mutual funds, for which MetWest serves as subadviser.[3]  Compl. ¶ 5.  Those eleven funds (the "Subadvised Funds") have an investment style similar to the "total return" or "core plus" style in which the Fund is invested.  SUF ¶ 50.  Each of the Subadvised Funds has its own sponsoring adviser (each a "Sponsoring Adviser") that oversees  MetWest's performance and provides the balance of advisory and administrative services in exchange for an advisory fee – only a portion of which it pays to MetWest as a *subadvisory* fee. *Id.* ¶ 51.  As reflected in Roy Declaration Exhibit 8, eight of the eleven Subadvised Funds pay advisory fees to their Sponsoring Advisers that are higher than the 35 basis point advisory fee challenged by the plaintiff.

Although the plaintiff purports to dispute the *degree* of difference between the services provided by MetWest to the Fund and those provided to the Subadvised Funds – as well as the *degree* of difference in the risks borne by MetWest in connection with those respective services – he does not dispute that there are in fact differences.  For present purposes, it is enough that the parties do

---

[3] MetWest's sister company, TCW Investment Management Company, serves as the subadviser for two of the at-issue funds.  The same team of fixed-income investment professionals (the "Fixed Income Group" or "FIG") manages the portfolios of the Fund and all the Subadvised Funds.  SUF ¶¶ 50-52.

not dispute that MetWest provides *more* services and incurs *more* risk in its role as sponsoring adviser to the Fund as compared to the services provided and risks incurred in its role as subadviser to the Subadvised Funds.  Specifically:

*Daily Pricing and Striking the Daily NAV*: As sponsor of the Fund, MetWest must ensure the integrity, accuracy, and timeliness of the calculation and publication of the Fund's net asset value ("NAV") – which sets the price at which the Fund's shares are bought and sold – a process called "striking the NAV."  SUF ¶ 55.  MetWest must price accurately the Fund's roughly 1,900 individual positions, and calculate the Fund's expenses and liabilities, which are the inputs to the NAV.  *Id.* ¶ 56.  The potential consequences of an error in calculating the NAV are grave.  *Id.*  The parties do not dispute that it is the Sponsoring Advisers, not MetWest, that are responsible for establishing and implementing daily valuation policies and procedures and for striking the NAV for the Subadvised Funds.  *Id.* ¶ 57.  The Sponsoring Advisers, not MetWest, bear all of the risk of striking the NAV accurately for the Subadvised Funds.  *Id.* ¶ 58.  At MetWest, three large internal departments – Mutual Fund Administration, Investment Operations, and Compliance – work closely with and supervise BNY Mellon as the fund administrator, to ensure accurate daily calculation of the NAV for the Fund.  *Id.* ¶ 59.  But BNY Mellon's role is strictly ministerial; it mechanically computes NAV after receiving all of the relevant inputs from MetWest and bears no risk of any errors in those inputs.  *Id.*  MetWest's internal departments have no responsibility for daily pricing and no responsibility or involvement with striking the NAV for the Subadvised Funds.  *Id.* ¶ 60.

*Liquidity Management*: MetWest has the statutory responsibility to ensure that the Fund can, at all times, honor investor redemption requests at the daily published NAV, and MetWest must comply with SEC regulations regarding liquidity management for the Fund.  SUF ¶¶ 61-62.  These SEC regulations generally require that no more than 15% of a mutual fund's holdings be "illiquid,"

meaning that the vast majority of the portfolio could be sold within seven calendar days without material price changes or market disruptions. *Id*. ¶ 62. MetWest developed a proprietary classification procedure to determine whether each security is "liquid" under regulatory guidance, to assist in compliance with the SEC rules. *Id.* MetWest bears regulatory, business, and litigation risk in connection with its execution of these duties. *Id.* ¶ 63. The Sponsoring Advisers, not MetWest, are responsible for liquidity management for the Subadvised Funds and for compliance with SEC guidance on the percentage of a portfolio that is illiquid, and the Sponsoring Advisers bear the risk of being unable to meet redemption requests. *Id.* ¶¶ 64-65. MetWest's only involvement with liquidity management for the Subadvised Funds is complying with Sponsoring Advisers' directives pursuant to their own liquidity management plans. *Id.* ¶ 66.

*Satisfying SEC and other Statutory and Regulatory Requirements of Fund Sponsorship*: MetWest, as sponsoring adviser of the Fund, is responsible for creating and filing with the SEC the various required disclosure documents for the Fund and for disseminating them to shareholders when appropriate. *Id.* ¶ 67. MetWest bears the regulatory, business, and litigation risk of material misrepresentations or omissions in its regulatory filings, and MetWest executives must personally certify, under threat of civil and criminal penalty, the accuracy and completeness of certain of those filings. *Id.* ¶ 68. MetWest is also responsible for facilitating the annual independent audit on behalf of the Fund. *Id.* ¶ 69. MetWest has no responsibility for the SEC filings or the audit of the Subadvised Funds; MetWest merely provides limited information to the Sponsoring Advisers when requested. *Id.* ¶ 70. The Sponsoring Advisers and their executives bear the regulatory, business, and litigation risk from any violation of the applicable laws. *Id.* ¶ 71.

*Coordination and Oversight of Third-Party Service Providers*: MetWest is responsible for coordinating with and overseeing the Fund's third-party service

providers, including the Fund's transfer agent, custodian, administrator, underwriter/distributor, and auditor. *Id.* ¶ 72. MetWest has no responsibility to supervise or manage these providers for the Subadvised Funds; MetWest interacts with them only on a limited basis as the Sponsoring Advisers direct. *Id.* ¶ 73.

*Implementation of Statutorily Mandated Fund Governance Structure*: For the Fund, MetWest provides three significant functions required by the ICA for ongoing governance of a mutual fund. First, MetWest provides the Board extensive information about the Fund's performance, operations, and services throughout the year and, in connection with the Board's detailed 15(c) process, provides extensive additional material covering everything from the Fund's performance to financial and profitability data. SUF ¶¶ 37-43. Second, MetWest must comply with Rule 38a-1 under the ICA, which requires MetWest to designate a Chief Compliance Officer (employed and paid by an affiliate of MetWest, not the Fund) and to create, implement, and maintain a customized compliance program reasonably designed to prevent violations of the federal securities laws, which has required MetWest to provide a compliance team and additional resources and support in addition to the Chief Compliance Officer. *Id.* ¶¶ 74-75. Third, the IMA between MetWest and the Fund requires MetWest to provide qualified professionals to serve as officers of the Fund without additional compensation. *Id.* ¶¶ 76-77. For the Subadvised Funds, MetWest has only minimal, periodic reporting obligations, does not provide a compliance officer or compliance team, does not have to implement a compliance program, and does not provide its executives as officers. *Id.* ¶¶ 78-79. MetWest's role in these areas is limited to providing discrete reporting and certifications as specifically required or requested by the Sponsoring Advisers. *Id.* ¶ 79.

*Client Servicing*: The Fund has hundreds of thousands of shareholders, each of whom MetWest considers a client. *Id.* ¶ 80. MetWest must communicate investment strategies, performance, and market outlook to these clients, and it

regularly responds to due diligence inquiries from, and conducts due diligence meetings with, shareholder clients, investment consultants, and intermediaries who are advising their shareholder-clients. *Id.* In contrast, MetWest has a single client in connection with each Subadvised Fund: the Sponsoring Adviser. *Id.* ¶ 81. MetWest does not meet with consultants or intermediaries in connection with the Subadvised Funds and very rarely hears directly from investors. *Id.* ¶ 82.

## PROCEDURAL HISTORY

The plaintiff, who held less than $10,000 in the Fund when he filed the Complaint on October 16, 2015, does not even know what the advisory fee of the Fund is, and testified that he only came to believe the advisory fee is too high after being introduced to his counsel by other lawyers. Kennis Dep. Tr. (Roy Decl. Ex. 9) at 44, 48, 94. After denying MetWest's motion to dismiss, the Court ordered the parties to focus in Phase I of the case on the core premise of the plaintiff's claim: an assertion that the services MetWest performs for the Fund are "the same or substantially the same" as the subadvisory services MetWest performs for the Subadvised Funds, and, therefore, the proffered comparison between the advisory fee and subadvisory fees is appropriate, Compl. ¶¶ 49, 53, 54. July 16, 2016 Hr'g Tr. 7-8 (Roy Decl. Ex. 10). MetWest moved for summary judgment following the completion of Phase I discovery, arguing that "the services rendered" to the Fund and Subadvised Funds "are sufficiently different that a comparison is not probative," *Jones*, 559 U.S. at 350. *See* Mot. Summ. J., ECF No. 112. The Court denied the motion, holding *inter alia* that "issuing summary adjudication on the narrow issue of the fee comparison alone" would be premature. Sept. 22, 2017 Order at 2, ECF No. 159. The Court held that MetWest could "move for summary judgment following the close of the rest of discovery, and include arguments as to the level of probative value of the fee comparison contentions made by Plaintiff." *Id.*

**ARGUMENT**

I.   **IT IS THE PLAINTIFF'S BURDEN TO ADDUCE EVIDENCE THAT THE FEES CHARGED TO THE FUND "COULD NOT HAVE BEEN THE PRODUCT OF ARM'S-LENGTH BARGAINING"**

A.   **MetWest Is Entitled to Summary Judgment if the Plaintiff Fails to Come Forward With Evidence Sufficient to Allow the Court to Find for the Plaintiff Under Section 36(b)**

The inquiry before the Court is not whether the Fund's advisory fee is reasonable, whether it is the lowest fee that the Board could have "negotiated," or whether it is the lowest fee that MetWest could charge and still technically make a profit.   Instead, the Court is asked to determine whether the plaintiff has met his burden to show that the 35 basis point advisory fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added).   Accordingly, the Court must evaluate whether the challenged fee falls within the "range of fees that might result from arm's-length bargaining." *Id.* at 347.  The Court need not undertake "a precise calculation of fees representative of arm's-length bargaining," *id.* at 352; instead, it is tasked with evaluating whether 35 basis points exceeds the "outer bounds of arm's length bargaining," *Jones II*, 611 F. App'x at 360.

The Court does not sit as a super-trustee with "rate-setting responsibilities." *Jones*, 559 U.S. at 352 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 538-40 (1984)).  The Court should give "a measure of deference" to the decisions of the Board of Trustees overseeing the Fund as appropriate "depending on the circumstances." *Jones*, 559 U.S. at 349; *see also* 15 U.S.C. § 80a-35(b)(2) ("[A]pproval by the board of directors of such investment company . . . shall be given such consideration by the court as is deemed appropriate under all the circumstances.").   Accordingly, the Court may not "substitute its business judgment for that of a mutual fund's board of directors in the area of management

fees." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982) (internal citations and quotation marks omitted).  Therefore, "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process," and, "if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351.

The arm's-length standard is the ultimate test for liability under Section 36(b).  The Supreme Court in *Jones* also endorsed consideration of "all pertinent facts," including the "*Gartenberg* factors": "(1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any 'fall-out financial benefits,' those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation." *Jones*, 559 U.S. at 344 n.5 (citing *Gartenberg*, 694 F.2d at 929-32).  Crucially, however, disputes of fact over the *Gartenberg* factors do not preclude summary judgment if those disputes, even if resolved in the plaintiff's favor, would not make the fee "so disproportionately large that it bears no reasonable relationship to the services rendered" and outside the arm's-length range. *Id.* at 346.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.  Comparison of Mutual Fund Fees to Fees Charged to Other Types of Clients Requires the Plaintiff to Establish a Factual Predicate of Comparability**

As the above discussion shows, a "comparative fee structure" is but one of

"all pertinent facts" that bear on the Section 36(b) liability inquiry.  The Supreme Court has cautioned that a district court's job is not to ensure "fee parity" among clients or funds.  *Jones*, 559 U.S. at 350.  Moreover, the Court recognized that "there may be significant differences" between the services an investment adviser provides to its various client types.  *Id.*  As a result, "[o]nly where plaintiffs have shown a large disparity in fees that *cannot be explained* by the different services *in addition to other evidence* that the fee is outside the arm's-length range will trial be appropriate."  *Id.* at 350 n.8 (emphasis added).  The plaintiff must make a "showing of relevance" so that the Court can "assess any disparity in fees in light of the different markets for advisory services."  *Id.*

The *JPM* court, considering facts and expert opinions materially indistinguishable from those here, recognized the appropriate role of a proffered fee comparison to the fees paid by subadvised clients when that fee comparison failed to establish a genuine dispute of material fact moving the challenged fees outside the arm's-length range.  301 F. Supp. 3d at 769-74.  There, as here, the plaintiffs contended that "the services provided to the Funds and the services provided to the subadvised entities are 'substantially' the same."  *Compare id.* at 769 *with* Compl. ¶¶ 49, 53-54.  And, as here, the *JPM* plaintiffs relied on proposed comparisons of the investment advisory agreements between the adviser and the at-issue funds on the one hand, and the adviser and the sponsoring advisers for subadvised funds, on the other.  301 F. Supp. 3d at 769-74.  At summary judgment, the *JPM* court looked beyond the language of the contracts and found that "the risk undertaken and scale of services are different."  *Id.* at 770.  Accordingly, it found that such subadvised fund "comparisons . . . are not materially similar and cannot create a genuine issue of material fact."  *Id.* at 774.  Ultimately, the *JPM* court found that "the evidence Plaintiffs have adduced establishes at most that others paid different amounts for fewer services," which "does not allow a reasonable inference that the amounts paid to the Funds were

outside of the range that could be expected to result from arm's length bargaining." *Id.* at 782; *see also id.* at 774 ("While there may be some similarities and some differences between comparators, at a minimum . . . Plaintiffs must demonstrate that the fees they wish to compare are similar in material respects.").

This case demands the same result.

## II. THE PLAINTIFF HAS FAILED TO ADDUCE EVIDENCE SUFFICIENT FOR THE COURT TO FIND THAT THE FUND PAID EXCESSIVE FEES IN VIOLATION OF SECTION 36(b)

### A. The Undisputed Record of MetWest's Performance, At-or-Below Median Fees, and the Approval Process for those Fees Defeats the Plaintiff's Claims Under Section 36(b)

MetWest's motion for summary judgment should be granted because the plaintiff does not, and indeed cannot, dispute the central facts regarding the challenged fees: shareholders paid median or below-median fees for consistently excellent long-term performance, following the approval of those fees by the Fund's Independent Trustees pursuant to 15 U.S.C. § 80a-15(c), and those fees therefore fit comfortably within the fair bargaining range. The Seventh Circuit, on remand in *Jones*, affirmed the district court's earlier ruling granting summary judgment because the fees that Harris charged the mutual funds – even when compared to institutional accounts like subadvised funds – fell within the fair bargaining range. As the district court in *Jones* held:

> Even assuming for the mere sake of comparison that the services Harris's institutional clients received were indistinguishable from those the Funds received, the amounts paid by different parties establish a range of prices that investors were willing to pay. The range extended from a low-end figure below what the institutional clients were paying and a high-end figure beyond the fees that other mutual fund clients paid. Harris's fees fell within this range . . . .

*Jones v. Harris Assocs. L.P.*, No. 04 C 8305, 2007 WL 627640, at *8 (N.D. Ill. Feb. 27, 2007), *vacated*, 559 U.S. 335 (2010), *and aff'd on remand*, 611 F. App'x 359 (7th Cir. 2015). Under the standard thereafter announced by the Supreme

Court, the Seventh Circuit held these facts dispositive: "This record shows that Harris's fee was comparable to that produced by bargaining at other mutual-fund complexes, which tells us the bargaining range. . . . [T]he undisputed evidence shows that Harris delivered value for money; the funds it was advising did as well as, if not better than, comparable funds." *Jones II*, 611 F. App'x at 361. Similarly, in *JPM*, the court held that fees and performance data are "telling regarding whether the fees are excessive." 301 F. Supp. 3d at 769. The *JPM* court looked at "Thomson Reuters Lipper [*i.e.*, Broadridge] reports, one of the most commonly used sources to measure fees and performance in the mutual fund industry," which "show[ed] that overall the Funds performed better than, and the fees were in line with, other mutual funds of similar scope." *Id.* In addition, "the fees and the performance of the Funds" were "part of the information considered by the Board in its review and approval of the [advisory] contracts." *Id.*[4]

First, as in *Jones II* and *JPM*, there is no dispute about the Fund's performance record and how that track record compares to the many other competitor funds in its peer universe. By any metric, the Fund's performance has been excellent, and its shareholders have enjoyed net-of-fee returns better than those they would have gotten from almost any other core bond fund. For example, based on 2015 Broadridge data, the three-, five-, and ten-year returns for investors holding institutional shares were all in the top decile. SUF ¶ 30. Second, there is no dispute about how the Fund's fee rates compare to the rates of similar mutual funds at other complexes, "which tells us the bargaining range." *Jones II*, 611 F. App'x at 361. As with the performance data, Broadridge's fee data show that the

---

[4] The emphasis here on relative fees, performance, and board approval is of course not to the exclusion of other potentially "pertinent facts" and *Gartenberg* factors. However, given the undisputed record on these key considerations, nothing in the plaintiff's proffered evidence relating to other factors – taken together or in isolation – creates a material dispute as to whether MetWest's fee falls outside of the range of what *could be* bargained at arm's length.

Fund compares favorably: regardless of which metric is used, the Fund's advisory fee is median or below.   SUF ¶¶ 18-27.   Just like in *JPM*, the "Lipper reports . . . show that overall the Fund[] performed better than, and the fees were in line with, other mutual funds of similar scope.  Plaintiffs do not and cannot deny this."  301 F. Supp. 3d at 769 (internal citation omitted).   Indeed, courts across the country considering Section 36(b) claims have recognized that Broadridge/Lipper materials are an objective data source, and one on which fund boards rely in determining whether to renew fund adviser contracts.  *See Zehrer*, 2018 WL 1293230, at *13 (relying on Lipper data in granting summary judgment that showed the adviser "charged fees that fall within (or, more accurately, below) the range of fees paid by similar funds"); *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11CV4194, 2016 WL 4487857, at *64-65 (D.N.J. Aug. 25, 2016), *aff'd*, No. 16-4241, --- F. App'x ---, 2018 WL 3359108 (3d Cir. July 10, 2018); *Kasilag v. Hartford Inv. Fin. Servs.*, LLC, No. CV 11-1083, 2017 WL 773880, at *9 (D.N.J. Feb. 28, 2017), *aff'd*, No. 17-1653, --- F. App'x ---, 2018 WL 3913102 (3d Cir. Aug. 15, 2018); *In re Am. Mut. Funds Fee Litig.*, No. Civ. 04-5593, 2009 WL 5215755, at *25 (C.D. Cal. Dec. 28, 2009) ("Lipper . . . is a recognized industry-leading third-party source for mutual fund industry data."), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).

Finally, there is no dispute that the challenged fees were approved annually by a unanimous vote of the Independent Trustees of the MetWest Funds as required by the ICA; that the Independent Trustees at all times met the ICA's definition of disinterestedness and comprised (well more than) a majority of the Board; and that the Board requested and received extensive information regarding MetWest's fees and services to the Fund from MetWest and from third-party industry consultant Broadridge.  SUF ¶¶ 37-47.  The plaintiff and his experts assert a few supposed criticisms about how the Independent Trustees conducted themselves, including whether they should have demanded and received different

or more detailed information; how they should have weighed the information they received; and how they engaged with their independent counsel.  But none of these after-the-fact quibbles alters the record of the Independent Trustees' vote in compliance with the ICA and the extensive materials they reviewed in conjunction with that vote.  Indeed, the plaintiff's thin allegations run headlong into the Supreme Court's requirement that the Board's approval decision receive "considerable weight, even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351.  As explained in *Kasilag* and affirmed by the Third Circuit:

> In general, a plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking. Such a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing a board's process.  Here, Plaintiffs seek to do just that.  They rely only upon their own experts' testimony and cherry-picked deposition excerpts suggesting Plaintiffs might have negotiated a different deal had they been in the directors' seats, but not showing that the Board abandoned or failed its watchdog function.  Such carping, if sufficient, would eviscerate the deference that is to be paid to an informed Board's process under *Jones*.  As such, the Court determines that the Board's decision is entitled to "substantial weight."

*Kasilag*, 2016 WL 1394347, at *14.

In this case, investors of the Fund paid median or below-median fees and received better net-of-fee returns than they could have secured in almost any other core bond fund.  These facts, in connection with the fully informed Board's annual approval of the contract, demonstrate that the advisory fee was well within the arm's-length range and, indeed, that the plaintiff can adduce no evidence creating a genuine dispute of material fact that would take the fee outside of that range.

**B.   The Plaintiff's Comparison of MetWest's Advisory Fees and Subadvisory Fees Does Not Create a Genuine Dispute of Material Fact Taking the Fund's Fees Outside the Arm's-Length Range**

In the plaintiff's view, the Fund's average fee and strong returns are of no

moment because MetWest charges the Subadvised Funds lower subadvisory fees than the 35 basis point advisory fee charged to the Fund. Yet the plaintiff has failed to develop evidence that would serve as a predicate for his proposed comparison – a flaw fatal to his ability to avoid summary judgment in light of *Jones*. *See Jones II*, 611 F. App'x at 361; *JPM*, 301 F. Supp. 3d at 774. The Supreme Court made clear in *Jones* that the burden of proof remains on the plaintiff when seeking to get to trial on the basis of fee comparisons:

> First, plaintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining. 15 U.S.C. § 80a-35(b)(l). Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services. Only where plaintiffs have shown a large disparity in fees that *cannot be explained* by the different services *in addition to other evidence* that the fee is outside the arm's-length range will trial be appropriate.

*Jones*, 559 U.S. at 350 n.8 (emphasis added).

The plaintiff has failed to develop evidence establishing that MetWest's advisory services were "the same or substantially the same" as its subadvisory services provided for a lower fee. To the contrary, it is well documented that the services, while overlapping to an extent, differ significantly in type and scale:

| Function | Evidence on Comparability |
|---|---|
| **Daily Pricing and Striking the Daily NAV** | MetWest must provide daily security pricing and must strike the NAV daily for the Fund. MetWest is not responsible for any of these services for the Subadvised Funds, other than providing the Sponsoring Adviser occasional input on valuation of individual holdings in the Subadvised Funds. SUF ¶¶ 55-60. |
| **Liquidity Management** | MetWest is responsible for maintaining adequate liquidity for the Fund in order to honor redemption requests at the daily NAV. MetWest is not responsible for maintaining liquidity for the Subadvised Funds, beyond generating cash at the direction of the Sponsoring Advisers. SUF ¶¶ 61-66. |
| **Satisfying SEC and other Statutory and** | MetWest is responsible for creating and filing with the SEC certain required disclosure documents for the Fund. |

| Function | Evidence on Comparability |
|---|---|
| **Regulatory Requirements of Fund Sponsorship** | MetWest has no responsibility for the Subadvised Funds' SEC filings, other than providing the Sponsoring Advisers with information they may request in preparing filings. SUF ¶¶ 67-71. |
| **Coordination and Oversight of Third-Party Service Providers** | MetWest is responsible for coordinating with and overseeing the Fund's third-party service providers. MetWest has no such responsibility for the Subadvised Funds' third-party service providers.  SUF ¶¶ 72-73. |
| **Implementation of Statutorily Mandated Fund Governance Structure** | MetWest coordinates with the Fund Board and officers but has limited interaction with the Subadvised Funds' boards. MetWest provides substantially more compliance services in both scale and scope to the Fund, as compared to the Subadvised Funds.  MetWest bears the responsibility for completing tax filings and reporting for the Fund and hires and oversees independent auditors for the Fund.  MetWest bears no such responsibilities as subadviser, other than providing discrete reports and certifications at the Sponsoring Advisers' request.  SUF ¶¶ 74-79. |
| **Client Servicing** | MetWest interacts and communicates with clients and the market far more frequently and substantively in its role as sponsoring adviser to the Fund than in its role as subadviser to the Subadvised Funds.  SUF ¶¶ 80-82. |

The Supplemental Administration Agreement ("SAA") referenced in the Phase I briefing and ruling provides no evidence to the contrary.  The Board approved a mechanism for MetWest to be partially reimbursed by the Fund for services it *already* was providing, but MetWest has never sought a penny of reimbursement under the SAA.  SUF ¶ 83.  The SAA is nothing more than a meaningless artifact of efforts to integrate the TCW and MetWest Fund families, *id.*, and it is simply irrelevant to the issue before the Court: the SAA does not change the fact that MetWest provides substantially greater services to the Fund in exchange for the 35 basis point advisory fee.

Faced with similar claims of comparability, the *JPM* court found that J.P.

1   Morgan, the sponsoring adviser of the mutual funds whose fees were at issue in

2   the case, provided substantially more services in scale and scope in its role as

3   sponsoring adviser as compared to the services it provided as a subadviser: "the

4   comparisons in this instance are not materially similar and cannot create a genuine

5   issue of material fact." 301 F. Supp. 3d at 774. As a result, the *JPM* court

6   concluded that "the evidence Plaintiffs have adduced establishes at most that

7   others paid different amounts for fewer services," which did "not allow a

8   reasonable inference that the amounts paid to the Funds were outside of the range

9   that could be expected to result from arm's length bargaining." *Id.* at 782.

10   The record here is indistinguishable. The plaintiff's ostensible expert,

11   Professors Ayres (who failed to convince the *JPM* court of substantially identical

12   services), ████████████████████████████████████████████████████

13   ██████████████████████████  Ayres Dep. Tr. (Roy Decl. Ex. 11) at 83:4-9.

14   While he opines ████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████  *Id.* at 159:11-13; 166:3-7; 173:22-74:2.

18   Moreover, Professor Ayres' analysis dramatically overstates the difference

19   between the advisory and subadvisory fees. Professor Ayres was instructed by

20   counsel to ████████████████████████████████████████████████████

21   ████████████████████████  *Id.* at 59:11-62:22. ████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ████████████████████  *Id.* at 136:15-40:10. Stated differently, even if the service

27   differences were ignored, the "range" of fees for Subadvised Funds charged by

28   MetWest extends to precisely the same fee MetWest charges the Fund. If there is

a *different* bargaining "range" for subadvised services and services to the Fund, the plaintiff simply has not established it other than by selective blindness to the *actual* fee range. As in *JPM*, the plaintiff here has not established the prerequisite for a trial under *Jones* – namely, showing "a large disparity in fees that *cannot be explained* by the different services" much less "*other evidence* that the fee is outside the arm's-length range." *Jones*, 559 U.S. at 350 n.8 (emphasis added).

Additionally, even setting aside the differences in the nature and quantity of services provided to different MetWest clients, MetWest has presented uncontroverted evidence that it incurs substantially greater risk when functioning as sponsoring adviser of the Fund than it does when functioning as subadviser to the Subadvised Funds, justifying a compensation differential. As the Fund's adviser, MetWest bears the business, legal, regulatory, and reputational risk of sponsoring, managing, and operating the Fund. And that risk is substantial. The uncontroverted evidence is that investors respond not only to a mutual fund's performance and fees, but also to other events involving the fund or its adviser. SUF ¶ 84. Any shortcoming in MetWest's performance, its regulatory compliance or other matters affecting investors' perceptions creates risk of asset flight to competitors, and an immediate decline in revenue and profit for MetWest.[5] These risks stem from MetWest's multiple responsibilities vis-à-vis the Fund, including valuing the Fund's 1,900 holdings and striking the NAV each day, *id.* ¶ 56; ensuring the Fund's liquidity to satisfy redemption requests, *id.* ¶¶ 61, 63; filing accurate SEC disclosure documents, *id.* ¶ 68; and oversight of the Fund's other service providers, *id.* ¶ 72. But MetWest does not bear any of these risks for any Sponsoring Adviser's fund. *Id.* ¶¶ 57-58, 64-65, 71, 73, 79. The *JPM* court

[5] A simple example confirms the business risks faced by sponsoring advisers. In 2014-15, the Fund grew substantially when a competitor, the PIMCO Total Return Fund, performed poorly and its portfolio manager departed, causing that fund's assets to decline from a high of $292 billion to $70 billion today.

considered and cited similar evidence regarding risk in reaching the conclusion that the plaintiffs had not shown that the fees charged by the adviser were beyond the range of arm's-length bargaining.  *See* 301 F. Supp. 3d at 770-72 (crediting J.P. Morgan's "uncontroverted evidence that the risk undertaken and scale of services are different" when J.P. Morgan functions as sponsoring adviser).  Here too, the plaintiff cannot dispute that there is a difference in the type and scope of the risks incurred by MetWest as a sponsoring adviser and subadviser – ██ ████████████████████████████████████  Ayres Dep. Tr. at 83:4-18.

In sum, the services rendered to the Fund and the Subadvised Funds are sufficiently different such that a comparison of the advisory and subadvisory fees charged cannot establish that the Fund's fees are beyond the arm's-length range. At most, the fact that other clients pay somewhat less for somewhat different services is just another data point in the range of fees that could be bargained for at arm's length, but it does not render the fee outside that range.  As the Court in *Jones* held, the plaintiff's proffered comparison, without more, does not warrant a trial.  559 U.S. at 350.

## C. The Plaintiff's Emphasis on MetWest's Profitability and Hypothetical Alterations to MetWest's Profitability Calculations Does Not Establish that the Fund's Median-Level Fees Are Beyond the Arm's-Length Range

███████████████████████████████████████████████████████████████████████████████████  But the plaintiff's reliance on hypothetical alternative profitability calculations simply does not establish that the Fund's 35 basis point advisory fee is beyond the arm's-length range.  MetWest's revenues and profits, by themselves, establish nothing about whether the Fund's median-or-below fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ Ayres Report ¶¶ 74-90 (Roy Decl. Ex. 12) ████████████

████ Under *Jones*, the question is not whether fees *could* be *lower*; it is whether they are *higher* than the arm's-length bargaining range.  Whether profitability "could" have been maintained with a lower fee says nothing about whether the fee is within the bargaining range.  Advisers are not obliged to cede profits or charge the lowest fee consistent with maintaining "some" degree of profitability.  As the *JPM* court noted: "Section 36(b) does not create a duty that advisers and administrators receive the lowest possible fee amount as compensation for the services they provide." 301 F. Supp. 3d at 782.  The plaintiff's argument reduces to the assertion that MetWest is only entitled to some (undefined) amount of profit above its costs.  But courts across the country are in agreement in rejecting the type of "cost-plus" approach that the plaintiff and his experts espouse.  *See In re BlackRock Mut. Funds Advisory Fee Litig.*, No. 14-cv-1165, --- F. Supp. 3d ---, 2018 WL 3075916, at *27 (D.N.J. June 21, 2018) ("[T]he fiduciary duty imposed under § 36(b) does not require investment advisers to charge the lowest fee in the industry, or to operate on a cost-plus basis."); *Zehrer*, 2018 WL 1293230, at *7 ("Even if the Board might have driven a harder bargain [than seeking a "competitive" fee "in line with the expected alpha generation of the fund"], the legal standard does not require that.").

Even if the approach the plaintiff advocates was justified by precedent – and it is not – it is flawed on its own terms.  ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ Ayres Dep. Tr. at 209:5-14. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

1     *Id.* at 224:7-12, 225:21-25. ███████████████████████████████

2     ██████████████████████████████████████████████████████████████

3     ████████████████████████████ *Id.* at 32:4-12; 226:5-27:24; Ayres Report at

4     161. And, in any event, a proper benchmark for adviser profitability would

5     account for the riskiness of the business.

6     ██████████████████████████████████████████████████

7     ███████████████████ and it is undisputed that the Board received comparative

8     profitability data. *See* SUF ¶ 41; Ayres Dep. Tr. at 213:24-14:19. MetWest's

9     profits were also justified by its track record of industry-leading performance and

10     by the services it offers to clients. Accordingly, the plaintiff's focus on

11     MetWest's profitability does not establish that the advisory fee is improper.

12         **D.**     **The Plaintiff's Claims of Supposed "Economies of Scale" in**

13                  **Managing the Fund Are Unsupported by Evidence and Immaterial in Any Event**

14         Based on his own say-so, the plaintiff contends that the advisory fee *must*

15     be outside the arm's-length range because the Fund *must* have generated

16     economies of scale as its AUM grew. *See* Compl. ¶¶ 63-64. But case law requires

17     a plaintiff to put forth quantitative analysis of actual cost data when demonstrating

18     economies of scale, not just bald assertions that the Fund *must* have become

19     relatively less expensive to manage as its AUM increased. Without quantifying

20     MetWest's relevant costs and proving "the per unit cost of performing Fund

21     transactions decreased as the number of transactions increased," *Krinsk v. Fund*

22     *Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989), there simply is "no way to

23     determine whether any economy of scale even existed that could have been passed

24     on to investors or whether there is another explanation," *Hoffman v. UBS-AG*, 591

25     F. Supp. 2d 522, 540 (S.D.N.Y. 2008). *See also Turner v. Davis Selected*

26     *Advisers, LP*, 626 F. App'x 713, 717 (9th Cir. 2015) (affirming dismissal of

27     Section 36(b) claim where plaintiff's allegations depended on "a conclusory

28

1    statement" that economies of scale existed when assets grew and on "general

2    allegations about cost savings").  And without quantifying ostensible economies

3    one simply cannot say how they may have pushed a challenged fee *outside* the fair

4    bargaining range.

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ██████████████████████████████████ Ayres  Report

11   ¶ 101.  ███████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ██████████████████████████ Ayres Dep. Tr. at 207:14-16:25.

15          In any event, to the extent the Fund has experienced economies of scale, it

16   is undisputed that MetWest has shared the benefits with shareholders by having

17   competitively priced the Fund to scale from its inception, and by making

18   additional investments into its operations and infrastructure for the benefit of the

19   Fund.  SUF ¶ 41.  Contrary to the plaintiff's insinuation, breakpoints – decreases

20   in the advisory fee for assets above a certain AUM level – are *not* the exclusive

21   way in which an adviser can share realized economies of scale with shareholders,

22   as a number of courts have held.  "That [the adviser's] fee rate did not employ the

23   use of breakpoints is of little significance.  Although breakpoints may be an

24   appropriate way for investment advisers to ensure that the benefits of achieving

25   economies of scale are shared with the Fund and its investors, it is by no means

26   the only way of doing so." *Pirundini v. J.P. Morgan Inv. Mgmt., Inc.,* 309 F.

27   Supp. 3d 156, 167 n.12 (S.D.N.Y. 2018) (citation omitted), *appeal docketed*, No.

28   18-733 (2d Cir. Mar. 16, 2018); *see also Am. Mut. Funds Fee Litig.*, 2009 WL

5215755, at *52 (economies of scale may be shared via "fee reductions and waivers, offering low fees from inception, or making additional investments to enhance shareholder services" (citations omitted)). Finally, it is undisputed that the Board in connection with the 15(c) process annually requested, received, and discussed information provided by MetWest relating to any potential economies of scale realized by the Fund and how MetWest shared any such economies with shareholders. SUF ¶ 41.

### E. The Plaintiff's Criticisms of the Independent Trustees' Fee Review and Approval Process Are Not Supported by the Record

As discussed above in Section I.A, because "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions," the Board's "decision to approve [the IMA] is entitled to considerable weight, even if a court might weigh the factors differently," so long as "the disinterested directors considered the relevant factors." *Jones*, 559 U.S. at 351. It is undisputed here that the Board's composition satisfied the ICA requirements and that its approval of the IMA was in compliance with the statute. SUF ¶¶ 46-47. Thus, the Board's decision to approve the IMA is entitled to deference if the Board was "apprised of all relevant information." *Jones*, 559 U.S. at 352. It was. The overwhelming weight of the record demonstrates that the Board engaged in an informed, thorough, and robust 15(c) process each year. SUF ¶¶ 36-49.

The plaintiff musters only a handful of examples, based on which he argues that the Board's process was deficient, but each of them fails under scrutiny:

- ███████████████████████████████████████ Birdthistle Report (Roy Decl. Ex. 13) ¶ 51. But the plaintiff offers no evidence that the *Board* found this time insufficient or that the allegedly shortened time was in any way material to any deliberations or decisions of the Board.

- ███████████████████████████████████ *Id.* ¶ 26. But there is no requirement that the independent trustees review agreements with funds that the Board does not

even oversee. Notably, it is undisputed that for each year in question, the Board received the fee schedule for all of the Subadvised Funds in addition to an explanation of the differences in services and risks provided to the Subadvised Funds pursuant to those agreements.  SUF ¶ 39.

- ██████████████████████████████████████████████████

Birdthistle Report ¶¶ 51-52.  However, the Independent Trustees' fiduciary duties do not require them to negotiate the lowest possible fees, but rather to exercise their reasoned business judgment.  The Board rigorously considered the proposed arrangement and its impact on the fund, approving the resolutions only after they had requested and received additional information.  SUF ¶ 38. There is no basis to conclude, nor does plaintiff's expert suggest, that the Board erred in reaching its decision to provide written consent to the proposals.

In any event, ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Birdthistle Dep. Tr. (Roy Decl. Ex. 14) at 48:5-49:4.  These quibbles are insufficient as a matter of law to undercut the deference due to the Board; the plaintiff "must demonstrate that the flaws [he] find[s] in what transpired would have made a legally significant difference."  *See Jones*, 2007 WL 627640, at *9.

The facts here are again on all fours with *JPM*.  The Fund's Board process compares favorably to the process deemed robust in *JPM*, where the court found sufficient a process in which the board met quarterly with independent auditors, met several times each year to review information it had requested from the adviser, and negotiated with the adviser to waive advisory fees that the funds would otherwise have owed.  301 F. Supp. 3d at 781-82.  The board in *JPM* also received information on the fees charged pursuant to separate subadvisory and subadministrative contracts, which the court found sufficient in rejecting the plaintiffs' quibble about "the form in which the Board received information about subadvisory and subadministrative services."  *Id.* at 782.  MetWest's robust board

process well exceeds the process deemed acceptable in *JPM.  See also BlackRock*, 2018 WL 3075916, at *13-20 (deeming board process robust and according deference even though "Plaintiffs contest[ed] the level of detail and information reviewed by the Board"); *Zehrer*, 2018 WL 1293230, at *9 ("[P]laintiffs have not pointed to admissible evidence to contest the Board's process or independence, nor have they shown that the Board was uninformed or that the review process was tainted by the withholding of necessary information."); *Kasilag*, 2016 WL 1394347, at *10  (deeming board process robust because "Plaintiffs' quibbles with the Board's process really amount to no more than nit-picking the Board's process" and did not "create a triable issue of fact").  So too here.  Here, the Court should give the same deference to the Board's approval of the IMA and the 35 basis point advisory fee.

### F. The Plaintiff's Evidence on the Remaining *"Gartenberg* Factors" Raises No Genuine Dispute of Material Fact Under Section 36(b) that the Fee Fell Within the Range of Arm's-Length Bargaining

Finally, there is no genuine dispute of material fact precluding summary judgment in MetWest's favor concerning the remaining two *Gartenberg* factors – the nature and quality of services provided to the Fund and "fall out benefits." The plaintiff has no evidence that would create a triable issue of fact, especially in light of the evidence above establishing the Fund's median-or-below fee, its exceptional returns, and the Board's robust 15(c) process.

*Nature and Quality of Services*: The "nature and quality" of services are not truly at issue in this case; the plaintiff makes no allegation in his Complaint that MetWest's services are poor, nor could he – the record of MetWest's performance and the customer satisfaction that grew the Fund to $70+ billion in AUM speak for themselves.  In any event, throughout each year and during the 15(c) process, the Independent Trustees diligently evaluated the nature, extent, and quality of the services MetWest provided to the Fund.  Among other things, MetWest provided an account of its extensive legal, regulatory, and compliance responsibilities to the

Fund; details about its program for infrastructure upgrades and expansion; and detailed information regarding MetWest's compensation structure.  SUF ¶ 40.  The Board also evaluated MetWest's services throughout the year.  For example, MetWest provided substantial information regarding policies and procedures in each quarterly set of Board meeting materials.  *Id.* ¶ 44.  MetWest further provided historical schedules of expense reimbursement recoupments, 12b-1 expenditures and advisory reimbursements, and the sub-accounting and administrative services agreement, among other materials.  *Id.* ¶ 42.

*Fall-Out Benefits*: "Fall-out benefits are those which accrue to the mutual funds adviser as a result of its work on behalf of the mutual fund." *Kasilag*, 2017 WL 773880, at *23 (quoting *Hoffman*, 591 F. Supp. 2d at 539).  Here, the plaintiff makes no allegations regarding fall-out benefits in his Complaint – an unsurprising omission given the undisputed record demonstrating the Board's consistent request and review of information on the nature of any direct or indirect fall-out benefits received by MetWest from its relationship with the Funds, including profits or losses from other services provided to the Funds and the enhanced ability to obtain more favorable execution of its role in servicing other clients from MetWest about fall-out benefits.  SUF ¶ 43.  The evidence is clear that MetWest has not obtained any soft dollar benefits or any other recognized fall-out benefits from its relationships with the Fund.  *Id.*

## CONCLUSION

Given the evidence in this case, there is no genuine dispute of material fact as to whether the Fund's median-or-below advisory fee and industry-leading performance, reviewed by a fully informed board of trustees, was within the arm's-length bargaining range.  For the foregoing reasons, the Court should enter summary judgment in favor of MetWest.

Dated:  September 20, 2018

Respectfully submitted,

**ROPES & GRAY LLP**
John D. Donovan, Jr. (*pro hac vice*)
Robert A. Skinner (*pro hac vice*)
Amy D. Roy (*pro hac vice*)

**IRELL & MANELLA LLP**
David Siegel
Glenn K. Vanzura

By:  */s/ Glenn K. Vanzura*
‌    Glenn K. Vanzura

*Attorneys for Defendant Metropolitan*
*West Asset Management, LLC*

1
2

## **CERTIFICATE OF SERVICE**

3
4
5

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 20, 2018.

6
7
8

/s/ *Glenn K. Vanzura*

Glenn K. Vanzura

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S NOTICE OF MOTION AND
PHASE II MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:15-CV-08162-GW-FFM