UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**\*\*AMENDED\*\* CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 15-8162-GW(FFMx) | | Date | October 25, 2018 |
| Title | *Thomas J. Kennis v. Metropolitan West Asset Management, LLC* | | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Robert W. Mockler | Amy D. Roy |
| Andrew W. Robertson | Robert A. Skinner |
| Robin Zwerling | Andrew J. Strabone |
| | John D. Donovan, Jr. |

PROCEEDINGS:     **DEFENDANT'S PHASE II MOTION FOR SUMMARY JUDGMENT [263];**

**DEFENDANT'S MOTION IN LIMINE TO PARTIALLY EXCLUDE EXPERT REPORT AND TESTIMONY OF IAN AYRES [256, 264];**

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT REPORT AND TESTIMONY OF WILLIAM A. BIRDTHISTLE [257, 265]**

Court hears oral argument. The Court's *Redacted* Tentative attached hereto, is adopted as the Court's Final Ruling. The Court would deny the Expert Motions in Limine and DENY IN PART the Motion for Summary Judgment.

Court and counsel discuss scheduling. The Court sets the following:

|  |  |
|---|---|
| Pretrial Conference | November 29, 2018 at 8:30 a.m. |
| Bench Trial | December 11, 2018 at 9:00 a.m. |

The post mediation status conference set for November 5, 2018 is TAKEN OFF-CALENDAR.

:     25

Initials of Preparer   JG

*Kennis v. Metropolitan West Asset Management, LLC*; Case No. 2:15-cv-08162-GW-(FFMx)
Tentative Rulings on: (1) Defendant's Renewed Motion for Summary Judgment, (2) Defendant's
Motion *In Limine* to Partially Exclude Expert Report and Testimony of Ian Ayres, and (3)
Defendant's Motion *In Limine* to Exclude Expert Report and Testimony of William A.
Birdthistle

# I. Background

### A. Factual Allegations

Thomas Kennis ("Plaintiff") sues Metropolitan West Asset Management, LLC
("Defendant" or "MetWest") for violation of Section 36(b) of the Investment Company Act of
1940 (the "ICA"), 15 U.S.C. § 80a-35(b). *See* Compl. ¶¶ 92-98, Docket No. 1. As background,
the Complaint alleges the following:

Plaintiff brings this action on behalf of the Metropolitan West Total Return Bond Fund
(the "Fund"). *Id.* ¶ 1. Plaintiff has continuously owned shares in the Fund since at least
February 2012. *Id.* ¶ 15. The Fund is an open-end management investment company, referred to
as a "mutual fund," and is registered under the ICA. *Id.* ¶ 18. The Fund is organized as part of a
series of nine mutual funds owned by Metropolitan West Funds ("Met West Funds"), a statutory
trust formed under Delaware law. *Id.* ¶¶ 18-19. The Fund issues shares to investors in exchange
for money, which is pooled and invested in a portfolio of securities. *Id.* ¶¶ 20-21. The Fund
does not have officers, employees, or facilities of its own, but rather is operated by external
service providers pursuant to contracts with the Fund. *Id.* ¶ 22.

The Fund is overseen by a Board of Trustees (the "Board") consisting of nine members
("Independent Trustees"). *Id.* ¶ 25. The Board also oversees eight other mutual funds managed
by Defendant or its affiliates. *Id.* ¶ 26. The Board is responsible for selecting and monitoring
the Fund's service providers, including the Fund's investment adviser. *Id.* ¶ 27. The Board is
not a party to this lawsuit.

Defendant MetWest serves as the Fund's investment adviser pursuant to an Investment
Management Agreement (the "IMA") between Defendant and Met West Funds. *Id.* ¶¶ 23, 28.
The IMA requires Defendant to provide investment advisory services to the Fund, including: "(a)
supervising and managing the Fund's portfolio of investments; (b) providing advice and
recommendations with respect to the investment of the Fund's assets; (c) placing orders for the
purchase or sale of securities on behalf of the Fund; (d) reporting to the Board; and (e)

overseeing the administration of the Fund's business and affairs." *Id.* ¶ 29.

In exchange for its services, the IMA requires the Fund to pay Defendant an annual fee that is calculated as a percentage of the Fund's assets under management ("AUM"). *Id.* ¶ 37. During the relevant time, Defendant's investment advisory fee rate has been 35 basis points, or 0.35% of the Fund's AUM. *Id.* ¶ 38. During fiscal year 2015, the Fund paid Defendant approximately $140.3 million in investment advisory fees. *Id.* ¶ 39. Pursuant to Section 36(b) of the ICA, "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services . . . ." 15 U.S.C. § 80a-35(b).

Defendant also provides investment advisory services to several other mutual funds that were organized and are sponsored by independent financial institutions (the "Sub-Advised Funds"). *Id.* ¶¶ 40-42. The sponsoring financial institution serves as the primary investment adviser to each Sub-Advised Fund, but subcontracts with Defendant to provide investment advisory services. *Id.* ¶¶ 46-47. The investment management agreement for at least one of the Sub-Advised Funds states that Defendant provides services that include: "(a) managing the investment operations and the composition of the assets of the Sub-Advised Fund; (b) determining what investment and securities will be purchased, retained, or sold by the Sub-Advised Fund; (c) placing orders for the purchase and sale of securities on behalf of the Sub-Advised Fund; and (d) rendering to the board of directors such periodic and special reports as the board may request." *Id.* ¶ 51.

Plaintiff alleges that Defendant has breached its fiduciary duty to the Fund in violation of Section 36(b) because it receives investment advisory fees that are "so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arms-length bargaining." *Id.* ¶ 4. Defendant filed a motion to dismiss the claim on December 12, 2015, and after extensive briefing the Court denied Defendant's motion on June 16, 2016.[1] *See* Civil Minutes June 16, 2016, Docket No. 58. Defendant later filed a motion for summary judgment on a Phase I issue, arguing that the services Defendant provides to the Fund in exchange for the advisory fee are not substantially

---

[1] In denying the motion, this Court primarily held that: "whether or not the services provided by [Defendant] to the Fund and the Sub-Advised Funds are substantially the same, and whether or not a comparison to other mutual fees' advisory fees is more appropriate, are both fact-intensive inquiries that cannot be resolved at this stage in the litigation." *See* Docket No. 58 at 4.

similar to the services provided to the Sub-Advised Funds in exchange for the subadvisory fee. *See generally* Motion for Summary Judgment ("MSJ I"), Docket No. 112. The Court ultimately denied the MSJ I. *See* MSJ Rulings, Docket Nos. 134, 155, 159.

## B. Procedural History

Defendant has recently filed two motions in limine, now pending before the Court. The first is to partially exclude the expert report of Plaintiffs' expert Professor Ian Ayres ("Ayres"). *See* Defendant's Notice of Motion and Motion *In Limine* to Partially Exclude Expert Report and Testimony of Ian Ayres ("Ayres MIL"), Docket No. 256. The second motion in limine is to exclude the expert report and testimony of Professor William A. Birdthistle ("Birdthistle"). *See* Defendant's Notice of Motion and Motion *In Limine* to Exclude Expert Report and Testimony of William A. Birdthistle ("Birdthistle MIL" and collectively with the Ayres MIL, "Expert MILs"), Docket No. 257. Plaintiff opposed both the Expert MILs in a single brief. *See* [Unredacted] Plaintiff's Opposition to Defendant's Motions *In Limine* ("Expert MILs Opp'n"), Docket No. 287. Plaintiff then submitted separate oppositions to each of the Expert MILs. *See* [Unredacted] Plaintiff's Opposition to Defendant's Motion *In Limine* to Exclude Expert Report and Testimony of William A. Birdthistle, Docket No. 293-1 ("Birdthistle MIL Opp'n"); [Unredacted] Plaintiff's Opposition to Defendant's Motion *In Limine* to Partially Exclude Expert Report and Testimony of Ian Ayres ("Ayres MIL Opp'n"), Docket No. 293-2. Defendant filed replies in support of the Expert MILs. *See* [Unredacted] Defendant's Reply in Support of Motion *In Limine* to Partially Exclude Expert Report and Testimony of Ian Ayres ("Ayres MIL Reply"), Docket No. 312-1; *see also* [Unredacted] Defendant's Reply in Support of Motion *In Limine* to Exclude Expert Report and Testimony of William A. Birdthistle ("Birdthistle MIL Reply"), Docket No. 312-2.

Also pending before the Court is Defendant's second motion summary judgment. *See* [Unredacted] Defendant's Notice of Motion and Phase II Motion for Summary Judgment ("MSJ II"), Docket No. 259-2. Plaintiff filed an opposition. *See* [Unredacted] Plaintiff's Opposition to Defendant's Phase II Motion for Summary Judgment ("MSJ II Opp'n"), Docket No. 296. Defendant filed a reply. *See* [Unredacted] Defendant Metropolitan West Asset Management's Reply Memorandum in Support of Phase II Motion for Summary Judgment ("MSJ II Reply"), Docket No. 298-2. Each party has submitted "uncontroverted" facts they believe to be undisputed, with the other party providing responses when applicable. *See generally* [Unredacted] Defendant's Response to Plaintiff's Statement of Genuine Disputes and Plaintiff's

Statement of Additional Facts, Docket No. 308-1.[2]

## II. Expert MILs

Defendant moves to exclude Section V of the Ayres Report, including testimony regarding topics discussed therein. *See* Ayres MIL at 1; [Unredacted] Declaration of Robert A. Skinner Ex. 2 ("Ayres Report"), Docket No. 259-20. Separately, Defendant moves to exclude the Birdthistle Report and testimony related to the topics discussed therein. *See generally* Birdthistle MIL; [Unredacted] Skinner Decl. Ex. 1 ("Birdthistle Report"), Docket No. 259-19. In response to the Expert MILs, Plaintiff argues that the Court need not exclude the opinions on the basis of *Daubert* at this juncture because in this case there will be a bench trial, rather than a jury trial. *See* Ayres MIL Opp'n at 3-4; Birdthistle MIL Opp'n at 3-4.

Federal Rule of Evidence 702 controls the Court's determination on whether to exclude the parties' proposed expert witnesses:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 583 (1993).

"*Daubert*'s general holding – setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This "gatekeeping obligation" requires "that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). Expert testimony must be relevant and reliable, and it must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective

---

[2] The Court will refer to the uncontroverted facts that Defendant proffers as "DUF," with those facts located at Docket No. 308-1 from CM/ECF pages 3 to 161. The Court will refer to the uncontroverted facts that Plaintiff proffers as "PUF," with those facts located at the same docket but from CM/ECF pages 162 to 267.

beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). "The test for reliability, however, is not the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

That being said, "far from requiring trial judges to mechanically apply the *Daubert* factors − or something like them − to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Exclusion of expert testimony is proper only when such testimony is irrelevant or unreliable because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

The Ninth Circuit has clarified a district court's gatekeeper function in the context of bench trials, holding that "*Daubert* is meant to protect *juries* from being swayed by dubious scientific testimony." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (internal quotation marks and citation omitted). Indeed, "[w]hen the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *See id.*; *see also FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial."). Because the gatekeeper and factfinder are the same entity in a bench trial, courts do "not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *See Flores*, 901 F.3d at 1165. Taking heed of Ninth Circuit precedent, because this case will proceed with a *bench* trial, the Court would admit the challenged expert testimony subject to the ability *later* to exclude it or disregard it if it turns out Ayres or Birtdthistle opine beyond their qualifications or in an unreliable fashion.[3] *Chill v. Calamos Advisors LLC*, No. 15 CIV. 1014 (ER), 2018 WL 4778912, at *7 (S.D.N.Y. Oct. 3, 2018) (denying motions to exclude expert testimony in a similar Section

---

[3] The Court notes that in reaching the below denial of the MSJ II it did not have to rely on Section V of the Ayres Report or any opinion in the Birdthistle Report. Though the Court does rely on other parts of the Ayres Report below (*i.e.* on economies of scale and Section IV which opines that MetWest charges advisory fees to the Fund greater than subadvisory fees charged to the Sub-Advised Funds), Section V is not relied on in any of the Court's analysis.

36(b) case prior to deciding motion for summary judgment, holding that "[i]f, after live testimony, the Court concludes that any of the experts lack the proper qualifications or offer unreliable opinions, the Court will give those opinions little or no weight in its decision."). As such, the Court would deny the Expert MILs.

## III. MSJ II

### A. Legal Standard

Summary judgment is proper when the pleadings, the discovery and disclosed materials on file, including any affidavits/declarations, show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). To satisfy its burden at summary judgment, a moving party *with* the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); O'Connell & Stevenson, Cal. Prac. Guide Fed. Civ. Proc. Before Trial (The Rutter Group 2017) § 14:126 at 14-46. By contrast, a moving party *without* the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, *specific facts* showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted, emphasis in original) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (to survive summary judgment, the non-movant party "ordinarily must furnish affidavits containing admissible evidence tending to show the existence

of a genuine dispute of material fact"). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage, and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

### B. Relevant Undisputed Facts[4]

MetWest serves as the investment adviser to the Fund, pursuant to an IMA, which Independent Trustees of the Fund's Board approve annually.[5] *See* DUF ¶ 1; Declaration of Laird Landmann ("Landmann Decl.") Ex. 1 (copy of IMA), Docket No. 255-3.

#### 1. The Fund's Fees

The Fund pays MetWest an annual contractual investment advisory fee of 0.35% (35 basis points) of the Fund's assets under management ("AUM") in exchange for services performed pursuant to the IMA. *See* DUF ¶ 2. The Fund has four share classes that have different minimum investment requirements. *See id.* ¶ 7. Each share class is apportioned the same 35 basis point advisory fees.[6] *See id.* ¶ 8. In 2014, the Fund paid approximately _____ in advisory fees to MetWest, increasing each year to an eventual _____ in 2018. *See* PUF ¶ 92. MetWest and the Fund entered into a Supplemental Administration Agreement on July 29, 2015, entitling MetWest to receive up to $650,000 per year to perform certain administrative services for all nine MetWest Funds, including the Fund. *See id.* ¶¶ 158-60; Landmann Decl. Ex. 16 (Supplemental Administration Agreement), Docket No. 255-18. In

---

[4] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiff or Defendant. The Court has reviewed such disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence. To the extent that the cited underlying "undisputed" facts have been disputed, the Court finds that the stated disputes: (1) fail to controvert the proffered "undisputed" facts, (2) dispute the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this tentative ruling were found to be: (1) improper opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof.

[5] The Court uses the abbreviations that were delineated in Section I.A of this tentative ruling.

[6] The sum of all charges allocated to a given share class, consisting of the advisory fee plus other applicable charges, is known as the total expense ratio. *See* DUF ¶ 8.

addition, the Fund pays for other operational expenses, including commitment fees, insurance expenses, trustee fees and expenses, registration and filing fees, reports to shareholders, and professional, legal, and accounting fees. *See* PUF ¶ 155. Those operating expenses varied between        and       in 2014 to 2018, exclusive of the advisory fees. *See id.* ¶ 156. The Fund pays separate administration fees, transfer agency fees, custody fees, and Rule 12b-1 fees to service providers other than MetWest. *See id.* ¶¶ 132-56.

Third-party consultant Broadridge Financial Solutions, Inc. ("Broadridge"), formerly known as Lipper, Inc., evaluates fees paid by mutual funds. *See* DUF ¶¶ 11-17. For peer groups of "core bonds" or "core plus bonds" consisting of bond funds that use a certain investment strategy, the Fund's fees have generally been below or at the median as to advisory fees and total expense ratios. *See id.* ¶¶ 14, 18-19. At least one exception is that with respect to one share class, the advisory fee was above the median by .003%, which is three tenths of one basis point. *See id.* ¶ 23.

### 2. The Fund's Performance

Based on the Broadridge data that the Board receives, between 2014 and 2017 for certain share classes the Fund generally performed in the top quintile or decile of its peer group in terms of long-term "net-of-fee" returns." *See* DUF ¶¶ 29-32. Defendant's expert Professor John Coates ("Coates") confirmed similar results. *See id.* ¶ 33. In addition, Professor Coates stated that using "Sharpe ratios," a metric measuring risk-adjusted performance, the Fund's three, five, and ten year performance has fared in the top quintile of core bonds fund since February 2010. *See id.* ¶ 34. Professor Coates also stated that the Fund's ten-year Sharpe ratios have generally been the highest of any core bond funds since June 2012. *See id.*

### 3. The Board's Review

Pursuant to the ICA, each year the Board decides whether to approve for an additional year the IMA and the fees charged under it. This process, known as the "15(c) process," culminates with an in-person meeting. *See* DUF ¶ 36. As part of the 15(c) process, the Board sends a questionnaire to MetWest through the Board's independent counsel Dechert LLP, seeking information prior to the annual renewal meeting. *See id.* ¶ 37. MetWest responds with a memorandum and exhibits. *See id.* ¶ 38. Broadridge provides reports, fee comparisons, and performance comparisons related to the Fund. *See id.* ¶ 11. More than a majority of the Board consists of independent trustees meeting the ICA's definition of "disinterestedness," and the

Board approved the 35 basis point advisory fee challenged in this litigation with a majority vote. *See id.* ¶¶ 46-47. The Board meets quarterly and communicates with MetWest throughout the year, with MetWest sending various materials, providing updates, and answering the Board's questions. *See id.* ¶¶ 44-45. ████████████████████████████████████████
████ (*see* PUF ¶ 215); ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████ (*see id.* ¶ 212); ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████ (*see id.* ¶¶ 218-19); ████████
████████████████████████████████████████████████████████████
████████████████████████████ (*see id.* ¶ 187); ████████████████
████████████████████████████████████ (*see id.* ¶ 217).

### 4. Comparing the Fund and Sub-Advised Funds

Part of this case is the comparison between the advisory fee Defendant charges the Fund and the subadvisory fee it charges for investment advisory services to externally sponsored mutual funds ("Sub-Advised Funds"), for which MetWest is a subadviser. *See* Complaint ¶ 5. MetWest provides services to the Sub-Advised Funds in exchange for a fee negotiated with the sponsoring advisor for each Sub-Advised Fund. *See* PUF ¶¶ 85-90. Each Sub-Advised Fund has its own sponsoring adviser (which is not MetWest) overseeing performance and providing advisory and administrative services in exchange for an advisory fee, and the sponsoring advisor pays a portion to MetWest as a subadvisory fee. *See* DUF ¶ 51. The Fund and the Sub-Advised Funds have similar investment objectives, processes, and strategies, and they have the same portfolio managers. *See* PUF ¶¶ 99-100. MetWest utilizes at least some of the same systems and models in managing the portfolios of the Fund and Sub-Advised Funds, and the personnel providing services to the Fund and Sub-Advised Funds overlap to some degree. *See id.* ¶¶ 101-102. Assuming that Plaintiff's definition of Sub-Advised Funds is correct,[7] the Fund would have paid between ███ basis points and ███ basis points in advisory fees to MetWest if the Fund instead paid the rate that MetWest charged Sub-Advised Funds in subadvisory fees. *See id.* 95. Using those metrics, the Fund would have paid between ████████ and ████████ less in advisory fees between 2014 and 2018. *See* PUF ¶¶ 96-97.

---

[7] The Court notes that Plaintiff's definition and categorization of Sub-Advised Funds is disputed.

**C. Discussion**

    *1. Legal Authority for Section 36(b) Liability*

    Section 36(b) of the ICA "impose[s] upon investment advisers a 'fiduciary duty' with respect to compensation received from a mutual fund, and grant[s] individual investors a private right of action for breach of that duty." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 340, 345-46 (2010) (citing 15 U.S.C. § 80a-35(b)). "[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Turner ex rel. Davis New York Venture Fund v. Davis Selected Advisers, LP*, 626 F.App'x 713, 716 (9th Cir. 2015) (internal quotation marks omitted) (citing *Jones*, 559 U.S. 335, 346 (2010)).

    To determine whether the fee charged is disproportionately large in light of the services rendered, courts consider all relevant factors "including the factual inquiries known as the 'Gartenberg factors.'" *See Kenny v. Pacific Inv. Mgmt. Co., LLC*, No. 14-1987-RSM, 2015 WL 10635505, at *3 (W.D. Wash. August 28, 2015) (citing *Jones*, 599 U.S. at 344; *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)); *see also Turner*, 626 F.App'x at 716. The *Gartenberg* factors are non-exclusive and non-disjunctive, meaning there is no requirement that a Plaintiff present evidence that relates to all six in order to prove a violation, but rather a court must consider "all facts in connection with the determination and receipt of such compensation," including: (1) the nature and quality of services rendered; (2) the profitability of the fund to the investment adviser; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence of the unaffiliated directors and the care and conscientiousness with which they performed their duties. *Kenny*, 2015 WL 10635505, at *3 (citing *Jones*, 599 U.S. at 344 & n.5); *see also In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593 GAF, 2009 WL 5215755, at *44 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom.*, *Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011). Additionally, "Section 36(b) does not require plaintiffs to establish that the fees charged by a defendant [are] excessive in the aggregate . . plaintiffs may challenge a particular fee and may prevail on their Section 36(b) claim if they show that such a fee was disproportionate to the services rendered in exchange for that fee." *Id.*; *see also Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) ("The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other. If the fee for each service viewed separately is not

excessive in relation to the service rendered, then the sum of the two is also permissible.").

       *2. Revisiting MSJ I*

       To some extent Defendant indirectly asks the Court to revisit its MSJ I Ruling,[8] though it claims not to make any such request. *See MSJ II* at 13-15, 18-23. Defendant argues that the services MetWest provides to the Fund and Sub-Advised Funds are not substantially the same, such that a comparison in fees charged is inapt. *See id.* Defendant does not provide any additional material evidence that would ultimately change the Court's prior conclusion in the MSJ I Ruling. *See id.* Instead, it predominantly regurgitates evidence previously presented to the Court and cites to the recent Southern District of Ohio case, *Goodman v. J.P. Morgan Investment Management, Inc.*, 301 F. Supp. 3d 759 (S.D. Ohio 2018), *appeal docketed*, Nos. 18-3238, 18-3239 (6th Cir. Mar. 14, 2018). In *Goodman*, the court granted summary judgment in favor of the defendant, making multiple findings. *See generally id.* The court found that the performance of the funds at issue was within the range of peer funds, that the board's approval process was thorough, and that the services the defendant provided to the funds at issue and the Sub-Advised funds *were not substantially similar* such that comparing fees charged for those services could not create a genuine issue of material fact. *See id.* at 774, 781-82.

       Nonetheless, the Court would agree with Plaintiff that the *Goodman* court may have overstepped its role in summary judgment and weighed evidence as if at trial. What the Court knows for certain is that in the case at bar, the Court does not find that Defendant presented evidence that would change the ruling in the MSJ I. Thus, the Court would reincorporate and adopt that reasoning herein, and again hold that:

> Ultimately, the Court agrees with Plaintiff that factual disputes remain as to the nature of the services provided to the Fund in exchange for the Advisory Fee enshrined in the IMA. The Court also remains unconvinced that the differences presented necessarily render the comparison wholly inapt . . . . In other words, when viewed in the light most favorable to Plaintiff, the evidence could support a finding that the services Defendant provides to the Fund in exchange for the Advisory Fee, are similar enough to the portfolio management services that Defendant concedes it provides to the Sub-Advised Funds that the comparison would have some probative value.

*See* MSJ Ruling at 15-16. The Court extends its prior MSJ I Ruling to the extent that the

---

[8] *See* Sep. 11, 2017 Civil Minutes ("MSJ Ruling"), Docket No. 155. The Court will refer to the September 11, 2017 tentative ruling as the "MSJ Ruling" because it contains the most detailed musings of the Court on the MSJ I and was made final vis-à-vis Docket No. 159.

advisory and subadvisory fee comparison is not just probative, but could also be sufficiently persuasive to indicate excessiveness depending on the evidence presented at trial.[9]  At the very least, the evidence proffered and discussed more thoroughly in the MSJ I Ruling creates a triable issue of fact on this front.  *See* MSJ I Ruling at 9-16.  Even without the additional testimony of Section V of the Ayres Report, which Defendant asserts is unreliable ███████████████

████████████████████████████████████████████████████████

████████████████████████████  the evidence addressed in the MSJ I Ruling is sufficient to proceed with this comparison.  *See* MSJ II Opp'n at 21-22.  In addition, the different risks that Defendant argues it takes on with regard to servicing the Fund is not enough to warrant summary judgment.[10]

### 3. The Board's Approval Process

Defendant asserts that the Board unanimously voted on the challenged fees each year, pursuant to the ICA.  *See* MSJ II at 17-18.  At all times, according to Defendant, the Board consisted of a majority disinterested Board, with the Board requesting and receiving extensive information regarding MetWest's fees and services in relation to the Fund.  *See id.*  Defendant asserts that the annual 15(c) process was informed, thorough, and robust, and that Plaintiff quibbles in hindsight about what *should have* been done.  *See id.* at 27-29; *see also* MSJ II Reply at 7.

In response, Plaintiff argues that the Court should not capitulate to the Board's decision

---

[9] Though the Court indicated to Defendant that it could move for summary judgment following the close of discovery and "include arguments as to the level of probative value of the fee comparison contentions made by Plaintiff at that point as part of its analysis," Defendant's arguments as to the degree of probative value are predominantly extensions of its MSJ I argument that the fee comparison had no probative value.  *See* Sep. 22, 2017 Civil Minutes at 2, Docket No. 159.  The Court did not find those arguments persuasive then and it does not find them persuasive now.

[10] The *Jones* holding contemplates fee comparisons between captive, and non-captive funds.  *See Jones*, 559 U.S. at 336 ("[C]ourts must give comparisons between the fees an investment adviser charges a captive mutual fund and the fees it charges its independent clients the weight they merit in light of the similarities and differences between the services the clients in question require.").  Presumably the Supreme Court did so with an awareness that legal and business risks may differ between a captive fund and independent fund.  As a result, the fact *Jones* permits fee comparisons despite these inherent and obvious differences suggests Defendant's discussion of the risks of Fund management is of little relevance.  *See BlackRock*, 2018 WL 3075916, at *26 (stating the same principle and noting that "the services rendered to different clients need not be identical to form an apt fee comparison.").  Regardless of the relevance of these risks, the Court would agree with Plaintiff that sifting out such risks is not appropriate at this stage.  *See id.* at *26 (holding that "Defendants' argument that BRA's services and BRIM's subadvisory services are not comparable, because of the different entrepreneurial, reputational, legal, and regulatory risks assumed by BRA, is too fact intensive to be decided on summary judgment.").

because the deference afforded to such decisions varies by context as per *Jones*. *See* MSJ II Opp'n at 25. Plaintiff asserts that MetWest did not provide important information to the Board, and that  *See id.* at 26 (citing PUF ¶¶ 172-75). Plaintiff also argues that

*See* MSJ II Opp'n at 27-28 (citing PUF ¶¶ 187, 211-219). Additionally, Plaintiff takes issue with the Board "almost entirely" relying on fee expense comparisons to *captive* mutual funds. *See id.* at 28 (citing DUF ¶¶ 10-27).

At the outset, the Court must "calibrat[e] the degree of deference" it should lend to the Board's decision to approve MetWest's advisory fee. *Jones*, 559 U.S. at 351-52; *see Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1178 (8th Cir. 2012) ("Although § 36(b) is 'sharply focused' on whether the fees are excessive, we evaluate the fee-negotiation process to determine the degree of deference that is due a board's decision to approve the adviser's fees."). The Board's decision to approve MetWest's advisory fee is entitled to considerable weight, "[u]nless the Board's approval process was deficient or [MetWest] withheld material information from the Board." *BlackRock*, 2018 WL 3075916, at \*14 (citing *Jones*, 559 U.S. at 351).

It is undisputed that pursuant to the ICA, each year the Board decides whether to approve for an additional year the IMA and the fees charged under it. This process, known as the "15(c) process," culminates with an in-person meeting each year. *See* DUF ¶ 36. As part of the 15(c) process, the Board sends a questionnaire to MetWest through the Board's independent counsel Dechert LLP, seeking information prior to the annual renewal meeting. *See id.* ¶ 37. MetWest responds with a memorandum and exhibits. *See id.* ¶ 38. Broadridge provides reports, fee comparisons, and performance comparisons related to the Fund as part of this process. *See id.* ¶ 11. More than a majority of the Board consists of independent trustees meeting the ICA's definition of "disinterestedness," and the Board has approved the 35 basis point advisory fee challenged in this litigation each year at issue. *See id.* ¶¶ 46-47. Separately from this annual meeting, the Board meets quarterly and communicates with MetWest throughout the year, with

13

MetWest sending various materials to the Board, providing updates, and answering the Board's questions. *See id.* ¶¶ 44-45. Also, the Board minutes from at least 2014 and 2015 indicate discussion of the *Gartenberg* factors. *See generally* Landmann Decl. Exs. 11-12 (copies of 2014 and 2015 Board minutes), Docket Nos. 255-13, 255-14.

Though the Court considers the Board's aforementioned process fairly robust in some respects, it must also decide whether MetWest withheld material information or if the process bore other deficiencies, weakening the Board's status as an independent check. *See Jones*, 559 U.S. at 351-52 ("where the board's process was deficient *or the adviser withheld important information*, the court must take a more rigorous look at the outcome) (emphasis added). The Court would find unpersuasive Plaintiff's argument that MetWest misled the Board in asserting, in the context of non-advisory fees, that it ███████████████████████████████████████
████████████████████████████████████████████████████████ *See* MSJ II
Opp'n at 26-27 (citing PUF ¶¶ 172-75). It is the advisory fee that is the subject of this litigation. As to the other deficiencies in the 15(c) process that Plaintiff proffers, ███████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ *See generally* Landmann Decl. Exs. 11-12 (copies of certain 2014 and 2015 Board minutes), Docket Nos. 255-13, 255-14. Nonetheless, there exists a triable issue of fact as to the approval process because the Board did not receive and/or consider various materials. It is undisputed ████████████████████████████████████████████████████████████████
(*see* PUF ¶ 215); ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████ (*see* PUF ¶ 212); ██████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████ (*see* PUF ¶¶ 218-19); ██████████████████████
████████████████████████████████████████████████████████████████
████████████████████ (*see* PUF ¶ 187); and (though somewhat unrelated) ████████████████████████████████████████████████ (*see*
PUF ¶ 217).[11]   At this stage, the Court would conclude that deference to the Board's decision is

---

[11] There is also a question of whether the Board may have overly relied on the Broadridge data without taking other comparisons or information into account. *See* DUF ¶¶ 10-27.

unwarranted based on the evidence presented. *See Chill*, 2018 WL 4778912, at *9 (S.D.N.Y. Oct. 3, 2018) (holding that "[a]fter reviewing the procedure and substance of the Independent Trustees' 15(c) Process, and in light of the *Gartenberg* factors, the Court concludes that deficiencies surrounding the Trustees' evaluation of the Advisory Fees preclude the Court from affording the Trustees' judgment substantial deference as a matter of law − at least at this stage of the litigation.").

### 4. The Fund's Performance and At or Below Median Fee

Defendant asserts it is undisputed that the Fund performed excellently and that the Fund's advisory fees compare favorably to the rates of similar mutual funds. *See* MSJ II at 16-17. To support this argument, Defendant relies on Broadridge materials as an objective data source, asserting that courts commonly rely on such data. *See id.* at 17. Plaintiff argues that the Fund and Sub-Advised Funds performed virtually the same yet the Sub-Advised Funds paid lower fees, and that the Fund's positive performance therefore cannot form the basis as a justification for the advisory fee. *See* MSJ II Opp'n at 16. Plaintiff argues that the positive returns of the Fund does not automatically preclude a finding that fees are excessive. *See id.* at 16. In addition, Plaintiff takes issue with Defendant's reliance on Broadridge reports because the comparisons used in the Broadridge reports involve *captive* mutual funds, and because Broadridge reports do not include evidence of the services provided by the "comparable" funds, whether services provided to those funds are substantially similar to that provided by MetWest to the Fund, and whether the fees charged by the comparable funds are not excessive themselves. *See id.* at 23-24.

While it appears undisputed that the Fund performed well (though to what degree might be in question), it is inappropriate for the Court to determine at summary judgment whether the Broadridge data or the subadvisory fees Defendant charged to Sub-Advised Funds is a more apt indicator of the advisory fee's excessiveness. Other courts have held the same. *See, e.g.*, *BlackRock*, 2018 WL 3075916, at *27 (holding that "[w]hile [Broadridge] provides a competing set of data [to the subadvisory fee received] regarding the appropriate bargaining range, the Court cannot weigh those two comparisons at the summary judgment stage."). In light of the Court's MSJ I Ruling and its confirmation of that ruling above, the Court would conclude that Defendant's reliance on the Broadridge data is not enough to warrant summary judgment because the comparison of the advisory fees and subadvisory fees offers a probative alternative

fee comparison that could win the day.[12]  Assuming that Plaintiff's definition of Sub-Advised
Funds is correct,[13] the Fund would have paid between ▮ basis points and ▮ basis points in
advisory fees to MetWest if the Fund instead paid the rate that MetWest charged Sub-Advised
Funds in subadvisory fees.  *See id.* 95.  Using those metrics, the Fund would have paid between
▮▮▮ and ▮▮▮▮ less in advisory fees between 2014 and 2018.  *See* PUF ¶¶ 96-
97.

Both parties ask that the Court broadly reject the other's data, but the Court would refrain
from doing so at summary judgment.  Even so, the Court would echo the warning in *BlackRock*,
and caution Plaintiff that its battle at trial would be arduous:

> [A]lthough I have found that a factual dispute exists regarding the comparability
> of the services that BRA renders to the Funds and BRIM renders to the
> Subadvised Funds, I note that, following *Jones*, those courts that have rendered a
> comparison of advisory services to subadvisory services beyond the pleadings
> stage have rejected the notion that these services are comparable.  *See, e.g.,*
> *Kasilag*, 2017 WL 773880 at *7, 22 n. 40 (observing the different entrepreneurial,
> reputational, legal, and regulatory risks borne by advisers); *Sivolella*, 2016 WL
> 4487857 at *46 (finding that the duties of an investment adviser were "far more
> extensive" than those delegated to subadvisors); *Goodman*, 301 F.Supp.3d at 770-
> 74 (finding a comparison of advisory fees and subadvisory fees was inapt, based
> on the different responsibilities, risks, and scale and scope of services involved
> between advisory and subadvisory services); *see also Hoffman v. UBS–AG*, 591
> F.Supp.2d 522, 540 (S.D.N.Y. 2008) ("[I]investment advisers and sub-advisers
> perform distinct services.").  While I agree with Plaintiffs that the scope and extent
> of the services rendered by BRA and BRIM is a fact-specific inquiry, and
> Plaintiffs will have the opportunity to show that BRA's advisory services and
> BRIM's subadvisory services are comparable in this case, the legal authority
> discussed above indicates that Plaintiffs may face an uphill battle in doing so.

*See BlackRock*, 2018 WL 3075916, at *26.  In addition, the Court also reiterates, as the court did
in *BlackRock*, that at trial it would not ignore the Broadridge data on which the Board relied,
which may very well outweigh the subadvisory fee comparison at trial.

### 5. Profitability

Defendant argues that Plaintiff's reliance on hypothetical alternative profitability

---

[12] The Court recognizes, however, that this conclusion alone would not "doom" the parties to trial.  *Jones*, 559 U.S.
at 350 n.8 (noting that "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the
different services in addition to other evidence that the fee is outside the arm's-length range will trial be
appropriate.").  Thus, the Court analyzes the other relevant *Gartenberg* factors in this tentative ruling.

[13] The Court notes that Plaintiff's definition and categorization of Sub-Advised Funds is disputed.

calculations does not establish that the Fund's advisory fee was beyond arm's-length range. *See* MSJ II at 23-25.   More specifically, Defendant argues that whether the Fund would have theoretically remained profitable if MetWest charged lower fees is "utterly beside the point," and Defendant is not entitled to some finite amount of profit above its costs. *See id.* at 24.   Plaintiff rebuts, arguing that it does not proffer that Defendant receives no profits, that it operate on a "cost-plus" basis, or that Defendant must charge the lowest fee. *See* MSJ II Opp'n at 17-18. Instead, Plaintiff argues that MetWest's profits increased from ███████ to ███████ in 2016 and that questions of fact remain as to profitability, which relate to Section 36(b) claims. *See id.* at 18-19.

The Court recognizes that "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50; *Gartenberg*, 573 F. Supp. at 1316 ("[The adviser] and its affiliates are entitled to recoup their costs and to make a fair profit without having to fear that they have violated Section 36(b)."). "Nevertheless, a fund's profitability to its adviser is at least *one* measure to take into account when evaluating the excessiveness of the Fund's Advisory Fee." *See Chill v. Calamos Advisors LLC*, No. 15 CIV. 1014 (ER), 2018 WL 4778912, at *21 (S.D.N.Y. Oct. 3, 2018).   ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ *See* Ayres Report ¶¶ 74-90. ██████████████████████

█████████████████████████████████████████ *See id.* ¶ 194.   The Court would conclude that there are indeed questions of fact remaining as to profitability, including as to the weight afforded to Ayres' opinion on this area, and the parties may present such evidence at trial. *See Cahill*, 2018 WL 4778912, at *21 (holding that "Plaintiffs will have their day in court to submit evidence on the 'fact-intensive nature of the profitability inquiry.'").

### 6. Economies of Scale

Defendant argues that Plaintiff merely provides bald assertions that the Fund became less expensive to manage as its AUM increased. *See* MSJ II at 25-26.   Defendant asserts that without *quantifying* MetWest's relevant costs and proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased, Plaintiff cannot demonstrate that economies of scale moved the challenged fee outside of the fair bargaining range. *See id.*   Even if Plaintiff could prove that the Fund has experienced economies of scale, Defendant argues that

it shared those benefits with shareholders by competitively pricing the Fund and by incorporating additional investments into its operations and infrastructure to benefit the Fund. *See id.* Defendant does not consider a reduction in the advisory fee as the only avenue to sharing the benefits of economies of scales. *See id.*

In response, Plaintiff asserts that the Fund's AUM has jumped approximately ▮▮▮ from 2011 to 2016, growing from ▮▮▮▮ to ▮▮▮▮. *See* MSJ II Opp'n at 19-20. Plaintiff points out that the advisory fee has not decreased, despite this change. *See id.* According to Plaintiff,



▮▮▮▮▮▮▮ *See id.* (citing Ayres Report ¶¶ 99-103).

Courts define economies of scale as "decline[s] in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes." *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (internal citation and quotation marks omitted); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. CV 11-1083 RMB-(KMWx), 2016 WL 1394347, at \*18 n.8 (D.N.J. Apr. 7, 2016), *aff'd*, No. 17-1653, 2018 WL 3913102 (3d Cir. Aug. 15, 2018). In the framework of Section 36(b), "[t]he concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally. If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness of the adviser-manager's fees." *Kalish v. Franklin Advisers, Inc.*, 742 F.Supp. 1222, 1237 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991). The plaintiff bears a two-pronged burden in Section 36(b) cases to demonstrate economies of scale. First, the plaintiff must establish that economies of scale were realized. *Id.* at 1238. Second, if the plaintiff satisfies the aforementioned inquiry, he or she must demonstrate that "the savings realized from economies of scale were not sufficiently shared with the Fund and its shareholders." *Pirundini v. J.P. Morgan Inv. Mgmt. Inc.*, 309 F. Supp. 3d 156, 166 (S.D.N.Y. 2018) (appeal docketed).

The Court would conclude that there exists a triable issue of fact with respect to economies of scale. *BlackRock*, 2018 WL 3075916, at \*34-\*35 (denying summary judgment as to the economies of scale factor, holding that "[w]hile Plaintiffs' arguments may not ultimately

be enough to carry their burden at trial, the foregoing factual disputes are sufficient to withstand summary judgment."); *Kasilag*, 2016 WL 1394347, at *18 (concluding that as to the economies of scale factor, the court could not "ignore expert testimony highlighting a large factual dispute concerning the economies of scale that were passed on to the Funds.").



*See* Ayres Report ¶¶ 99-103. Though not dispositive, ████████████████████ *See id.* ¶¶ 100-103. The Court does not ignore Defendant's concerns with ████████████

*See* MSJ II Reply at 14-15. Instead, the Court finds such arguments more suitable to weigh and consider at trial.

### 7. Nature and Quality of Services; Fall-Out Benefits

Pursuant to the *Gartenberg* factors, courts also consider fall-out benefits[15] and the nature and quality of services provided. *Kenny*, 2015 WL 10635505, at *3 (citing *Jones*, 599 U.S. at 344 & n.5). It appears from briefing that Plaintiff does not meaningfully argue that these factors lean in his favor, despite the fact Defendant explicitly moves for summary judgment as to each of them. *See* MSJ II at 29-30; *see generally* MSJ II Opp'n. The Court would therefore grant summary judgment as to these two factors in Defendant's favor.

### C. Conclusion

In weighing the *Gartenberg* factors and other evidence presented, the Court would find that for the foregoing reasons it would deny summary judgment except for as to the aforementioned two factors. Precluding summary judgment, the Court would find triable issues of fact as to comparative fees, the deference afforded to the Board's 15(c) decision, economies of

---

[14] "Breakpoints are staggered reductions in marginal fee rates that accompany marginal increases in assets under management . . . used to reflect the reduced marginal cost of providing investment advisory services to a growing pool of assets, allowing shareholders to reap some economy-of-scale benefits via reduced fees." *Chill*, 2018 WL 4778912, at *4 (internal quotation marks omitted).

[15] Fall-out benefits "are those which accrue to the mutual funds adviser as a result of its work on behalf of the mutual fund." *See Kasilag*, 2017 WL 773880, at *23 (citation omitted).

scale, and profitability.

### D. Plaintiff's Request for Evidentiary Ruling on Specified Objections[16]

    1. Overruled;

    2. Overruled;

    3. Sustained;

    4. Overruled;

    5. Overruled;

    6. Moot in light of Defendant providing the earlier report of expert Coates (*see* Roy Rebuttal Decl. Ex. 4, Docket No. 308-4);

    7. Overruled;

    8. Overruled;

    9. Overruled;

    10. Overruled; and

    11. Overruled.

### E. Defendant's Request for Evidentiary Ruling on Specific Objections[17]

    1. The Court did not rely on this expert testimony in ruling on the MSJ II;

    2. The Court did not rely on this expert testimony in ruling on the MSJ II;

    3. The Court did not rely on this expert testimony in ruling on the MSJ II;

    4. The Court did not rely on this expert testimony in ruling on the MSJ II;

    5. Overruled;

    6. Overruled;

    7. Overruled;

    8. Sustained; and

    9. Sustained.

## IV. Conclusion

For the foregoing reasons, the Court would **DENY** the Expert MILs and **DENY IN PART** the MSJ II. The Court would deny the MSJ II, except as to the aforementioned two *Gartenberg* factors: fall-out benefits and the nature and quality of services provided. If the parties would like this tentative ruling redacted in any manner prior to its appearance on the public docket, the parties should make such a request at the October 25, 2018 hearing and the parties should jointly submit to the Court a suitable redacted version.[18]

---

[16] *See* Plaintiff's Request for Evidentiary Ruling on Specified Objections, Docket No. 269. Defendant filed a response to these objections. *See* Defendant's Response to Request for Evidentiary Ruling on Specified Objections, Docket No. 300.

[17] *See* [Unredacted] Defendant's Request for Evidentiary Ruling on Specified Objections (Phase II), Docket No. 298-4. Plaintiff filed a response to these objections. *See* Plaintiff's Response to Defendant's Request for Evidentiary Ruling on Specified Objections, Docket No. 319.

[18] As mentioned in the Court's recent minute order, Docket No. 316, the parties should discuss the continuance of relevant dates at the October 25, 2018 hearing.